## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                  Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                             Chapter 11

     Debtor.

_____

Michael Goldberg, Chapter 11 Trustee                    Adversary Pro. No. _____

     Plaintiff,

v.

AMERICAN MOMENTUM BANK,

     Defendant.

_____/

## **COMPLAINT**

Plaintiff, Michael Goldberg, in his capacity as Chapter 11 Trustee ("**Trustee**") of the

bankruptcy estate of The Center for Special Needs Trust Administration, Inc., brings Complaint

against Defendant, American Momentum Bank (the "**Bank**") as set forth below.

## **INTRODUCTION**

1.      Thousands of vulnerable community members—including permanently disabled

children, victims of catastrophic injuries and medical malpractice, and people suffering from

severe mental illnesses—entrusted their life-sustaining special needs trust funds ("**SNT**") to The

Center for Special Needs Trust Administration, Inc. (the "**Center**" or "**Debtor**"). The Center

deposited the funds at the Bank for safekeeping.

2.      The Bank was fully aware of the Center's business, the purposes of its accounts,

and that the Center was holding thousands of beneficiaries' (the "**Beneficiaries**") SNT accounts. Instead of exercising even the most minimal of efforts to ensure these essential SNT funds were not pilfered, the Bank aided Leo Govoni ("**Govoni**"), former director of the Center, and his related entities and various Govoni directees in depleting the SNTs' funds of more than $100,000,000. Govoni used these funds to reinvest in his personal, far-fetched business ventures and purchase luxury goods. Nearly every Govoni-related entity into which SNTs' funds flowed, and then subsequently were used to pay expenses or buy assets for those other entities, utilized the Bank as its primary depository.

3.      None of these actions benefited the Center.  The Bank never notified the Center that its funds were being pilfered for Govoni's personal endeavors, yet the Bank frequently provided assistance to Govoni and his non-Center entities in taking funds from these accounts.  Among the more meaningful assistance, the Bank would vouch for specific SNT funds allocated to particular Beneficiaries when such funds were not actually present, and the Bank allowed the Center to disseminate false account statements containing the Bank's logo and similarly represented the presence of non-existent assets as within the particular Beneficiaries' portion of the SNT pooled funds.

4.      The Bank also relaxed its banking regulations to accommodate the pilfering of accounts, it modified its policies to allow wires to be initiated out of Center accounts by individuals who lacked authority to move Center funds, and it charged the Center thousands of dollars of administrative fees incurred by Govoni's non-Debtor business accounts.

5.      Beyond not helping the Center, these actions directly harmed the Center and its mission.  The scheme left many SNT accounts partially or fully compromised, which in turn left Center employees scrambling to find liquidity to cover the legitimate costs of Beneficiaries'

housing and medical care.  The Bank would then, in turn, allow transfers by and between various entities to "cover" the shortfalls. Without the Bank's substantial assistance in aiding the misconduct and helping disguise the illegitimate investments of funds that were taken under the cover of an ever-growing loan to Govoni's other company, Boston Financial Group, LLC (discussed below), the misuse of SNT funds could have, and would have been, discovered long ago.

6.     Instead of protecting Beneficiary and Center assets, the Bank catered to the individual who controlled one of its largest related group of customers and assisted Govoni with continuing the scheme to invest SNT funds in his personally-owned companies and luxury items, such as a private plane and extensive luxury real estate.

7.     Govoni's extensive use of the Bank followed shortly after the Bank's creation. Soon thereafter, the Bank's highest personnel, its President/COO and Chairman, was offering to provide services far beyond simple commercial banking to the Center and Govoni, including setting up corporate structures, holding trust funds, and providing specialized services. Quickly and collectively, the Bank accounts related to Govoni represented at peak, on information and belief, of about 8% of the Bank's total assets under management, leaving the Bank eager to cater to its lucrative relationship with Govoni. By taking affirmative steps to facilitate the shuffling of funds through an intricate web of illegitimate transactions, the Bank assisted Govoni's scheme and facilitated his breach of the fiduciary duties he owed to the Center, and it breached its own fiduciary duties owed to the Center.

8.     Once the loss of over $100 million of SNT funds was discovered, and after certain management changes, the Center spiraled into bankruptcy and the Trustee was appointed.

9.     Due to the actions of Govoni and his related entities, along with the Bank's knowing

actions in support and turning a blind eye at Govoni's known misdeeds, the Center was deprived of the loaned funds subsequently owed to the various SNTs, as well as the derivative or residual SNT funds remaining upon a Beneficiary's death. Govoni utilized these funds for his personal benefit instead. The damages to the Center are a combination of the greater of the value of the unpaid balance of the loan from the Center to BFG or the outstanding shortfall to the SNTs, plus the value of the loss of the derivative interests in the SNT funds that the Center lost.

10.     Unlike stand-alone trust arrangements, neither Beneficiaries of the pooled SNTs nor their heirs maintain an ownership interest in SNT funds upon death. Rather, to the extent funds remain in a Beneficiary's account upon the passing of an SNT Beneficiary, the pooled trust funds become assets of the Center, which holds a derivative interest in remaining SNT funds. Those remaining funds should have been utilized by the Center to further its mission of providing support to individuals with special needs and administering assets for their benefit.

11.     The Trustee brings this action on behalf of the bankruptcy estate to recover the more than $150,000,000 million in financial losses suffered as a result of the Bank's knowing efforts and substantial assistance to Govoni's and other individuals' breaches of fiduciary duties owed to the Center. The Center, defunct and unable to collect funds from operations in the future, owes its own Beneficiaries the sums that are due under the Loan, which has not been paid back.

## PARTIES AND RELEVANT NON-PARTIES

### The Parties

1.     The Plaintiff Michael Goldberg is a natural person over the age of 21 and is otherwise *sui juris*. Mr. Goldberg is a citizen and resident of the State of Florida.

2.     Mr. Goldberg brings this case in his capacity as the chapter 11 Trustee of the bankruptcy estate of the Center.

3.      The Defendant, American Momentum Bank, is a Texas-chartered banking association with its principal place of business at One Momentum Boulevard in College Station, Texas.

4.      The Bank was established on October 25, 2006, in Tampa, Florida, but moved its charter to Texas in 2014. The Bank has branches throughout Texas and in Florida, concentrated in Central Florida and on the state's Gulf Coast.  On information and belief, Govoni maintained more than 140 accounts at the Bank, including those for the Center, BFG, BAM, BSG, and FTAS.

5.      The Bank undertook most of the conduct at issue in this Complaint, and the Bank accounts at issue were held at the Bank's Urban Centre Branch at 4830 West Kennedy Boulevard in Tampa, Florida.

### Relevant Non-Parties

6.      Leo Govoni is a citizen and resident of Pinellas County, Florida. Govoni was a businessman who founded the Center in 2000, together with John Staunton, for the apparent purpose of administering special needs trusts. Govoni also owns, manages, or otherwise controls more than one hundred other business entities, including Boston Financial Group, Boston Asset Management, Boston Settlement Group, and Fiduciary Tax & Accounting Services, and other entities related to, among other things, luxury real estate, entertainment, liquor licensing and distribution, real estate and timber, website design and marketing, management services for athletes and more.

7.      John Staunton is a citizen and resident of Pinellas County, Florida. Staunton is a barred attorney in the state of Florida, Bar No. 126950. With Govoni, Staunton co-founded the Center in 2000.

8.      Caitlin Janicki is a citizen and resident of Pinellas County, Florida.  She is Govoni's

daughter.  She worked at the Center until her resignation in 2022.  She worked as settlement coordinator, whose role was, supposedly, to assist with intake of SNTs when a Beneficiary was coming in with a structured settlement which needed to be administered (and funds needed to be invested).

9.     John Witeck ("**Witeck**") is an accountant who, with Govoni, co-owned Fiduciary Tax & Accounting Services, LLC. The Center retained Witeck and Fiduciary Tax & Accounting Services, LLC to perform trust accountings and prepare tax filings for the Beneficiaries' SNTs.

10.    Tracey Gregory was employed by one of Govoni's entities, Boston Settlement Group, LLC, from 2008 until her resignation in 2020. Even though she may have technically been a Boston Settlement Group employee, Gregory frequently acted as though she worked for the Center, and she did work for Govoni and many other Govoni-related entities. Gregory was Govoni's personal administrative assistant for nearly all tasks.  She worked entirely at his specific request and direction.  Despite lacking any formal education or accounting degrees, and clearly not qualified for elevated roles in the accounting field, Gregory was elevated to the Center's Board of Directors at Govoni's demand.  She served as the Center's accounting manager and was granted full access to and control over the Center's accounts at the Bank by Govoni.

11.    Sherry Lilly, at all relevant times, was the Assistant Vice President and Management Sales Officer at the Tampa branch of American Momentum Bank and served as a relationship manager to the Center and to Govoni's entities. The vast majority of the Center's daily interactions with the Bank, including account openings and transactions, were communicated from Govoni, one of his directees, Govoni's non-Center entities, or the Center through Lilly.

12.    Sandy Green, at all relevant times, was a Treasury Management Sales & Service Associate at the Tampa branch of American Momentum Bank and worked regularly with the

6

Center.

13.     Boston Finance Group, LLC ("**BFG**") is a Florida for-profit limited liability company in the financial services sector. BFG ostensibly loaned money to businesses and profited from the interest charged on the loans. Govoni founded BFG in 2008 and served as CEO and managing member of BFG from 2008 to 2024.

14.     BFG in turn was the obligor when Govoni caused the Center to first comingle, and then loan, from the Center, comingled SNT funds of more than $100,000,000 to BFG (the "**BFG Loan**").

15.     The BFG Loan was a purported "investment" vehicle, though as the allegations below explain, Govoni subsequently distributed or 'loaned' the money from BFG to his other entities for his personal ventures and non-investment grade asset acquisitions.

16.     Govoni used these funds to, among other things, buy real estate, invest in litigation funding of others' commercial disputes, purchase a private jet, buy box seats to the Kentucky Derby and the Tampa Bay Lightning, crate a network of outsource service companies to usurp fees and control information, and invest millions of dollars into other personal endeavors without an intention or ability to repay the BFG Loan.

17.     Boston Asset Management, Inc. ("**BAM**") is a Florida for-profit corporation that purports to function as an investment advisory firm for trustees who administer SNTs, including the Center.

18.     Govoni was BAM's majority owner and served as chief executive officer from 1992 through 2025.  As of 2024, the Center was BAM's only client.

19.     Govoni's brother, Mark Govoni, serves as president and managing director of BAM.

20.    Boston Holding Company, LLC ("**BHC**") is a Florida limited liability holding company founded and controlled by Govoni, which served as parent company of approximately thirty (30) other Govoni-controlled entities, including BAM, BFG, and Big Storm Brewery. Govoni was the president of BHC.

21.    Witeck served as a senior advisor to BHC.

22.    Govoni directed BFG Loan funds to BHC (among other places) and used those funds to pay BHC's purported operating costs, including Govoni's salary.

23.    Boston Settlement Group, LLC ("**BSG**") is a for-profit Florida limited liability company that purported to provide case settlement services to personal injury law firms. Govoni owned and (with others including Staunton) controlled BSG.

24.    Fiduciary Tax & Accounting Services, LLC ("**FTAS**") is a Florida for-profit tax and accounting limited liability company co-owned by Govoni (majority owner, through another corporate entity) and Witeck (minority owner). FTAS purported to provide tax and accounting services to trustees, including the Center.

25.    Govoni and Witeck used the Center and FTAS to convert Beneficiaries' SNT funds to the BFG Loan to then be used for their personal benefit. On information and belief, approximately 95% of FTAS's work was on the Center's behalf. The Center paid FTAS approximately $650,000 per year for its services.

26.    Big Storm Brewery LLC is a brewery and restaurant located in Clearwater, Florida, owned by Govoni (run and managed by L.J. Govoni, Leo Govoni's son) and now under the control of the Trustee. Govoni funneled a significant portion of the BFG Loan funds to Big Storm Brewery to cover the brewery's operating expenses and payroll (including to his son, L.J. Govoni), with no investment returns to the Center and, therefore, no returns to the SNTs or the Beneficiaries.

27.     Most of the 140 other accounts held by Govoni at the Bank were not Center-related, but opened by Govoni to pursue pet projects and ill-conceived endeavors to the detriment of the Center and its Beneficiaries.

## JURISDICTION AND VENUE

28.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 157(c)(1) and 1334(b).

29.     This adversary proceeding is related to a case under Title 11 pursuant to 28 U.S.C. § 157(c)(1), and the Plaintiff consents to the entry of final orders and judgment by the Bankruptcy Court.

30.     This Court has personal jurisdiction over the Defendant, American Momentum Bank, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6) because the Bank conducts substantial business in this State (including in this judicial district and including with the Center, located in this judicial district), and a substantial portion of the actions giving rise to the causes of action took place in this judicial district. Further, Florida has significant contacts with the Bank, as it has eleven branches or offices in Florida. This action arises out of and relates to the Bank's contacts with this forum.

31.     In addition, this Court has personal jurisdiction over the Bank pursuant to Federal Rule of Bankruptcy Procedure 7004(f).

32.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL ALLEGATIONS

### *Special Needs Trusts - Generally*

33.     Special needs trusts, or SNTs, are irrevocable trusts that typically hold assets derived from judgments, settlements, insurance payouts, and similar sources, all intended to

compensate SNT beneficiaries for their injuries or disabilities. The resulting SNTs may be (but are not always) court ordered.

34.    Because many beneficiaries of SNTs are permanently disabled in a way that precludes gainful employment, the SNTs are commonly their sole source of income. SNT beneficiaries often depend on their SNTs to cover the basic costs of living, such as housing, food, clothing, and transportation.

35.    By placing their funds in SNTs, beneficiaries remain financially eligible for needs-tested programs like Medicaid and Supplemental Security Income ("**SSI**"), for which they would likely not qualify if their settlements or judgments were paid directly to them.

36.    Federal law provides for this arrangement. Section 42 U.S.C. § 1396p specifies, among other things, that assets held in certain qualified trusts—like the Beneficiaries' SNTs—do not affect eligibility for public benefits.

37.    Section 1369p(d)(4)(A) relates to individual, first-party special needs trusts.  These usually relate to larger SNTs with unique needs.

38.    Section 1369p(d)(4)(C) relates to pooled SNTs wherein assets from many individuals are pooled together for investment purposes. While allowing pooled trusts, the statute still requires that administrators of SNTs, like the Center, maintain separate accounts and records for each beneficiary and reiterates that the accounts in the pooled trust remain established solely for the benefit of the disabled beneficiary.

39.    Pooled trusts may allow for more fruitful investment opportunities because of the aggregate volume of assets available. Many smaller trusts choose to pool trust assets because the administrative costs of a pooled trust can be lower.

40.    Assets held in a pooled SNT are "solely for the benefit of individuals who are

disabled" during the beneficiary's life.  Upon the beneficiary's death, after reimbursement to the

state for medical assistance paid on the beneficiary's behalf during his or her lifetime, the

remaining amounts go to the special needs trust administrator (in this case, the Center) to further

the Center's mission and purpose and to assist other special needs individuals.

41.     Alternatively, individual SNTs may stand alone without pooling, as described

above in § 1369(d)(4)(A). Individual SNTs may be used to pay the beneficiary's expenses during

the Beneficiary's life, and after the Beneficiary's death the remainder is first used to satisfy taxes

and reimburse the state for medical assistance, and any residual corpus reverts to the beneficiary's

next of kin. No portion of the assets remains in the control of the trust administrator, as would be

the case for pooled funds.

42.     In either case—whether pooled or not—SNTs that comply with § 1369(d) are

excluded from needs-based eligibility determinations, allowing permanently disabled individuals

to maintain important Medicaid and SSI benefits.

### *The Center is a 501(c)(3) Special Needs Trust Administrator*

43.     The Center is a 501(c)(3) Florida corporation that provided trust administration

services for SNTs across most states until its Chapter 11 filing in 2024.  The Center managed

individual and pooled trusts.

44.     From its founding in 2000 through 2024, the Center managed funds for more than

6,000 total trust Beneficiaries, making it one of the largest SNT administrators in the country.

45.     Govoni served on the Center's Board of Directors until 2009.

46.     As further discussed below, after his nominal resignation, Govoni maintained

significant control and influence over the Center and various of his directees who had control

within the Center, and he continued to dictate the Center's staffing, finances, and decision making

until at least 2022.

47.     Staunton, co-founder of the Center, also served on the Board of Directors until 2009, when he resigned. Like Govoni, Staunton also continued to stay involved with the Center. He transitioned to a role as a purported legal advisor for the Center through 2023, and he attended board meetings "for historical purposes," to keep an eye on the Center and its employees.

48.     Over the years, the Center appointed other managers and directors of the Center who were seemingly unaware of the BFG Loan or the misuse of Center and Beneficiary funds.

49.     Board of Director meeting minutes indicate these individual, including Rick Shonter, Joe Huenke, Michelle Diebert, and possibly others, appear to have lacked knowledge of the BFG Loan or the improper investments by Govoni and the Center.

### *Irrevocable Declarations Guiding the Protection and Investment of Trust Assets*

50.     The Center served as trustee for SNTs under its administration, memorialized in the individual and pooled SNT agreements related to each Beneficiary's trust.  The Center's primary task was to preserve trust assets for the benefit of Beneficiaries.

51.     The Center deducted administrative and 'trustee' fees from every Beneficiary's SNT for which it served as Trustee.

52.     Upon information and belief, most if not all administrative fees taken from the Beneficiaries' individual accounts were transferred to the Center's main corporate bank account (also referred to as the "**Distribution Account**"), which the Center maintained with the Bank.

53.     For each Beneficiary, the Center executed an irrevocable Declaration of Trust identifying the Center as trustee ("**Irrevocable Declaration**").

54.     The Irrevocable Declarations state that the trusts established under each agreement is a Special Needs Trust created pursuant to 42 U.S.C. § 1396p(d).

55.     The Irrevocable Declarations define the purpose of the trusts, with a primary focus on preserving trust assets for each Beneficiary's use. Examples of the "purpose" language used in the Center's irrevocable Declarations include:

> The purpose of this Trust is to supplement any benefits received by [the Beneficiary], or for which he may be eligible, through or from various governmental assistance programs and not to supplant any such benefits or to provide support. All actions of the Trustee shall be directed toward carrying out this intent and purpose as specifically expressed in this Article II and as expressed more generally throughout this Trust.
>
> *or*
>
> The primary purpose of the Trust is to preserve the settlement amount conveyed to the Trust for the future use and benefit of the Beneficiary and to protect such amounts from inappropriate use and wasteful dissipation.

56.     In a list of "Non-exclusive Examples of Appropriate Distributions," certain of the irrevocable Declarations identify the following or substantially similar expenditures which could be made from the SNTs in the best interest of Beneficiaries:

> a.  medical, dental, and diagnostic work and treatment for which there are no available private or public funds;
>
> b.  medical procedures that are desirable in the Trustee's sole discretion, even though they may not be medically necessary or lifesaving;
>
> c.  supplemental nursing care, rehabilitative and/or occupational therapy services;
>
> d.  differentials in cost between housing and shelter for shared and private rooms in institutional settings;
>
> e.  care appropriate for the Beneficiary that assistance programs may not or do not otherwise provide;
>
> f.  expenditures for travel, companionship, experiences, and expenses in bringing the Beneficiary's siblings and others for visitation; and
>
> g.  items of a similar nature to those contained in subsections a–f above.

57.     The Center's comingling and loan of the Beneficiaries' SNT assets to a Govoni-controlled company for his personal use and benefit is not an authorized expenditure, nor is such

a loan similar in nature to the listed examples of approved expenditures.

58.     The Bank had knowledge of the SNTs and the Center's role as a trustee.  Among other things, the Bank held copies of many of the Beneficiaries' trust documents and, at times, specifically requested copies of additional trust instruments from the Center.

59.     The Bank knew or was on reasonable notice that the various transfers being made from and with SNT derived funds, were not within the corporate authority of Govoni, any of his directees, related non-Center entities, or Center employees.

60.     Because the Bank had the Beneficiaries' trust instruments, it knew that the Center was only authorized to disburse trust funds for narrow and prudent purposes.

61.     Some of the Irrevocable Declarations provide the following examples of proper disbursements of trust res:

    a.  to persons, corporations, or other entities for the sole use and benefit of the Beneficiary;

    b.  to a commercial bank account or savings institution in the name of the Beneficiary, or in a form reserving the title, management, and custody of the account to a suitable holder for the sole use and benefit of the Beneficiary;

    c.  in any prudent form of annuity purchased for the sole use and benefit of the Beneficiary;

    d.  to any guardian or other person deemed suitable by the trustee and who has assumed responsibility of caring for the Beneficiary;

    e.  in any form allowed by law;

    f.  to any person deemed suitable by the trustee; and

    g.  by direct payment for the expenses of the Beneficiary.

62.     In a subsection titled "Powers to be Exercised in the Best Interests of the Beneficiary," exemplar Irrevocable Declarations state that "the Trustee shall not exercise any power in a manner that is inconsistent with the Beneficiary's right to the beneficial enjoyment of

the Trust property in accordance with general principles relating to the law of trusts or that is inconsistent with the purpose and intent of this Trust."

63.     This caveat plainly limits the trustee's (the Center's) stated power to invest the SNT assets by requiring any investment to be in the best interests of the Beneficiaries.

64.     The Irrevocable Declarations also lay out parameters for the Center's ability to buy and sell real estate; execute deeds, leases, contracts, notes, and security instruments; to borrow money from other sources and secure such a loan or guaranty by mortgage; to expend funds in ways that are proper for the preservation or improvement of assets; and to make gifts of trust property to the Beneficiary's family for purposes of health care planning, financial planning, or tax planning, provided such gifts are consistent with the terms and purpose of the trust.

65.     Under the Irrevocable Declarations, the Center is required to report, at least annually, to the Beneficiary or the Beneficiary's legal representative and to provide "a complete statement of the Trust assets and all of the receipts, disbursements and distributions to or from the Trust occurring during the reporting period."

66.     As a recipient of various Irrevocable Declarations and other trust related documents, the Bank also knew of these limits of the corporate authority of anyone purporting to act on behalf of the Center, or anyone attempting to dictate the use of SNT Funds.

67.     Beyond knowledge of these specific trust documents it had received, the Bank had represented a knowledge and network of others with knowledge who could assist the Center, including providing services needed beyond those for an ordinary depositor.  The Center, in reliance on these representations, assistance, and special services, ultimately moved its substantial accounts to the Bank.

68.     Govoni and Staunton similarly used the Bank after it provided additional assistance

and services for their many other affiliated entities.

### *The Pooled Trusts required separate sub accounts and accurate reporting.*

69.     The Center held both individual, standalone trusts, and pooled trusts.

70.     In many instances, the Beneficiaries' assets were placed into pooled SNTs at the trust's creation.

71.     At the time of the Center's bankruptcy filing, over half of the SNTs were pooled trusts.

72.     To create pooled SNTs, the Center entered into Irrevocable Declarations with Beneficiaries in each state where it served as a trustee.

73.     For example, in Florida, the Center executed an Irrevocable Master Declaration of Trust on October 22, 2009, effective retroactively to March 10, 2001.

74.     To join a Beneficiary into a pooled trust, the Center and the Beneficiary or the Beneficiary's representative would then execute a Joinder Agreement or similarly titled document, enrolling the SNT into the pooled trust.

75.     The Joinder Agreements re-identify the Center as trustee.

76.     The Joinder Agreements reiterate the same or substantially similar fiduciary obligations as the Irrevocable Declarations for individual Beneficiaries, including that the Center shall comply with the sole-benefit requirement by ensuring that sub-account funds shall benefit no one other than the Beneficiary for whose benefit the sub-account is established.

77.     While the Joinder Agreements grant the Center discretion to make distributions, they affirm that all distributions and investments must be solely for the Beneficiary's supplemental needs and care.

78.     Joinder Agreements also require, in accordance with § 1369p, that a separate sub-

account be maintained for each Beneficiary within a pooled trust.

79.　　The Bank received copies of individual trusts, as well as pooled trust documents.

80.　　On information and belief, the Center maintained nine Pooled trust accounts, eight of which were at the Bank.  The pooled trust accounts comprised the majority of the compromised SNT accounts.[1]

81.　　The Bank—which issued statements and made specific email requests regarding the trust instruments underlying the Pooled and individual SNTs—knew that the SNT accounts were trusts and knew the identities of the Beneficiaries, including those whose interests were aggregated within the Pooled SNTs.

82.　　As he set up the Center, Govoni had conversations with the Bank's President/COO regarding his plan to set up a trust company. That is, the Bank knew—at its highest managerial level—that Govoni's business was involved in the industry of special needs trusts from the beginning.

83.　　The Bank offered its special needs trust experience to help Govoni set up and administer SNTs.  In August of 2008, the President and COO of the Bank emailed Govoni, saying:

> Leo,
>
> We have completed quite a bit of research on the needs we discussed, and are waiting for a couple of final answers. I did want to share what has been identified to date.
>
> Our chairman has a close contact at a significant Texas trust company in Houston that is not affiliated with a bank.  He is contacting the principal of the company to arrange a conference call where we can describe the exact details of the service you need to be provided.  We will coordinate with your schedule to arrange the call.
>
> We are also researching a second Texas trust company and hope to have that contact qualified by early next week.

---

[1] Without respect to compromised assets, on the petition date, the Center was supposed to be holding approx. $161 million in approximately 650 individual trusts, and approx. $38 million in approx. 1,306 pooled trusts.

Our Florida regulatory legal counsel has indicated that they can form a trust company for you if you decide to take that route. They are currently forming trust companies for both financial and non-financial institutions and have a lot of experience in this area. They indicated it took a little time, but that it was very doable.

We contacted our Texas regulatory counsel who also works on the acquisition side to determine if they have any shell trust charters that are for sale. Our specialist is out until Monday, and we expect to hear from them at that time. Should you wish to form the trust company in Texas, this is a firm you would want to consider using for that option.

When you return next week, please give me a call so that we can discuss the other information I am obtaining and what direction you would like to pursue.

84.    It was well known the Center ultimately became one of the largest special needs trust companies in the country.

### *The Center's Loans of SNT Funds to BFG*

85.    As discussed below, only after, and very soon after, the Center moved its accounts to the Bank, and was given such special treatment and services, from June 2009 to April 30, 2024, the Center funded approximately $100,000,000 of SNT comingled funds to BFG on account of a loan made from the Center to BFG.

86.    Initially, on June 1, 2009, the Center entered into a Revolving Line of Credit ("**LOC**") Agreement with BFG, under which the Center agreed to loan a maximum of $2,500,000 to BFG.

87.    The LOC was accompanied by a Promissory Note, in which BFG promised to repay the $2,500,000, or any outstanding portion, with interest. The maturity date of the Promissory Note was July 1, 2012.

88.    On the same date, June 1, 2009, the Center and BFG executed a related Security Agreement, under which BFG collateralized all of BFG's right, title, and interest in all real and personal property as of the date of the LOC Agreement and granted the Center a security interest

in the same.

89.     The Center and BFG also executed a Negative Pledge Agreement in which BFG promised not to sell, assign, mortgage, or otherwise encumber any of the collateral—defined as all of BFG's right, title, and interest in all real and personal property as of the date of the LOC Agreement—without the Center's written consent.

90.     On December 1, 2009, BFG and the Center executed an Amended and Restated Revolving Line of Credit Agreement in which they increased the loan value to $15,000,000.

91.     BFG also signed an Amended and Restated Promissory Note in the Center's favor, reflecting the higher value of the LOC Agreement.

92.     Seeing no red flags raised at or by the Bank, and the ease of which he could transfer money to his related companies, on March 15, 2010, BFG and the Center extended the loan value again, with another Amended and Restated Revolving Line of Credit Agreement under which the Center permitted BFG to double its loan and borrow $30,000,000 of the Beneficiaries' and Center assets.

93.     With this increased amount not sounding any alarms from the Bank, that was effectuating these transfers out of the Center and SNTs to Govoni's other entity and subsequently to even more of his entities with accounts at the Bank, another $20,000,000 was added on in March 15, 2011.  As of that date the Center extended the loan value further in an Amended and Restated Revolving Line of Credit Agreement that raised BFG's lending ceiling to $50,000,000.

94.     BFG, through Govoni, also signed another Amended and Restated Promissory Note in the Center's favor, reflecting the $50,000,000 value of the new LOC Agreement.

95.     Completely undeterred, less than a year later Govoni caused the loan to BFG to be doubled yet again.  On January 1, 2012, in another Amended and Restated Revolving Line of

Credit Agreement, the Center agreed to make an additional $50,000,000 loan—for a total of $100,000,000—available to BFG.

96.     Also on January 1, 2012, BFG, through Govoni, executed another Amended and Restated Promissory Note reflecting the new $100,000,000 loan balance. 1 Todd Belisle, as President of the Center, executed various prior loan documents and the final documents brining the BFG Loan up to $100 million.  Before his passing, he indicated that he did not remember signing these documents.

97.     This final iteration of the Promissory Note included a promise to pay an incredibly low interest at a rate of 2% per annum through December 31, 2012, and for later periods, "such rate or rates as Debtor and the Center may from time to time negotiate in good faith . . . consistent with prevailing market rates[.]"

98.     As for interest on defaulted past-due sums, the Promissory Note provides for "interest at the lesser of the highest rate for which Debtor may legally contract or . . . 18% per annum[.]"

99.     Govoni signed the January 2012 Promissory Note as Managing Member of BFG.

100.     Govoni also executed a personal guaranty of the final extension of the loan.

101.     From 2010 through 2020, the Center funded the BFG Loan a total amount just under $100,000,000.  **See Exhibit A.**

102.     In the three-year period from 2010 through the end of 2013, the BFG Loan account grew from $0 to over $48 million, though due to subsequent transfers out of BFG, the amount of funds held in BFG accounts was substantially smaller.

103.     The BFG Loan matured on January 1, 2017, at which time the BFG Loan was funded at approximately $77 million.  However, the Center continued to pay out money to BFG

under the BFG Loan until 2020, through the Center's respective accounts at the Bank.

104.    By the end of 2020, the Center had transferred over $99 million in cash to BFG.

105.    As of December 6, 2024, the total outstanding principal and interest owed to the Center under the BFG Loan was $120,324,391.07.

106.    The BFG Loan was cryptically reported on annual SNT statements created by FTAS to the Beneficiaries as "investment," or "investment account," without disclosing the true nature of the transfer of Beneficiaries' SNT funds to a Govoni-controlled entity, which then excreted those proceeds to pay for Govoni's personal assets and endeavors.

107.    Internally, the BFG Loan was referred to as "BFG Prime" or a series of "Axys" names used to provide a gloss of formality, including: Center Fixed Income V, Center Private Equity  III, Center Realty IIV, Pooled Portfolio I, and Pooled Prime Income, among others.

108.    The BFG Loan was not reported as a liability on the Center's balance sheets presented at the annual Board of Directors' meetings, keeping many of the Center's decision makers in the dark as to its existence.

109.    During each of the years from 2000 through 2022, one or more of the following individuals were board members of the Center, and upon information and belief attended annual board meetings for the Center: Caitlin Janicki, John Staunton, Todd Belisle, and Tracey Gregory. Upon information and belief, each of these board members or watchful participants, planted to be Govoni's eyes and ears, knew about the BFG Loan because they either executed the BFG Loan Documents personally, or assisted Govoni's administration of the BFG Loan and transfer of Center funds to BFG.  Yet, they failed to disclose the loan's existence at the Center's board meetings to others who lacked knowledge of the BFG Loan.

110.    Like Gregory, Todd Belisle acted solely at the direction and control of Govoni to

further Govoni's own personal financial interests.  While acting as President of the Center, he also served as a named employee of both BAM and BFG, likely so he could help Govoni keep the existence of the BFG Loan a secret.  In executing a $100 million loan on behalf of the Center, which the Center had no ability to repay, Belisle's actions were obviously anything but in furtherance of the Center or the Beneficiaries, and solely for the benefit of Govoni.

111.    Alternatively, Belisle was so siloed himself and placed in such a position beyond his abilities, that he was unaware that the BFG Loan was not going to be invested in third party investments for the benefit of Center and its Beneficiaries, but in Govoni's other companies for Govoni's own profit scheme.

***Govoni's efforts and Bank's assistance in hiding the true nature of the BFG Loan***

112.    The Center used FTAS (by and through Witeck) to prepare and disseminate annual reports to Beneficiaries showing the "ins" and "outs" of their SNTs reflecting distributions for caregivers, health and welfare needs, trustee fees, and other miscellaneous expenses.  An example of an annual report is attached hereto as **Exhibit B.**

113.    At Govoni's direction and for his benefit, these trust reports provided to Beneficiaries indicated only that SNT funds were in an "investment," not that the "investment" was the BFG Loan, the proceeds of which were largely already disseminated from BFG and being used for Govoni's personal purposes.

114.    These annual statements were accompanied by false Bank statements, created at the Center at the direction of Govoni, and by his directees, with an "American Momentum Bank" logo, purporting to reflect actual Bank registers or sub-accounts for each Beneficiary.

115.    Govoni and the Bank knew that an annual report from the Center (Exhibit B) was insufficient to provide Beneficiaries (and Courts) with enough information to demonstrate the

assets of each SNT sub-account.  After all, without a bank statement showing it was holding real funds, a trust administrator could falsify annual reports to its beneficiaries or provide the reports in piecemeal fashion to individual Beneficiaries without any way to discern whether sufficient funds, in the aggregate, existed in the Bank.

116.    Aware of the Center's need to have an independent verification of Beneficiary accounts, the Bank allowed the Center to use its logo to create these false bank statements which would give Beneficiaries assurance that their SNT funds were safe when they were not.

117.    The Center was required to hold each Beneficiary's account in sub-accounts which could be independently reported and verified.  However, the Beneficiaries' accounts were comingled, and not properly held at sub-accounts at the Bank, nor could the Bank independently verify how much was in each Beneficiaries' trust.  When asked, the Bank had to rely on the Center to tell it how much was in each Beneficiary's account.

118.    The Bank implicitly authorized the Center's creation and use of the false Bank statements, knowing it could not independently verify for each Beneficiary the amounts in the accounts, by not ceasing the practice initially and allowing it to occur for years.

119.    The Bank only passively, and partially, rescinded its permission in 2018, one week after the successor trustee for a former Center Beneficiary filed a complaint against the Center with a demand for accounting.

120.    Immediately after that lawsuit was filed, the Bank emailed Gregory attaching a purported "Account Statement" using Bank letterhead for the beneficiary involved in the lawsuit. In the email from Sandy Green, the Bank said: "Please see attached, I believe this statement is being created by The Center and Maureen is asking if you can remove the banks [sic] name since they are not generated by American Momentum Bank."

121.    Govoni's daughter, Caitlin Janicki, forwarded the email that Gregory received from Sandy Green regarding the logo to an attorney barred in Florida who worked for Govoni's non-Center entities, and to Staunton. Janicki wrote:

> I want to make you both aware that Tracey Gregory just got the attached e-mail from American Momentum Bank. She then reached out to our rep. at the bank who stated someone went through the Naples American Momentum branch asking for account information to be verified. They confirmed that no information was released but given that someone reached out to them to verify the statement they **no longer feel comfortable** with us producing these statements. **They confirmed that they previously approved of statements such as this** but they have asked we no longer produce statements with their name on it.

122.    Notably, even after being confronted with evidence of the Center's agents leveraging the Bank's name and professional reputation as part of its scheme, the Bank took no steps to end the banking relationship.

123.    Nor did the Bank make any effort to prevent or mitigate Govoni's breaches of fiduciary duty to the Center.

124.    Instead, Sandy Green at the Bank provided handwritten edits to the false statements in a manner that would still allow the Center to produce the statements with the veneer of credibility.

125.    Eventually, the Bank stopped responding to Tracey Gregory's inquiries on the topic of account statements, which could be, and was, understood by the Center to be a tacit approval of the Center's continued conduct, including obscuring the depletion of the Beneficiaries' funds by describing the improper loans as "investments" in various funds on the account statements.

126.    The Center relied on, among other things, a massive spreadsheet produced from an internal accounting program to determine how much of each Beneficiary's funds were 'invested' in the BFG Loan, such that FTAS could put these amounts on the statements produced to Beneficiaries.

127.    Not one BFG investment statement was ever produced to the Center or anyone else.

128.    The Center's "investment" of SNT funds in Govoni's businesses and for Govoni's own personal use were not permitted under the Irrevocable Declarations for individual trusts for the Master Declarations and joinders for pooled trusts.

129.    The Bank knew of these restrictions, because the Bank asked for and received Beneficiaries' trust documents.  And the Bank specifically represented knowledge of the SNT industry and offered the services the Center needed to operate such a business.  Yet the Bank expressly permitted the Center and certain of its employees, acting as Govoni's agents, to affix the Bank's logo to falsified account statements that omitted any reference to the loans of trust funds to Govoni's company as a purported investment. An example of the false Bank statements is attached as **Exhibit C** (see page 2).

130.    Around the same time, Sandy Green at the Bank, for the first time, began asking Tracey Gregory to provide "financials for each company" because she was concerned about "the high exposure of all combined companies." One of three things could have happened, all of which are problematic.  Either 1) the Bank received financial statements showing the existence of the BFG Loan, 2) the Bank asked for them, but never followed up or received financial statements for all of Govoni's companies, or 3) received financials which did not match the reality they knew existed in the accounts the Bank was holding.

### *<u>The Bank also assisted in relaxing its banking rules and standards</u>*

131.    The Bank also regularly relaxed its banking standards and rules to cater to Govoni and his companies because they were lucrative clients.

132.    For example, in 2013, Gregory emailed Lilly and asked:

Sherry,

Can you open up a new bank account for the following?

Orvis Entertainment LLC

Leo Govoni is the authorized signor.

EIN # [XX-XXX]0579

Can you add this to the remote deposit scanner for both John Burns and myself? Can you add this to the Center for Lien Resolution online access? Can I get a wire transfer agreement and hold harmless agreement?

The type of business holds liquor licenses.

Attached is the Articles of Organization and the IRS letter confirming the EIN number.

Thank you.

Tracey

133.    Lilly replied, "Ok. We will open in the am." She did not ask why a liquor license holding company would share access with the Center for Lien Resolution online; or about Gregory or John Burns's authority to make remote deposits to an account in Govoni's name.

134.    Gregory sent Lilly similar requests for accounts in the names of Seaboard Craft Beer Holdings, Broadleaf Warner LLC, Intergritas Management LLC, and more.

135.    On another occasion in 2018, Gregory emailed Sandy Green with a request to open new accounts in the names of North American Kegs, BCL Partners Fund, Boston Capital Leasing Management, LJG Management, Big Storm Brewery, Big Storm Brewery Tax Account, Fat Point, Fat Point Tax Account, Big Storm Canteen, Big Storm Coffee, and Big Storm Creamery.

136.    All of these emails came from Gregory at her "@centersmail.com" email address, but the Bank correctly understood and treated Gregory as a representative of all Govoni entities and treated the entities as interchangeable, realizing that Gregory was acting for Govoni and his non-Center entities in these communications.

137.    The Bank was not merely turning a blind eye. It went out of its way to skirt policies and enable the Center's and Govoni's breaches of duty and care.

138.    As another example, on May 29, 2015, Lilly, with the assistance of a Bank colleague, lifted normal wire restrictions and allowed BFG to send funds it didn't yet have based on the promise of incoming funds from the Center to BFG.

139.    To facilitate BFG's desire to wire out $354,765 against its $221,514 balance, the Bank agreed to allow BFG to issue the wire from its "available funds" instead, which included a not-yet-cleared check from the Center.

140.    Maureen Gallagher, Executive Vice President and Chief Administrative Officer, had no objection to this deviation of procedures. Instead, she wrote back asking "When the wire has been received and processed, please maintenance the account back to wire on collected." In other words, she permitted the special favor to Govoni but insisted the trail be covered back up afterwards.

141.    On another occasion in 2022, the Bank allowed employees of another Govoni entity—*not* Center employees—to "delete" a check that the Center had presented for deposit, even though the other employees were not signatories on the Center account.

142.    After being informed by the Bank that a deposit had been "deleted" without the Center's knowledge or consent, one of the Center's directors, Laura Davis informed the bank that "no one should have access or authority to delete CSNT deposits."

143.    On another occasion, Gregory sent an email to Lilly and others at the Bank who were training a new employee and said: "I am certainly doing a good job this week of training you with all of these one-time exceptions."  Catering to Govoni and his companies' requests for exceptions to the rule was a regular occurrence.

### *The Bank served as Custodial Trustee*

144.    Over the course of the Center's history and Govoni's relationship with the Bank,

the Bank offered other services to the Center which helped keep the BFG Loan disguised.

145.    For some SNTs, the Bank co-signed trust instruments identifying itself as "custodial trustee" of the accounts where trust funds were held.  See Texas Prop. Code 142.005. The President and COO of the Bank signed some of these instruments.  **See Exhibit D.**

146.    In other instances, the Bank executed probate forms to be filed in the public records on behalf of guardianship cases. For example, Sherry Lilly at the Bank executed a "Bank Certificate" on January 21, 2021 which was provided to the County Clerk in Harris County, Texas (probate court) certifying that Beneficiary 102942 had $1,754.42 in cash in his sub-account at the Bank.  Attached to the Bank Certificate is a report showing that this Beneficiary had $20,764.20 in Pooled Fixed Income V (known as the BFG Loan), a falsified AMB Statement created by the Center using the Bank's logo, and the Center's annual report created by FTAS. **See Exhibit E.**

147.    Problematically, however, the Bank had no way of knowing how much each subaccount contained, other than getting this information from the Center, because the Bank did not manage the sub-accounts or provide reconciliation.

148.    The Bank also provided similar attestations to the Department of Veteran's Affairs pursuant to Title 38, U.S.C. Chapter 55.  **See Exhibit C, last page.**  Sherry Lilly at the Bank signed a Certificate of Balance on Deposit and Authorization to Disclose Financial Records on or about October 16, 2016, certifying that the balance on hand for Beneficiary 123699 was $2,469.14. Again, the Bank had no way of knowing how much was in any Beneficiary's sub account because the Bank did not keep track, and had to rely on the Center's bogus records.  This statement also included the false Bank statement with false logo, and the Center's annual report created by FTAS, sent to the Department of Veterans Affairs to give assurance the Bank's statements were accurate.

149.    The Bank took on these additional duties and tasks to assist Govoni and the Center,

not just by holding funds, but doing far more.  The Bank's extra efforts gave beneficiaries and the non-Govoni directors at the Center an added level of comfort that Beneficiaries' funds existed and were protected.  Little did many know that the Bank was only relying on what Govoni and his directees told them even though those actions were directly adverse and provided no benefit to the Center.

### *How Govoni Siloed Employees and Kept them in the Dark*

150.    After Govoni resigned from the Center's Board in 2009, in the Center's own view, "Govoni continued to control and exert his influence over The Center's operations and finances." Govoni's resignation was nominal only and he continued to run the Center from behind the scenes through certain trusted employees and officers who remained at the Center and in his tight ring of confidants.

151.    While Govoni had nominally removed his titles from the Center, his control is obvious from the nature of the BFG Loan and its subsequent transfers, which were all made to benefit him personally and for his related entities, as well as the false reporting to hide his bad actions.

152.    Despite claiming not to work for the Center, Govoni regularly appeared at the Center for meetings, often unannounced and uninvited.  He regularly got involved in beneficiary trust issues between 2009 and 2022 to continue to grow and oversee transfers from the Center to BFG and other insider companies.

153.    Govoni continued to control the Center through, among things, communications with Janicki (his daughter) related to SNT issues, through Witeck related to trust accounting issues, and through Tracey Gregory to control funds through the Bank's accounts.

154.    Over time, Govoni created service companies to maintain even great control over

the Center's outsourced operations, bringing them under one umbrella. He created the Austin Colby Company, a technology and HR company he used to manage all of the employees and their access to information. Govoni also used Austin Colby to maintain his electronic access to the Center's physical buildings, and he had the company install keystroke monitoring to screen all his employees and their activities.

155.   Govoni created FTAS and, with Witeck, utilized FTAS to prepare accounting statements to Beneficiaries so he could control the information flow and hide the existence of the BFG Loan from the Center, its Board, and from the Beneficiaries.

156.   Govoni created BAM so he could control the investment related information given to Beneficiaries when they asked where their SNTs were invested.  Beneficiaries who asked too many questions of their case managers regarding what the word "investment" mean on their account statements were directed to call Govoni's brother, Mark Govoni.  Mark Govoni would provide these Beneficiaries with little to no information and often chastise them for asking.

157.   In addition to controlling all of the outsourced companies so he could control the information to Beneficiaries, Govoni tightly controlled his companies' employees' movements. He tracked employees' emails and computer searches, and he discouraged employees from communicating with each other, both at work and outside of work.  The use of cell phones in meetings was strictly prohibited.

158.   Using these means of control and bully tactics, from 2009 to 2022, Govoni continued to oversee nearly all facets of the Center and his related service companies, while attempting to 'silo' his employees and keep them from discovering what he was doing with SNT funds.  The Center should have been holding $100s of millions of dollars in safe, prudent investments for the SNTs, but due to Govoni's conduct and the Bank's help in keeping his actions

hidden, the combined holdings of the Center and BFG, at year end for any given year, never reached or exceeded even $15 million. In most years the total figures across all Center and BFG accounts was substantially lower than even $10 million. **See Exhibit F.**

159.    It is clear that, absent Govoni continuing to exercise control and direction over the Center and the SNTs, no independent party would have made the same transfers or the BFG Loan.

160.    Govoni exerted complete control over the Center, BFG, and his other entities through 2022, such that he owed the Center fiduciary duties, despite attempting to relinquish his official titles.

161.    The Bank treated Govoni as the owner of the Center and all of Govoni's other entities, even after he relinquished his official titles at the Center.

### *Deficient Bank Accounts and the Bank's Knowledge of Govoni's Scheme*

162.    As the depository for the various Govoni related entities that siphoned SNT funds through the BFG Loan and subsequent transfers of those funds from BFG, the Bank knew or reasonably should have known of Govoni's misconduct.

163.    The Bank had knowledge of the SNTs and the various applicable trust documents, which required protected investments.

164.    The Center was a very public entity that obtained press coverage and community recognition for its mission.

165.    The Bank knew the underlying Beneficiaries were some of the country's most vulnerable individuals, yet turned a blind eye to these transactions, aided them by, among other things allowing transfers from unauthorized persons, represented account balances as a custodial trustee for various Beneficiaries (without any ability to verify the accuracy), and permitted the use of its logo on SNT account statements that falsely represented the existence of real "investments"

that could be monetized for the applicable Beneficiary.

166.     The Bank account balances, along with the known transfers, easily demonstrate the falseness of the representations being made by Govoni and those acting at his direction and for his personal benefit.

167.     Yet, the Bank never alerted anyone else at the Center or any of the Beneficiaries as it was allowing these activities and continuing to process payments in support of Govoni's scheme.

168.     The Bank continued to deal with and fulfill the requests of Govoni and his directees, even when they were not actual or formal Center employees, were not authorized account signatories, and did not have any corporate authority, or trustee capacity authority, to direct the transfers to BFG and subsequently to Govoni's entities.

169.     As just a few early examples of funding the BFG Loan, the following transactions were all carried out at the Bank in an eight-week window in the early years of funding the BFG Loan:

    a.  August 6, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

    b.  August 15, 2012: $240,000 from the Center Acct. 1722 to BFG Acct. 0013;

    c.  August 30, 2012: $300,000 from the Center Acct. 1722 to BFG Acct. 0013;

    d.  September 6, 2012: $362,500 from the Center Acct.1722 to BFG Acct. 0013;

    e.  September 14, 2012: $3,000,000 from the Center Acct. 1722 to BFG Acct. 0013; and

    f.  September 21, 2012: $1,500,000 from the Center Acct. 1722 to BFG Acct. 0013.

170.     The Bank was undoubtedly aware of the suspicious nature of the transactions. On September 24, 2014, the Bank sent a letter to Todd Belisle, a Center executive at the time, listing the large 2012 transactions above and asking Belisle to sign the letter indicating his approval of the transfers.  Tracey Gregory, who had the authority to make the transfers on her own, was on

every request. However, due to the large scale of the transfers, the Bank was concerned and asked for Belisle, Vice President of the Center, to verify the transactions. Either Belisle was aware of the true, self-interested nature of the BFG Loan and acting adversely to the Center and Beneficiaries in approving this transaction, or the BFG Loan had not yet fully funded, much less matured, and Belisle was ignorant to and siloed from the true ramifications that his authorization would have.

171. The Bank continued processing more large transfers out of the Center's accounts, facilitating the movement of trust funds into BFG's accounts, and worse, then out of BFG to other various non-trust related entities or simply disappearing into large personal purchases for Govoni, such as a private plane, vanity projects like a brewery, and extensive real estate purchases.

172. Yet, unlike earlier transfers, and even after setting an example of the necessity to obtain clear approval from the Center, this process of attempting to obtain such consent was not undertaken for subsequent transfers from BFG or additional funding of the BFG Loan.

173. Also, while the Bank undertook the step of getting confirmation of authority from the Center, beyond what might ordinarily exist for an account holder, it took no additional protective steps related to the fund or the imprudent nature of the investment. This lack of any further steps continued after the large sums transferred out as the BFG Loan were obviously not being paid back in the Center bank accounts held at and managed by the Bank.

174. While the Center was transferring $99 million in cash between 2010 and 2020 to BFG, BFG was then transferring large amounts of funds to Govoni's other projects and companies including but not limited to the following:

a. Big Storm Brewery, LLC and Big Storm real Estate LLC (the Govoni company which purchased the land underneath the brewery) received nearly $18 million;

b.  Austin Colby Company received over $39 million;

c.  BLC Aviation LLC received $3.7 million to purchase and maintain a plane.

d.  Leo Govoni received over $3 million personally.

e.  Artspace Properties LLC received $1.5 million to purchase a portfolio of small, single family homes.

f.  Other Govoni-related brewery entities received over $10 million.

g.  Dozens of other Govoni-related entities received millions more.

175.    The Center-originated money above traveled from the Center account at the Bank, to the BFG account at the Bank, to dozens of Govoni's related accounts at the Bank, even though the Bank knew the trust nature of the funds.

176.    Tens of millions of SNT and Center funds were directed into Govoni's pet projects with no apparent ability or intention of repaying the funds to BFG for the purpose of returning the funds to the Center, which could have then replenished the SNTs.

177.    Govoni entered into self-interested loan agreements between BFG and his other entities, including but not limited to Big Storm Brewery, LLC, to facilitate the further shuffling of the Center and SNT funds and reduce his personal tax exposure.

178.    Tracey Gregory was copied on the communications requesting that the Bank execute each one of these transfers.  However, Gregory was acting to advance Govoni's personal financial interests. Her actions in setting up accounts for Govoni's various companies, and facilitating transfers of millions of dollars from the Center to BFG were clearly adverse to both the Center and the Beneficiaries' interest. She would have approved any transfer Govoni asked her to approve.

179.    Despite Gregory's purported role on the Center's board, she never acted in a

fiduciary capacity, nor did she even understand her roles and duties on behalf of the Center.  As with others at the Center, Govoni put Gregory in a role on the Center's Board of Directors to control both the information flow and keep his misconduct secret siloed from others.

180.    Gregory's lack of sophistication, knowledge of fiduciary duties, or even accounting experience was evident to the Bank by the communications between them.  The emails and records all clearly demonstrate Gregory was merely acting at the sole request of Govoni and his pecuniary interests.

181.    Further, Govoni's actions, and the Bank's own obligations to the Federal Government would have almost certainly caused internal fraud alerts or suspicious activity alerts as the depository of trusts with such unusual transactions to related party entities being directed in an unconventional manner and often by unauthorized individuals.

182.    The Bank—as the financial institution where all of the accounts were established and held—knew that all of the transferee companies were owned or controlled by Govoni based on the account opening documents and signatory authorizations.  The Bank also knew that nearly all of the funds held by the Center at the Bank were trust funds.

183.    Perhaps most troubling, the Bank knew of the total deposits in the Center's SNT accounts, the huge amounts that were transferred out over time, and the lack of any correlating funds in the other Govoni accounts.

### *The Center's needs to search for liquidity and the Bank's knowledge of the BFG Loan*

184.    When BFG or other Govoni-related non-Center entities had funding needs, they reached into the Center for liquidity, often using available SNT funds that were comingled with the Center's own funds. This became the modus operandi for all of Govoni's entities, including the Center, where employees "look[ed] for liquidity" to make distributions for Beneficiaries under

their applicable trust documents—using "Beneficiary A's" funds to cover "Beneficiary B's" expenses, because Beneficiary B's funds (or the overall large pot of comingled funds) had been used to fund the BFG Loan and were not liquid to pay the Beneficiary's ongoing needs.

185.    Using only internal spreadsheets and a financial program, Govoni's directees had Beneficiaries "buy" BFG Prime, and "sell" their cash assets to BFG to use for BFG's liquidity purposes.  The affected Beneficiary would be left with an increase in the BFG Prime "investment" and his or her cash attributable cash in the SNT would be sent to BFG for Govoni and his non-Center businesses' use and benefit.

186.    Of course, the Center would not have had to search for liquidity if the SNT and Center funds had been protected, each Beneficiary's funds had been separately accounted for, prudently invested, properly reported to the Beneficiaries on a regular basis, and had the residual value  of the SNTs been available for transfer to the Center upon other beneficiaries deaths.

187.    The Bank was aware of the shuffling of SNT funds and the Center's search for liquidity to cover compromised SNT accounts.

188.    Regularly, Tracey Gregory would process "funding requests" with the Bank, wherein Beneficiaries would "purchase" BFG Prime, and their liquid SNT funds would be sent to BFG to increase the BFG Loan.

189.    Gregory would sum the Beneficiaries' purchases and have the Bank execute a transfer from the Cetner's Depository account, on a Bank letterhead, to BFG account with a combination of following transfer descriptions:

    a.    "BFG Prime Purchase tg"

    b.    "BFG Prime Investment"

    c.    "Trsf for BFG Prime"

d.   "trsf for BFG Prime tg"

e.   Trsf for BFG Prime Investment"

190.   Each of these transfers with the above notations came through the Bank's system on a "Transfer Confirmation" form.

191.   On or about March 28, 2014, the Bank took notice of a particularly large check signed by Todd Belisle seeking to transfer $750,000 of Center funds to BFG with the memo line: "03/25/14 BFG Prime."

192.   The Bank identified that the check was not executed by an authorized signer and required an authorized signer (who appears to be Tracey Gregory) to execute a verification form because of the "irregular endorsement." But the Bank did not ask Gregory why the Center, which has trust funds, is sending $750,000 to BFG for "BFG Prime." This was two years after the Bank had previously sought specific Center approval for transfers from the Center accounts.

193.   Nor does the Bank ask Belisle again about the other millions of dollars transferred from the Center's accounts over the next four years.

194.   Due to these documents, among other reasons, there is no doubt the Bank was aware of the Center's purchase of large amounts of the BFG Prime Investment underlying the BFG Loan.

### _The Bank was aware of the purpose of each account, the corporate structure of Govoni's companies, and the companies' business strategies_

195.   On January 12, 2015, after having received and facilitated the transfer of over $50 million from the Center to BFG, Maureen Gallagher and others from the Bank met with BFG to discuss Govoni's "plans …for the future and discuss any additional banking needs that they could potentially provide." The Bank, aware the Center held SNT accounts and aware of the Center's fiduciary duties, set an agenda to discuss 1) the purpose of each of the accounts it was holding, including those related to Govoni, the Center, and BFG; 2) the overarching business strategy; and

3) the corporate structure of Govoni's companies.

196.    At the time of this meeting, Govoni was supposedly no longer on the board or managing the Center.  Yet, at no point did the Bank find this odd or improper or otherwise alert the Center of its six-year history of transfers, without correlating return transfers, with BFG or the subsequent draining of BFG for the other 100+ non-Center Govoni entities.

197.    By 2016, the Bank had only solidified its expected value of Govoni's business to such an extent that the Bank President of the Tampa market reached out for a meeting "just to personally introduce ourselves in person with Leo and thank him for his business. He has an outstanding relationship[.]"

198.    On another occasion in 2017, Lilly told Gregory that because "the relationship has grown so much, I can certainly look into some possible reductions" to the Govoni-entity bank fees, even though those fees were being paid by the Center.

199.    At Tracey Gregory's request and instruction, Sherry Lilly at the Bank opened nearly every one of Govoni's non-Center accounts at the Bank. Govoni was the authorized signer for many of them.

200.    Each time an account was opened, Gregory would send an email to Lilly, advising of the nature of the company being opened (one of the Bank's protocols).  Accordingly, the Bank was already well aware of the nature of each of these accounts even before the 2015 meeting.

201.    As such, the Bank was aware that BFG was a "finance lending company" because this is what Gregory told the Bank when the BFG account was opened.

202.    As a result of the January 2015 meeting, the Bank was also well aware of Govoni's frivolous empire funded with SNT funds.  In discussing the purpose of each account, as set forth on the agent, the Bank must have also learned that Orvis Entertainment, LLC was created to hold

38

liquor licenses, Broadleaf Forest Mgmt, LLC was created for farmland and timber holdings, and Prometheus Foundation Management, LLC was created for marketing services for professional athletes. The list goes on an on.

203.    The Bank was aware that SNT funds were going from the Center to BFG and into these non-trust companies owned by Govoni.

204.    Because a bank is a corporate entity that can only acquire knowledge through its agents, Lilly, Green and Gallagher's knowledge is imputed to the Bank. They are not the only employees who corresponded with the Center about the specific trust nature of the individual SNTs and Pooled SNT subaccounts.

205.    The Bank knew, therefore, that each and every transfer was solely for Govoni's benefit as the owner of each of the accounts (including BFG) and that the Center did not benefit from the excretion of its funds, SNT funds, or MSA funds.

206.    The Bank's own website describes its obligations under Section 326 of the PATRIOT Act, including the requirement that the Bank obtain, verify, and record information to identify each person who opens an account or changes an existing account—for the express purpose of combatting terrorism and, as relevant here, money laundering.

207.    No matter how many of his accounts Govoni used to divert trust funds, the Bank knew that all of the transactions were connected to him and inured to his benefit due to, among the other reasons stated herein, the reporting and record keeping obligations imposed on the Bank by law.

### *The Medicare Set-Aside Funds*

208.    Govoni also targeted funds designated for Medicare Set-Asides ("**MSA**").

209.    Govoni funneled these MSA funds to BFG, BSG, and other entities he controlled.

210.    For example, on February 28, 2011, Gregory emailed Sherry Lilly at the Bank and asked her to "transfer $60,000.00 from the Center – MM XII MSA account ending in XXXX0035 to Boston Finance Group account ending in XXXX0013," and within a half hour, Lilly replied that the transaction had been completed.

211.    On September 12, 2011, the Center's outside accountant (not FTAS) emailed Karen Curran (BFG) and Tracey Gregory and inquired into the MSA funds. He asked about the "significant liability on the books called Loan – MSA" for which there did "not appear to be any interest being calculated or paid on this loan." The accountant specifically asked, "Isn't this borrowing from client MSA accounts?" and flagged a "fiduciary duty concern."

212.    Govoni and his agents at the Center were undeterred and continued "lending" the MSA money, and the SNT money, to BFG—all through the Bank, despite the Bank's knowledge that the funds were subject to fiduciary duties.

213.    The Center was also damaged by this conduct.  Like the losses the Center was responsible for as a result of the BFG Loan, the Center would ultimately be liable for shortfalls on the MSA accounts that were used to fund Govoni's other endeavors.

### The World's Discovery of the Loan

214.    After Gregory resigned from the Center in 2020, her replacement, Laura Davis, started reviewing the books. In March of 2021, Davis discovered that "they have been doing money transfers that we have not been keeping track of." After conferring with another colleague—who said Gregory "never sent me anything for MSA. She dealt with that herself"—Davis reached the following conclusion that she shared with Witeck and Janicki:

> With this being said and Tracey taking full accountability for investing MSA money I am going to pull all MSA money out of BFG. We will have to add this to the deficit to cover. I will need to figure out how much this comes too [sic] but last count we were around 3–4 million. I am sorry but this is not something I want to

continue to do as I have been told by outside counsel that MSA money cannot be invested.

. . .

Hope you understand that there can be no other option at this time and if anything were ever to arise TRACEY was completely and solely responsible.

215.     However, BFG did not repay the MSA loan and Govoni never intended BFG or his other entities that received the MSA loan proceeds or the BFG Loan proceeds to repay the Center.

216.     In 2022, Govoni's daughter, Janicki, resigned from the Board of Directors and her employment with the Center.   Upon her departure, she left behind a copy of an unsigned letter dated November 11, 2021, from BFG to the Center's then board of directors, which sought to modify the terms of BFG Loan. The BFG Loan was thus discovered by the non-Govoni directees, i.e., the truly independent officers and directors of the Center.

217.     Within a short time period, Govoni and other known Govoni-associated directors were pushed out, despite their efforts to maintain control over the Center.

218.     A new Board of Directors was selected for the Center to attempt to fix the wrongs which had occurred for over a decade.

219.     Michelle Diebert became President, taking over for Todd Belisle (who signed the BFG Loan documents).

220.     Laura Davis became Vice President, taking over for Caitlin Govoni.

221.     Carl Schroeder became Secretary (taking over for Diebert who served as Secretary since 2016).

222.     Diebert and Davis also served on the Center's Board in prior, more limited roles. Diebert started as a temp at the Cetner in 2007, and served as secretary and treasurer from 2016-2066. Davis joined the Center in 2020 as an employee and worked on the trust distribution side. Like many other employees of the Center, both Diebert and Davis were provided only limited

information to perform their jobs and were siloed from the BFG Loan.

223. Unhappy with his ousting, Govoni approached the Center's new board of directors (Michelle Diebert, Laura Davis, and Carl Schroeder) and attempted to retake official control through a proposed management agreement that would allow him to run the Center's operations.

224. The Board rejected this proposal.

225. Govoni then suggested that the Center enter into a "Third Party Agreement" with a separate company he controlled, Global Litigation Services, LLC, which would effectively allow this new company to run and manage the Center. This plan was also rejected by the now more independent Board.

226. In a final attempt to maintain control of the Center, Govoni proposed that his long-time lawyer and confidant, Johnathan Golden, become an employee of the Center and oversee and run all of the Center's operations (i.e., Govoni would maintain control through Golden). This plan was also rejected by the Board as well.

227. The new Board of Directors attempted to run the Center properly while launching an investigation into how the losses occurred. The new Board of Directors hired Hill Ward Henderson, a separate law firm in Tampa, Florida, to facilitate this investigation.

228. On February 9, 2024 ("**Petition Date**"), the Board made the decision to put the Center into a chapter 11 bankruptcy. The Center stated that the balance of the BFG Loan on the Petition Date was "in excess of $105 million." This sum does not account for interest or lost investment growth which the Beneficiaries depend on to promote the longevity of their trust assets.

229. Not coincidentally, the Center only had approximately $4,600,000 cash on hand, far less than necessary to even begin to make the Beneficiaries whole to pay for Beneficiaries' trust needs.

230.   The outstanding BFG Loan balance as of the Petition Date also does not account for the lost residual SNT balances that should have transferred to the Center upon the passing of a Beneficiary, improving both the Center's liquidity, but also ensuring its ability to properly meet the intended mission of an SNT.

### *The Bank charged the Center all Govoni's fees*

231.   For over a decade, the Bank charged the monthly account fees for all of Govoni's accounts to the Center's corporate account because, by the Bank's own admission, it thought Govoni's hundred-plus accounts—and the Center—were all "one big company."

232.   Yet, the Bank assisted the Center at the outset with connections to other special needs trusts and counsel for creation of its own SNT.  The Bank obtained the various trust documents that limited the authority of the Center in investing the SNT funds.  So, in the Bank's subjective view, or one of the Bank's employees' subjective view of these entities all being "one big company" is either a lie, willfully turning its back on known facts, or extreme and gross negligence and complicity concerning the alarming conduct of Govoni in violation of his duties to the Center.

233.   The Bank's substantial assistance in, among other things, (i) transferring Center and SNT funds to BFG and then to additional third parties related to Govoni - to the complete detriment of the Center, BFG, and the beneficiaries of the trusts; (ii) allowing transfers ordered by individuals lacking signatory and corporate authority over designated accounts; (iii) cancelling Center deposits without authorization or notification; (iv) charging exorbitant account fees to the wrong client; (v) allowing, for years, the Center to affix the Bank's logo to (false) account statements; (vi) allowing improper financial transfers, and (vii) other conduct, including that identified herein, facilitated, enabled, aided, and allowed Govoni's breach of fiduciary duty to continue for well over a decade.

The Bank rendered this assistance exclusively for Govoni's benefit, and at the expense of the Center (and, derivatively, but also obviously, the extremely vulnerable Beneficiaries).

**TOLLING OR NON-ACCRUAL OF STATUTES OF LIMITATION**

234.    The Plaintiff did not discover and could not have discovered the facts constituting the Bank's violations until the Center's bankruptcy filing on February 9, 2024.  The directors and decision makers at the Center who were shielded from Govoni's misconduct could not have discovered the Govoni's breaches or the Bank's violations and substantial assistance of the breaches until shortly before the bankruptcy filing.

235.    In fact, it is the Bank's assistance and complicitly in not alerting the Center to the wrongdoing that allowed Govoni's breaches to continue.

236.    Govoni and his directees and co-owners of the Non-Center entities concealed the wrongdoing, and the Bank's assistance therein, by carrying out the complex series of transactions and processes through which the Center and SNT funds were misused and utilizing outside Govoni related companies to do the reporting (or lack thereof) to the Center, its board of directors, and the Beneficiaries.

237.    In this way, Govoni and his directees kept information regarding the BFG Loan and BFG's subsequent transfers to other Govoni entities secret from many Center employees.

238.    The true extent and nature of the breaches of fiduciary duty of Govoni and his related entities providing services to the Center, and the Bank's role in that scheme, only truly came to light shortly prior to the commencement of the Chapter 11 proceeding.

239.    Because of the lack of knowledge of any non-Govoni controlled officer or director of the Center, the Center could not have reasonably discovered the facts constituting the claims asserted against the Bank herein until, less than a year prepetition, any applicable statutes of limitation were tolled prior to that time period.

240.    Moreover, the misconduct at issue was ongoing and continued to result in accrual of new claims.

241.    Further, pursuant to 11 U.S.C. § 108(a), the Trustee may bring causes of action which have not reached the applicable statute of limitations within two years from entry of the order for relief.

## CLAIMS FOR RELIEF

## COUNT I – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

242.    Plaintiff re-alleges and incorporate paragraphs 1–241 as if fully set forth herein.

243.    The Center served as trustee for all of the Beneficiaries' SNTs.  Govoni was in charge of, actively managed, and controlled every aspect of the Center from time he founded the Center until he was ousted in 2022, despite his outward facing relinquishment of his formal titles.

244.    Govoni owed fiduciary duties to the Center which apply by operation of law. Govoni nearly exclusively oversaw the Center and its trusts, which dictate the Center "shall exercise these powers at all times in a fiduciary capacity."

245.    Govoni breached his duties to the Center by commingling, misappropriating, and misusing the SNT funds that were held in trust for each Beneficiaries' sole benefit, and using these funds and the Center's funds, commingled, for the BFG Loan.

246.    Other, non-Govoni officers of the Center had an obligation to conduct a reasonable inquiry and gain sufficient knowledge to make corporate decisions.

247.    The Bank knew that Govoni, and other officers of the Center over the past decade plus, owed a fiduciary duty to the Center, and yet the Bank treated Govoni as the Center's sole owner and director, despite lack of titles.

248.    The Bank also knowingly failed to alert any of the formal officers of the Center of

suspicious activity it would have, almost certainly, been alerted to by its internal, government mandated systems, which assisted in keeping those officers uninformed and allowing Govoni's wrongful activities to remain hidden and to expand over time.

249.    The Bank was aware of the trust nature of the Center and its accounts because it had the account opening agreements and statements, which labeled the accounts as trust accounts; the Bank frequently discussed the "trust" nature of the accounts with Center representatives including Tracey Gregory; the Bank specifically offered assistance and legal counsel placement to the Center for the explicit purpose of creating such trusts and the services the Center would need for such trusts, the Bank received and reviewed trust instruments, and at times the Bank signed trust instruments as Custodial Trustee.

250.    The Bank had actual knowledge of Govoni's breaches of fiduciary duty to the Center. The Bank knew, *inter alia*, that:

    a)   the Center was controlled by Govoni;

    b)   Govoni had relinquished formal titles and other individuals now held those official titles;

    c)   the Center accounts held at the Bank were SNTs;

    d)   the Bank held accounts for over 100 other Govoni-owned or related entities which were obviously not trust accounts or trust-related;

    e)   the SNT accounts were comingled in the Center, then transferred to BFG and other Govoni-related accounts;

    f)   Govoni's business strategy was to invest SNT and Center funds with BFG and other Govoni-related endeavors;

    g)   the corporate structure of the Center, BFG, and dozens of other Govoni-related companies, were all controlled by Govoni for Govoni's benefit;

    h)   the Center accounts lacked the liquidity to meaningfully administer Beneficiaries' SNTs;

    i)   due to its holding the trust documents and aware of the trust nature of the SNT funds, the Bank knew the SNT funds were to be prudently invested, but were not

so invested when they were placed into BFG's accounts and sent to Govoni's other related accounts thereafter.

j)   the Center printed and issued Beneficiary account statements using Bank letterhead with the Bank's explicit or implicit authorization;

k)   individuals without signatory authority directed fund transfers from the Center's and Govoni's accounts;

l)   non-Center employees without signatory authority directed the Center to delete deposits from Center accounts;

m)   the Bank was relaxing its standard operating procedures and banking procedures and regulations for its very good customers, i.e. Govoni and his hundreds of accounts; and

n)   the Center routinely paid fees for banking services not rendered to the Center.

251.   The Bank provided substantial assistance by, *inter alia*,

a.   allowing Govoni's agents and directees at the Center to use AMB letterhead (and helping to modify the letterhead) to issue false account statements to the Beneficiaries, giving them a false sense their SNTs were safe and invested prudently;

b.   After a Beneficiary raised a concern regarding false Bank "statements" they had received, the Bank actively assisted the Center in devising a way to respond while still giving the impression that the Bank had signed off on the Beneficiary statements provided by the Center;

c.   providing certifications as to specific amounts held on behalf of Beneficiaries at the Center, despite the Bank's inability to verify how much funds it held on behalf of specific Beneficiaries;

d.   transferring SNT funds into Govoni's other accounts, either directly from the Center, or indirectly by direction from Tracey Gregory on behalf of all of Govoni's other companies;

e.   lifting wire restrictions to permit improper transactions;

f.   accepting wire approvals from individuals who were not authorized signatories;

g.   relaxing its own procedures and policies and making many policy exceptions to benefit Govoni and his companies;

h.   certifying to courts that the Center held specific amounts on behalf of specific Beneficiaries, despite the Bank knowing it could not identify which funds belonged to individual Beneficiaries;

i. violating their own internal policies, including by allowing account opening and signatory authority by Govoni via emails, but not even emails from Govoni himself, but Tracey Gregory and then, allowing deposits that would not appear on the account, the ordering of checks before there were authorized signatories, creating a Management Agreement to demonstrate Govoni had any such control, and confirming later the Bank had no actual evidence of Govoni's connection to the account where they had authorized his depositing and signing of checks;

j. failing to alert the formal officers of the Center of the extensive suspicious activities that the Bank's own systems almost certainly flagged for review over the decade long scheme by Govoni; and

k. favoring their own profits and higher account balances from treating Govoni so favorably and allowing him, with the Banks implicit consent and active support, to treat the various companies' funds as his personal assets to do with as he wished.

252. Moreover, the Bank encouraged Govoni's breach of fiduciary duty by actively monitoring the various Govoni related accounts held at the Bank and notifying the Center and Govoni's directees when nominally unrelated accounts were in danger of having insufficient funds.

253. While the Bank would help monitor Center accounts for insufficient funds and would selectively choose to alert the Center or Govoni's agents of this status, they did not alert anyone to the substantially small amount of total deposits on hand compared to the volume of deposits being made in the SNTs or the expansive transfers to Govoni's related entities from those SNTs.

254. In essence, the Bank was ok with the Center's transfer of what the Bank knew were protected trust funds because it benefited the Bank. Without the Bank's willing cooperation and desire to chase profitability at the expense of the Beneficiaries' financial security, Govoni's pilfering of trust assets would not have been viable.

255. The Center suffered damages as a result of Govoni's breaches of duty. The Center lost its own funds and its business which can no longer operate as a result of the horrific losses it suffered at the hands of Govoni. The Center owes its Beneficiaries over $100 million of

compromised SNT assets funded into the BFG Loan.  The Center also lost its ability to recover the pooled trust res from Beneficiaries whose residual pooled trust assets would have gone back to the Center to fulfill its 501(c)(3) mission.

256.    As a result, but not exclusively, the Beneficiaries also suffered damages and lost some or all of their SNT assets (over $100 million in total) as a result of Govoni's breaches of fiduciary duty, secretly guided by Govoni and his insiders, and as aided and abetted by the Bank.

257.    The specific misconduct that gives rise to this claim for aiding and abetting fiduciary breach was intentional, malicious and deliberate, or at least willfully and recklessly, outrageous, and reprehensible, and so wanting in care that it constituted a conscious disregard or indifference to the rights, assets, and corporate separateness of the Center, and therefore an award of punitive damages is appropriate. In addition, senior management of the Bank engaged in such conduct, or knowingly condoned, ratified, or consented to such conduct.

258.    By reason of the foregoing, the Center is entitled to a judgment awarding it compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

WHEREFORE, the Trustee respectfully requests that the Court enter a judgment against the Bank and in favor of Trustee, awarding Trustee compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law; awarding the Trustee punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law; awarding the Trustee costs and disbursements and reasonable allowances for fees including for counsel and experts and reimbursement of expenses; and awarding all other and further relief the Court deems just and proper.

## COUNT II – THE BANK'S BREACH OF FIDUCIARY DUTY TO THE CENTER

259.    The Trustee realleged the allegations in paragraphs 1–241 as though set forth fully herein.

260.    The Bank was fully aware that the Center was depositing Beneficiary trust funds with the Bank.

261.    The Bank knowingly agreed to hold <u>trust</u> funds on behalf of the Center. It asked for Beneficiaries' trust documents on many occasions, on occasion agreed to act as a custodial trustee for the Center and let its letterhead be used to give to Beneficiaries the imprimatur that their SNT funds were safe at a bank.

262.    In fact, the Bank offered and provided guidance and assistance to Govoni in the creation of the Trust at the outset.  The Bank specifically offered up services to create the Center as a trust company, connect Govoni with other similar trust companies, find shell companies that were already authorized to act as a trust company for Govoni to buy and avoid the regulatory process, and for legal counsel to create a trust company if needed.

263.    Ultimately, the Center and Govoni took the assistance of the Bank, created the Center as a SNT trust company, and repaid the Bank's initial willingness to provide these services by utilizing the Bank for the Center's SNT accounts, as well as so many other of Govoni's affiliated companies.

264.    The Bank's President and Chairman took individual, special focus to assist Govoni in creating these accounts, a level of personal service most business account holders could not expect.

265.    Beyond merely opening bank accounts this Center used, the Bank's President promoted that the Bank's Chairman had a "close contact" at significant, similar Texas trust

companies and as a result, the Center and Govoni could join a call with the Bank, wherein the Bank "can describe the exact details of the service you need to be provided."

266.    The Bank's proposal to provide "the exact details of the service you need" can only be described as something beyond a mere depository relationship, for which standardized agreements would suffice and would not require the involvement of the Bank's President and Chairman.

267.    In furtherance of providing the exact services Govoni and the Center required, the Bank contacted some of its own regulatory counsel and had such regulatory counsel advise Govoni and the Center via the Bank's guidance.

268.    In this regard, the Bank had active regulatory counsel with specialized knowledge of the SNT and trust industry, yet did not follow basic protections that would be mandated by the Federal government, or if they did, intentionally withheld this knowledge from anyone other than Govoni, including withholding the information from the formal officers of its banking client, the Center.

269.    The Bank also took on the role of a custodial trustee for certain of the SNTs, including verifying account balances within pooled SNTs for which the Bank could have no knowledge of the exact balance.  If anything, the Bank had actual knowledge that based on the deposits compared to withdrawals (and lack of equivalent returns from the withdrawing entities) that such SNT funds were not actually available to the particular pooled SNT Beneficiary.

270.    As such the Bank took on a special relationship with the Center, above and beyond that of a typical customer-bank relationship.

271.    Due to the special relationship between the Bank and the Center, the Bank owed fiduciary duties to the Center, including the duty of loyalty, the duty not to take unfair advantage,

the duty to act in the best interest of the Center, and the duty to disclose material facts.

272.    The Bank breached its duty of loyalty, duty not to take unfair advantage, duty to act in the best interest of the Center, and duty to disclose material facts by among other actions:

a.  Transferring trust funds from the Center to Govoni's other entities without proper authorization;

b.  Assisting Govoni's agents to conceal the improper use of trust funds held by the Bank by allowing its letterhead to be used;

c.  Failing to notify the Center and its formal officers of, among other things, the alarmingly insufficient amounts of funds at the combination of the Center and Govoni's other entities to service the SNTs, that unauthorized individuals were transferring funds from Center accounts at the Bank to Govoni affiliated accounts, that return transfers were miniscule in comparison, or that its own suspicious activity or fraud internal alerts were raising major concerns;

d.  providing certifications as to specific amounts held on behalf of Beneficiaries at the Center despite the Bank's inability to verify how much it held on behalf of specific Beneficiaries; and

e.  Assisting Govoni and entities under his direction and control to receive trust funds which were held in Center accounts at the Bank.

273.    The Center was harmed by the Bank's breaches of its fiduciary duties to the Center.

274.    The Center lacked the ability to faithfully administer the Beneficiaries' SNT trusts, which were woefully compromised and deficient as a result of the Bank's actions.

275.    The Center was forced to file bankruptcy and now is facing claims against it of over $100 million from Beneficiaries.

276.     The specific misconduct that gives rise to this claim for fiduciary breach was intentional, malicious, deliberate, outrageous, and reprehensible, or so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of the Center, and therefore an award of punitive damages is appropriate. In addition, senior management of the Bank engaged in such conduct, as well as knowingly condoned, ratified, or consented to such conduct.

277.     By reason of the foregoing, the Center is entitled to a judgment awarding it compensatory and punitive damages in an amount to be determined at the trial of this action, together with interest at the maximum allowable rate.

WHEREFORE, the Trustee respectfully requests that the Court enter a judgment against Bank and in favor of Trustee, awarding Trustee compensatory damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law; awarding the Trustee punitive damages in an amount to be determined at trial, together with appropriate prejudgment interest at the maximum rate allowable by law; awarding the Trustee costs and disbursements and reasonable allowances for fees including for counsel and experts and reimbursement of expenses; and awarding all other and further relief the Court deems just and proper.

## COUNT III – AVOIDANCE OF IMPROPERLY PAID ACCOUNT FEES PURSUANT TO 11 U.S.C. § 544 AND RECOVERY UNDER § 550

278.     The Trustee realleges the allegations in paragraphs 1–241 as though set forth fully herein

279.     Beginning in 2010, the Bank began charging the Center fees for the account servicing provided by the Bank.

280.     These charges appeared on the Center's bank statements as an "account analysis charge."

281.    A full list of the transactions, including the date and amount of each transaction that is the subject of this Count is attached hereto as **Exhibit G.**

282.    Eventually, the Center learned that the "account analysis charge" included amounts due for non-Center accounts.

283.    Specifically, the Bank had been charging the Center "account analysis charges" for non-Center accounts associated with Govoni's other business interests.

284.    The Center had no obligation to pay the "account analysis charge" associated with the non-Center bank accounts.

285.    The Center received no benefit from the payment of these fees for non-Center accounts.

286.    The Center did not receive reasonably equivalent value for the payments made to the Bank on behalf of the non-Center, Govoni-related entities.

287.    The Center also did not receive reasonably equivalent value for the "account analysis charge" payments made on behalf of its own accounts which were pilfered under the Bank's watch.

288.    The transactions identified in Exhibit G are avoidable by the Internal Revenue Service, which as of the Petition Date holds an unsecured claim in this case.

289.    Further, at the latest, if not earlier, the Center began suffering damages when the BFG Loan was made and first funded in May of 2010.  To the extent SNT assets were used and included in the Center's transfer of assets to fund the BFG Loan in May of 2010, Beneficiaries also began suffered damages at this time.

290.    Therefore, the "account analysis charges" totaling at least $133,754 are avoidable pursuant to § 544.

WHEREFORE, the Trustee respectfully requests that the Court enter a judgment against Bank and in favor of Trustee determining that the "account analysis charges" totaling $133,754 are avoidable as constructively fraudulent transfers and entering a judgment against Bank and in favor of the estate in the same amount.

## COUNT IV – OBJECTION TO BANK POC

291.    The Trustee realleges the allegations in paragraphs 1–241 as though set forth fully herein.

292.    The Bank filed Proof of Claim 10268 (the "**Bank POC**") on October 16, 2024. **See Exhibit H.**

293.    The Bank POC asserts a secured claim in the nominal amount of $100,000.00.

294.    The Bank refers to numerous agreements with the Center to establish the basis for its secured claim against the Center but only attaches a single agreement to the Bank POC, the ACH Origination Agreement dated September 5, 2013 (the "**ACH Agreement**").

295.    The Bank POC alleges that under the ACH Agreement the Bank was granted a security interest in assets of the Center held at the Bank and asserts obligation of the Center to indemnify the Bank for any wrongdoing.

296.    Specifically, the Bank POC states that "pursuant to [p]aragraph 3 of the [ACH Agreement], Debtor granted to [Bank] a [s]ecurity [i]nterest in certain assets of the Debtor." Bank POC at addendum pg. 1.  The Bank POC then identifies $3,792.196.00 in funds in which the Bank claims to have a perfected security interest in by virtue of "[Bank's] possession of the assets that existed as of the Petition Date."

297.    The Bank POC also asserts that it is entitled to indemnification despite its role in assisting in the breaches of fiduciary duties which gave rise to this Complaint.

298.    The relevant portion of Paragraph 25 of the ACH Agreement states: "the [c]ustomer shall defend, indemnify, and hold harmless the [Bank], and its officers, directors, agents and employees, from and against any and all actions claims, losses, damages, or expenses, including attorney's fees and expenses, resulting form or arising out of (aa) any breach of any of the agreements, representations or warranties of the [c]ustomer contained in the [a]greement; or (bb) any act or omission of the [c]ustomer or any other person acting on the [c]ustomer's behalf."

299.    At the time that the Bank entered into the ACH Agreement with the Center in 2013, the Bank knew that certain, but not all funds held by the Center were trust funds.

300.    The Bank ignores this distinction in its characterization of the amount and extent of its security interest.

301.    The Bank gave the Center permission to use the Bank's logo on statements provided to Beneficiaries by the Center designed to give the impression that the Bank had either created or signed off on the accuracy of statement.

302.    Additionally, on occasion the Bank certified that specific amounts were accessible to Beneficiaries in "disbursement accounts" held at the Bank, without having any ability to make this certification other than from information provided by the Center, but with the knowledge that the Bank's certifications would be relied on by courts and Beneficiaries.

303.    When a Beneficiary questioned one of the statements created with the Bank's permission, rather than raise an immediate red flag, the Bank worked with the Center to modify the statements that would allow the Center to continue leverage the Bank's reputation, while also allowing the Bank to claim plausible deniability.

304.    The Bank continued to "certify" that specific amounts were on hand at the Bank in "sub-accounts" for each Beneficiary after informing the Center that it could no longer use the

Bank's logo.

305.    The Bank relaxed its standards, policies, and regulations for the Center and Govoni's many accounts because the Center and Govoni's other accounts at the Bank were extremely profitable and important to the Bank.

306.    Without the active assistance and inequitable conduct of the Bank, including allowing the Center to use the Bank's logo on falsified account statements, working with Govoni's agents to create new account statements designed to put Beneficiaries at ease, certifying specific amounts held in disbursement accounts for Beneficiaries, and relaxing protocols and policies, Govoni and his agents at the Center would not have been able to misappropriate over $100,000,000.00 in Beneficiary trust funds.

307.    The Bank should not be permitted to recover on behalf of the harm it caused to the Center and its Beneficiaries.

308.    To the extent that the Bank has any claim against the Center, it certainly does not have a secured claim by virtue of holding trust funds administered by the Center.

309.    The Bank's attempt to levy on any funds remaining at the Bank after the Bank's inequitable conduct and assistance in breaches of duties underlies its utter disregard for the rights of the Beneficiaries in pursuit of profit at any cost.

310.    The damages incurred by the Center and Beneficiaries resulted in part of the Bank's own wrongful conduct.

311.    An indemnity provision does not cover damages that result from the Bank's own wrongdoing and cannot serve as basis for the Bank's claim against the Center.

WHEREFORE, the Trustee respectfully requests that the Court disallow the Bank's proof of claim in its entirety as the Bank does not have a perfected security interest in the Beneficiaries'

trust funds held at the Bank and the indemnity provision identified by the Bank does not cover the Bank's own wrongful conduct.

### COUNT V – EQUITABLE SUBORDINATION OF THE BANK'S CLAIM

312.    The Trustee realleges the allegations in paragraphs 1–241 as though set forth fully herein.

313.    The Bank filed the Bank POC on October 16, 2024.  See Exhibit H.

314.    At the time that the Bank entered into the ACH Agreement with the Center in 2013, and long before, the Bank knew that the funds held by the Center were trust funds.

315.    Nevertheless, the Bank gave the Center permission to use the Bank's logo on statements provided to Beneficiaries by the Center designed to give the impression that the Bank had either created or signed off on the accuracy of the statement.

316.    Additionally, the Bank certified that specific amounts were accessible to Beneficiaries in "disbursement accounts" held at the Bank, without having any ability to make this certification other than from information provided by the Center, but with the knowledge that the Bank's certifications would be relied on by courts and Beneficiaries.

317.    When a Beneficiary questioned one of the statements created with the Bank's permission, rather than raise an immediate red flag, the Bank worked with the Center to create new statements that would allow the Center to continue leverage the Bank's reputation, while also allowing the Bank to claim plausible deniability.

318.    The Bank continued to "certify" that specific amounts were on hand at the Bank in "sub-accounts" for each Beneficiary after informing the Center that it could no longer use the Bank's logo.

319.    The Bank relaxed its standards, policies, and regulations for the Center and

Govoni's many accounts because the Center and Govoni's accounts at the Bank were extremely profitable and important to the Bank.

320.    Without the active assistance and inequitable conduct of the Bank, including allowing the Center to use the Bank's logo on falsified account statements, working with Govoni's agents to create new account statements designed to put Beneficiaries at ease, certifying specific amounts held in disbursement accounts for Beneficiaries, and relaxing protocols and policies, Govoni and his agents at the Center would not have been able to misappropriate over $100,000,000.00 in Beneficiary trust funds.

321.    The Bank should not be permitted to recover on behalf of the harm it caused to the Center and its Beneficiaries.

322.    The Bank's misconduct resulted in injury to the Center, and to the Center's Beneficiaries.

323.    The Bank's attempt to levy on any funds remaining at the Bank after the Bank's inequitable conduct and assistance in breaches of duties highlights its utter disregard for the rights of the Beneficiaries in pursuit of profit at any cost. An indemnity provision does not cover damages that result from the Bank's own wrongdoing and cannot serve as basis for the Bank's claim against the Center.

324.    Subordination of the Bank POC under these circumstances is not inconsistent with the provisions of the Bankruptcy Code.

325.    Recoveries by the Trustee should not go to anyone who caused the Beneficiaries harm, nor should the Bank be entitled to offset any amounts that the Court determines are owed by the Bank pursuant to this Complaint.

326.    Therefore, to the extent any claim is allowed, the Bank POC should be subordinated

to the claims of all Beneficiaries pursuant to 11 U.S.C. § 510(c).

WHEREFORE, the Trustee respectfully requests the Court enter a judgment subordinating the Bank POC in its entirety to the claims of general unsecured creditors, in the event the Bank POC becomes an allowed claim.

## COUNT VI – BREACH OF CONTRACT AND VIOLATION OF ACH AGREEMENT

327. The Trustee realleges the allegations in paragraphs 1–241 as though set forth fully herein.

328. The Bank entered into an ACH Agreement with the Center in 2013, and presumably years before beginning in 2008 when the relationship with the Bank and the Center began.

329. The Bank and the Center entered into another ACH Origination Agreement on March 10, 2021 (the "**2021 ACH Agreement**"), a copy of which is attached as **Exhibit I**.

330. The ACH Agreement and 2021 ACH Agreement, with presumably others not yet discovered by the Trustee (collectively the "**AMB ACH Agreements**"), explicitly incorporate the rules of the National Automated Clearing House Association ("**NACHA Rules**") as part of the terms of the ACH Agreement and the 2021 ACH Agreement, including the Bank's obligations therein and to comply therewith. The introductory paragraph of the 2021 ACH Agreement specifically provides that "Customer [Center] wishes to initiate credit and or debit Entries through the Financial Institution to accounts maintained at Financial Institution and in other depository financial institutions by means of the Automated Clearing House Network ("**ACH**") pursuant to the terms of this [2021 ACH] Agreement and the rules of the National Automated Clearing House Association…." 2021 ACH Agreement at pg. 1. The 2021 ACH Agreement also explicitly incorporates the definitions used by the NACHA Rules into the 2021 ACH Agreement, stating "[t]erms not otherwise defined in this [2021 ACH] Agreement shall have the meaning provided to

such term in the Rules.[2]   Section 1 of the 2021 ACH Agreement also states explicitly that "Customer agrees to comply with and be subject to the Rules of NACHA."  The ACH Agreement contains nearly identical language in its introductory paragraph and Section 1 as well.

331.   Additionally, the AMB ACH Agreements contain provisions acknowledging that the Bank will be liable for damages arising from the Bank's gross negligence or willful misconduct.  Section 27(b) of the 2021 ACH Agreement states "Financial Institution [Bank] shall be liable for Customer's [Center's] actual damages due to claims arising solely from Financial Institution's [Bank's] gross negligence or willful misconduct." 2021 ACH Agreement at § 27(b). The same language is present in Section 27(b) of the ACH Agreement.

332.   The Bank has taken actions and provided information and NACHA rules to the Center, suggesting the Bank has been governed by NACHA Rules for many years, perhaps since its existence.  Accordingly, upon information and belief, the Bank has been governed by NACHA Rules since the Bank and the Center's relationship began.

333.   Pursuant to NACHA Rule 1.2.4, a participating financial institution like the Bank must conduct a risk assessment of its ACH activities, and implement a risk management program on the basis of such assessment.

334.   In addition to the risk management program required by NACHA Rule 1.2.4, NACHA Rule 2.2.3 imposes additional risk management requirements on financial institutions that act as originating depository financial institutions under the NACHA Rules.

335.   Under NACHA Rule 2.2.3, an Originating Depository Financial Institution ("ODFI") has an obligation to assess the nature and risk of an originator's ACH activity and to "establish, implement, and periodically review an exposure limit for the [o]riginator."

---

[2] The term "Rules" as used in the 2021 ACH Agreement is defined to include the NACHA Rules.

336.    NACHA Rule 2.2.3 also explicitly requires that an ODFI enforce the exposure limit it has established.

337.    ODFI's must take certain proactive steps to protect both their financial assets and the institutions reputation, including know your customer procedures.  These steps are designed to ensure that "[o]riginators are credit-worthy and engage in reputable business practices."

338.    The Bank agreed to act as an ODFI under the AMB ACH Agreements and was therefore subject to the NACHA Rule 2.2.3.

339.    The Bank's explicit incorporation of the NACHA rules must be explicitly for the benefit of the Center, otherwise the incorporation would be meaningless.

340.    The Bank cannot merely turn a blind eye to suspicious transactions.  If after reviewing ACH activity the Bank determines it has concerns about either the credit worthiness or business practices of a customer, it must take remedial action, otherwise these regulations would be pointless.

341.    The Bank clearly understood its obligations to manage risks in its portfolio of customers.  Sherry Lilly provided detailed explanation to Tracey Gregory in 2018, using excerpts from NACHA rules, as to why the Bank needed financial information for each of Govoni's companies.  The Bank had undertaken a risk assessment, and had determined that, due to its exposure to the size of Govoni's accounts, it needed additional financial information.

342.    Yet, despite knowing this information, the Bank failed to properly raise alerts and allowed this $100,000,000 million Govoni Scheme to be perpetuated for over a decade.

343.    Had the Bank implemented a proper risk management program based on an assessment of its ACH activities, it would have discovered what was happening with the Center's accounts and the transfer of Center and Beneficiary funds to BFG, and then elsewhere.

344.    Rather than comply with established protocols, the Bank knowingly and willingly relaxed and ignored its own internal controls and policies to accommodate requests made by Govoni and his directees at the Center.

345.    The Bank also actively skirted its own risk management controls by:

    a.    allowing BFG to wire out funds it did not have available;

    b.    deleting a check that had been presented for deposit by the Center without the knowledge or request of the Center; and

    c.    allowing for bank accounts to be opened without typical documentation.

346.    The Bank's failure to implement and/or follow a risk management program are violations of NACHA Rule 1.2.4, and NACHA Rule 2.2.3, each of which in turn are breaches of the AMB ACH Agreements, which explicitly incorporate the NACHA Rules as part of their terms.

347.    The Bank knew or should have known that the failure to properly implement a proper risk management program could lead to imminent harm to the Center by needlessly increasing the risk that bad actors could take advantage of the bank's carelessness.

348.    Moreover, there is little doubt that the actions of the Bank described in this Count, but also paragraphs 1 through 241 constitute gross negligence and willful misconduct in breach of the Bank's obligation to not act with gross negligence or willful misconduct set forth in the AMB ACH Agreements

349.    As a result of the Bank's breaches of the AMB ACH Agreements, including the failure to comply with NACHA Rule 1.2.4, NACHA Rule 2.2.3, and the Bank acting with gross negligence and/or willful misconduct, Govoni and his associates were able to funnel over $100,000,000 in trust funds to entities and accounts controlled by Govoni and his associates, causing the Center to be unable to meet its financial requirements to the Beneficiaries.

350.    Govoni leveraged the Bank's breaches to further his scheme and to increase the Center's exposure from $2,500,000 that went uncheck in breach of the ACH Agreement to a staggering $100,000,000.

WHEREFORE, the Trustee respectfully requests the Court enter judgment against the Bank and in favor of the Trustee for a breach of the ACH Agreement and 2021 ACH Agreement and award damages in amount to be determined at trial.

## COUNT VII – BREACH OF CONTRACT IN FACT

351.    The Trustee re-alleges the allegations contained in paragraphs 1–241 as though set forth fully herein.

352.    On August 15, 2008, the President and Chief Operating Officer of the Bank emailed Leo Govoni to provide an update on a previous discussion regarding the Center's banking needs.

353.    Specifically, the Bank offered to provide numerous services to assist with the corporate documentation, management, and expansion of the Center, including connecting Mr. Govoni with the Banks' Florida and Texas regulatory counsel, arranging a conference call with a Texas trust company to discuss Mr. Govoni and the Center's needs, and assisting Mr. Govoni with locating shell trust companies.

354.    Both of the Bank's President and Chairman were acting on behalf of the Center and offering additional services beyond a deposit account. The President of the Bank offered a conference call to "describe the exact details of the service [Mr. Govoni and the Center] need to be provided [by the Bank]."

355.    In other words, the Bank offered to act as an agent to address the Center's banking and trust company needs and provide services to help expand the Center's trust services beyond being a mere depository account provider.

356.     As borne out by the decade's long relationship between the Bank and the Center, the Center accepted the Bank's offer to assist in providing information to set up and administer Center's trust operations and administration.

357.     The Bank then took actions which led to the Center's fair expectation that the Bank was not only going to act as a deposit institution, but that it would assist with the administration of the Center's SNTs.

358.     Yet, the Bank's provision of services was not done in good faith in favor of the Center.  The Bank, in purporting and contracting to provide SNT and trust related services to the Center, allowed its other customers, with the Bank's knowledge, to pilfer the Center and SNT funds.  This is the exact opposite of providing services the Center needed, including even the most minimal monitoring of incredibly protected and crucial trust funds the Center held for the benefit of others.

359.     When the Bank undertook to hold these special, heighted services on behalf of the Center, it also failed to use commercially reasonably means to do so.

360.     Govoni leveraged the Bank's breaches of the implied contract in fact to further his scheme and to increase the Center's exposure from $2,500,000 that went unchecked in breach of the ACH Agreement to a staggering $100,000,000.

361.     The Center was directly harmed by the Bank's breaches. The damages to the Center are a combination of the greater of the value of the unpaid balance of the loan from the Center to BFG or the outstanding shortfall to the SNTs, plus the value of the loss of the derivative interest in the SNT funds that the Center lost.

WHEREFORE, the Trustee requests the Court enter judgment in favor of the Trustee and against the Bank in an amount to be determined at trial for Bank's breach of an implied contract.

## **DEMAND FOR JURY TRIAL**

The Trustee requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

By: /s/*Megan W. Murray*
Megan W. Murray
Florida Bar Number 0093922
Scott A. Underwood
Florida Bar Number 730041
Adam Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY, P.A.
100 N Tampa Street, Suite 2325
Tampa, Florida 33602
Tel: (813) 540-8401 │ Fax: (813) 4553-5345
Email: mmurray@underwoodmurray.com
sunderwood@underwoodmurray.com
agilbert@underwoodmurray.com
*Special Counsel to the Chp. 11 Trustee*