## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

In re:                                                            Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                                        Chapter 11

      Debtor.

_____

Michael Goldberg, Chapter 11 Trustee                    Adversary Pro. No. 8-26-ap-00015-RCT

      Plaintiff,

v.

AMERICAN MOMENTUM BANK,

      Defendant.

_____/

## DEFENDANT AMERICAN MOMENTUM BANK'S MOTION TO DISMISS
## AND INCORPORATED MEMORANDUM OF LAW

---

NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING

      If you object to the relief requested in this paper you must file a response with the Clerk of Court at 801 North Florida Avenue, Tampa, Florida 33602 within twenty-one days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

      If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

      You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.

---

Defendant American Momentum Bank ("AMB" or the "Bank") respectfully moves the Court, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, for an order dismissing counts 1, 2, 3, 6, and 7 of Plaintiff's Complaint (the "Complaint"). AMB does not consent to the entry of final orders or judgment by the Bankruptcy Court or to a jury trial being conducted by the Bankruptcy Court. In support of its Motion to Dismiss, AMB respectfully shows as follows:

### INTRODUCTION AND BACKGROUND

The fundamental problem with the Complaint is that Plaintiff Michael Goldberg, in his capacity as Chapter 11 Trustee of the bankruptcy estate of The Center for Special Needs Trust Administration (the "Center"), is attempting to hold AMB liable for a fraudulent scheme perpetrated *by the Center itself*. This will not do. Goldberg stands in the shoes of the Center, which, along with its founder Leo Govoni, is the primary alleged wrongdoer in this case—Goldberg claims that the Center improperly loaned $100 million to Govoni that Govoni never intended to pay back and operated a Ponzi scheme by which the trust funds of some beneficiaries would cover the expenses of other beneficiaries in order to hide the improper loans. Under well-established Eleventh Circuit precedent, Goldberg does not have Article III standing to bring common law claims on behalf of the Center based on this fraudulent scheme because the Center cannot have been injured by its own scheme.

Even if the Court had jurisdiction, Goldberg's trustee status and admission of the Center's wrongdoing would still require dismissal. Most importantly, *in pari delicto* bars Goldberg from asserting common law claims against AMB arising out of the Center's wrongdoing. Additionally, the Center's knowledge of its own actions means that the statute of limitations has not been tolled. Similarly, Goldberg cannot claim that AMB breached a fiduciary duty that it allegedly owed to the Center by failing to disclose to the Center information *about the Center's own actions*.

1

The Complaint's affirmative claims fail for numerous other reasons as well. The aiding and abetting and fiduciary duty claims fail because there is no allegation that the Bank went rogue; rather, every relevant action taken by AMB was directed by the Center. Further, the aiding and abetting claim fails because Goldberg affirmatively alleges that AMB did not have actual knowledge of Govoni's alleged breach; the fiduciary duty claim fails because the contracts attached to the Complaint demonstrate that AMB did *not* owe the Center a fiduciary duty; and the fiduciary duty and contract in fact claims fail because they implausibly try to transform an offer to introduce Govoni to people who could help him form a trust company into both a fiduciary relationship and an implied contract that AMB would assist in administering the Center's SNT accounts in perpetuity. For all these reasons and more, the Complaint should be dismissed.

## LEGAL STANDARD

A defendant may move to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1); *see* Fed. R. Bankr. P. 7012(b). "Article III of the Constitution establishes that federal courts only have jurisdiction over 'Cases' and 'Controversies.'" *Sierra v. City of Hallandale Beach, Florida*, 996 F.3d 1110, 1112 (11th Cir. 2021). "Standing doctrine falls within this constitutional requirement." *Id.* "We look to three elements to determine whether a plaintiff has standing to sue: (1) injury in fact, (2) causation, and (3) redressability." *Id.*

A defendant may also move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see* Fed. R. Bankr. P. 7012(b). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (cleaned up).

2

"When evaluating a motion to dismiss, the first step is to 'eliminate any allegations in the complaint that are merely legal conclusions.'" *Newbauer v. Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (citation omitted). "The second step is to assume the veracity of well-pleaded factual allegations and 'then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* at 934-35 (citation omitted). "[W]hen determining whether the complaint crosses 'the line between possibility and plausibility of entitlement to relief,' 'courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.'" *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (citations omitted).

A<span style="font-variant:small-caps">RGUMENT</span>

## I. The Court should dismiss counts 1, 2, 6, and 7 for lack of subject matter jurisdiction.

Plaintiff Michael Goldberg is the Chapter 11 trustee of the Center's bankruptcy estate. Dkt. 1 at 1. "A bankruptcy trustee stands in the shoes of the debtor." *O'Halloran v. First Union Nat. Bank of Florida*, 350 F.3d 1197, 1202 (11th Cir. 2003). Accordingly, if the debtor would lack standing to bring a claim, then so does the trustee. *See id.* at 1202-03.

Goldberg lacks standing to bring his common law claims against AMB (counts 1, 2, 6, and 7). The Eleventh Circuit's recent *Wiand v. ATC Brokers Ltd.* decision controls this issue. There, the court considered "whether a receiver appointed in the wake of a Ponzi scheme has standing to maintain … common-law tort claims against alleged accomplices." 96 F.4th 1303, 1306 (11th Cir. 2024). The court explained that "receivers who assert common-law tort claims must meet a heightened standard to establish their standing." *Id.* at 1310. "The crux of the standing inquiry is whether the receivership estate … was 'separate and distinct' from the Ponzi scheme." *Id.* at 1310. After all, "a sham corporation created as the centerpiece of a Ponzi scheme … could not have suffered any injury from its *own* fraudulent scheme." *Id.* (citation omitted).

3

"To establish that a receivership estate is separate and distinct from a Ponzi scheme, the receiver must allege the presence of innocent decision-makers within the corporation." *Id.* at 1310. However, *Wiand* rejected the argument that the receiver "need only allege the existence of a *single* innocent and honest shareholder" to establish his standing. *Id.* at 1311. Rather, the relevant question is whether "the now-receivership estate 'was *controlled* exclusively by persons engaging in its fraudulent scheme.'" *Id.* (citation omitted). The court explained that under this rule, the receiver's "assertion that there existed six innocent shareholders is not dispositive because he failed to allege that those shareholders exercised any decision-making power." *Id.* And without such an allegation, the receiver "fail[ed] to allege that the [debtor] corporate entities were separate and distinct from the Ponzi scheme." *Id.* Accordingly, the receiver lacked standing. *Id.*

*Wiand* thus holds that the estate of an entity that perpetrated a fraudulent scheme does not have standing to bring common law claims against the entity's alleged accomplices if the entity was controlled exclusively by persons engaged in the fraudulent scheme. And although *Wiand* involved a federal equity receiver, the Eleventh Circuit has made clear that the rules articulated in *Wiand* apply equally to cases involving bankruptcy trustees. *See O'Halloran*, 350 F.3d at 1202-03 (bankruptcy trustee lacked standing to sue based on "Ponzi scheme torts"); *Wiand*, 96 F.4th at 1310 (applying *O'Halloran* to hold that receiver lacked standing).

Under *Wiand*, Goldberg lacks standing. Goldberg unequivocally alleges that he was appointed as the Chapter 11 Trustee in the wake of a fraudulent scheme perpetrated by Govoni and the Center. *See, e.g.*, Dkt. 1 at ¶¶ 2, 6, 85-111, 174, 176, 184-86 (giving overview of alleged scheme); *id.* at ¶ 8 ("Once the loss of over $100 million of SNT funds was discovered, … the Center spiraled into bankruptcy and the Trustee was appointed."). Further, Goldberg does not allege that the Center was separate and distinct from the underlying fraudulent scheme; rather, he

4

alleges that "Govoni exerted complete control over the Center … through 2022." Dkt. 1 at ¶ 160; *see also, e.g., id.* at ¶¶ 10, 46, 110, 150, 153, 158 (elaborating on how Govoni controlled the Center). Accordingly, Goldberg cannot allege an injury to sustain his common law claims against AMB, and the court should dismiss counts 1, 2, 6, and 7 for lack of subject matter jurisdiction. *See Wiand*, 96 F.4th at 1310-11; *O'Halloran*, 350 F.3d at 1202-03.[1]

## II.     The Court should dismiss counts 1, 2, 6, and 7 based on affirmative defenses.

"A district court … may dismiss a complaint on a rule 12(b)(6) motion 'when its own allegations indicate the existence of an affirmative defense, so long as the defense clearly appears on the face of the complaint.'" *Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (citation omitted). If the Court reaches the merits of Goldberg's common law claims, it should dismiss them because the defenses of *in pari delicto* and limitations clearly appear on the face of the Complaint.

### A.     The Complaint is barred by the doctrine of *in pari delicto*.

"If a claim of [the debtor] would have been subject to the defense of *in pari delicto* at the commencement of the bankruptcy, then the same claim, when asserted by the trustee, is subject to the same affirmative defense." *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1150 (11th Cir. 2006). "[*I*]n *pari delicto* is an equitable doctrine that states 'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" *Id.* at 1152 (citation omitted). Florida law recognizes this defense. *See Earth Trades, Inc. v. T & G Corp.*, 108 So. 3d 580, 583 (Fla. 2013).

---

[1] In a concurrence joined by every member of the *Wiand* panel, Judge Marcus suggested that while Eleventh Circuit caselaw is clear that "a receiver lacks standing to bring tort claims on behalf of Ponzi corporations" and that "this lack of standing is a matter of subject matter jurisdiction," "the better way to understand the defect in *Wiand*'s tort claims is that a receiver does not have a cause of action under Florida's common law of tort to sue on behalf of Ponzi corporations." 96 F.4th at 1312 (Marcus, J., concurring) (cleaned up). Of course, the panel opinion in *Wiand* controls, not the concurrence. Nonetheless, out of an abundance of caution, AMB argues in the alternative that Goldberg does not have a cause of action to bring common law claims against AMB and that the Complaint should be dismissed on the merits on this basis. Either way, the Complaint should be dismissed.

*In pari delicto* bars Goldberg's common law claims. The Complaint makes it abundantly clear that the Center was an active participant in Govoni's fraudulent scheme. *See* Dkt. 1 at ¶¶ 2, 6, 85-111, 174, 176, 184-86. Accordingly, even if AMB were also involved in this scheme (which it was not, for the reasons explained below), Goldberg cannot recover anything from AMB based on the scheme. The court should dismiss counts 1, 2, 6, and 7 on this basis. *See Edwards*, 437 F.3d at 1155-56 (*in pari delicto* required dismissal because "it is beyond doubt that the allegations of the trustee's complaint render [the debtor] in active participation with the IRA Custodians").

Goldberg may argue that the so-called "adverse interest exception" applies to this case. To be sure, "[w]here the defense of *in pari delicto* is asserted against a corporate entity based on the misconduct of the corporation's agents, it must be determined whether the misconduct of those agents is properly imputed to the corporation." *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1044 (Fla. 2d DCA 2007). However, "[w]here a corporation is wholly dominated by persons engaged in wrongdoing, the corporation has itself become the instrument of wrongdoing," and the exception does not apply. *Id.* at 1045. Here, the Complaint clearly alleges that the Center was wholly dominated by persons engaged in wrongdoing—namely, Govoni and his agents. *See, e.g.*, Dkt. 1 at ¶¶ 10, 46, 110, 150, 153, 158, 160. Accordingly, the adverse interest exception does not prevent the Court from dismissing the Complaint.

**B.    The Complaint is barred by the statute of limitations.**

"A statute of limitations defense may be raised on a motion to dismiss where it is clear from the face of the complaint that the statutory period has expired." *Mesones v. Estevez*, 2021 WL 3721324, at *2 n.2 (11th Cir. Aug. 23, 2021). The statute of limitations for breach of fiduciary duty and aiding and abetting breach of fiduciary duty is four years. *See* Fla. Stat. § 95.11(3)(o). The statute of limitations for breach of a written contract is five years. *See id.* § 95.11(2)(b). The statute of limitations for breach of an unwritten contract is four years. *See id.* § 95.11(3)(j).

6

"[U]nder Florida law, a cause of action generally accrues upon the *first* injury caused by another's wrongful act." *Kipnis v. Bayerische Hypo-Und Vereinsbank, AG*, 784 F.3d 771, 779 (11th Cir. 2015). The injury that forms the basis of Goldberg's common law claims is the Center's loan of $100 million in SNT funds to Govoni-controlled entities, which the Center began paying out in 2009. *See* Dkt. 1 at ¶ 85; *see also* Dkt. 1 at ¶ 255 (describing the injury underlying count 1); *id.* at ¶¶ 273-75 (count 2's injury); *id.* at ¶ 349-50 (count 6's injury); *id.* at ¶ 360-61 (count 7's injury). Accordingly, the face of the Complaint makes clear that the limitations period for Goldberg's breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract in fact claims expired in 2013 and that the limitations period for Goldberg's breach of contract claim expired in 2014—a decade before the Complaint was filed.

Goldberg argues that limitations were tolled because "Plaintiff did not discover and could not have discovered the facts constituting the Bank's violations until the Center's bankruptcy filing on February 9, 2024." *Id.* at ¶ 234. Nonsense. Goldberg stands in the shoes of the Center, and the Complaint clearly alleges that the Center had actual knowledge of the very wrongdoing about which Goldberg now complains. *See, e.g*, *id.* at ¶¶ 109, 236. This makes perfect sense, since, as discussed above, the Center and Govoni (who controlled the Center) were the primary wrongdoers. *See* pp. 4-5, *supra*. Indeed, Goldberg alleges only that "[t]he directors and decision makers at the Center *who were shielded from Govoni's misconduct* could not have discovered … the Bank's violations and substantial assistance." *Id.* at ¶ 234 (emphasis added). But even if some Center directors did not know about the wrongdoing, the knowledge of those who did know is imputed to the Center. *See Beck v. Deloitte & Touche, Deloitte, Haskins & Sells, Ernest & Young, L.L.P.*, 144 F.3d 732, 736 (11th Cir. 1998). Accordingly, Goldberg's argument that limitations were tolled based on lack of knowledge fails.

Goldberg also invokes the continuing tort doctrine. Dkt. 1 at ¶ 240. But that doctrine only allows "a plaintiff [to] recover damages for tortious acts committed *within the limitations period*." *Suarez v. City of Tampa*, 987 So. 2d 681, 685 (Fla. Dist. Ct. App. 2008) (emphasis added). The conduct that Goldberg complains about had ceased by 2020; most of it occurred before the end of 2017. *See* Dkt. 1 at ¶ 103. Accordingly, even if that doctrine does apply, the Court should still dismiss Goldberg's breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and breach of contract in fact claims to the extent that they complain of conduct that occurred before February 9, 2020 (four years before the Center filed for bankruptcy) and Goldberg's breach of contract claim to the extent that it complains of conduct that occurred before February 9, 2019.

## III. Each affirmative count of the Complaint should be dismissed for failure to state a claim.

### A. The Court should dismiss Goldberg's claim for aiding and abetting breach of fiduciary duty (count 1).

Goldberg claims that AMB aided and abetted a breach of fiduciary duty that Govoni supposedly owed to the Center. Dkt. 1 at ¶¶ 242-58. The elements of this cause of actions are "1) a fiduciary duty on the part of a primary wrongdoer; 2) a breach of that fiduciary duty; 3) knowledge of the breach by the alleged aider and abettor; and 4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017). This claim should be dismissed because the Complaint does not plausibly allege that Govoni owed the Center a fiduciary duty, that AMB knew about any duty Govoni might have owed, that AMB knew about any breach, or that AMB substantially assisted in any breach.[2]

---

[2] This section of the Complaint also vaguely alludes to fiduciary duties owed by "other officers of the Center over the past decade." Dkt. 1 at ¶ 247. However, the Complaint appears to be alleging only that AMB aided *Govoni's* alleged breach. *See id.* at ¶ 250 ("The Bank had actual knowledge of *Govoni's* breaches …." (emphasis added)). To the extent that Goldberg claims that AMB aided breaches by others, this claim should be dismissed as conclusory and lacking in factual matter. Further, Goldberg fails to plausibly allege that AMB had knowledge of any breaches by these "other officers," for the same reasons that AMB had no knowledge of Govoni's alleged breach. *See* Part III.A.2, *infra*.

### 1.    No fiduciary relationship.

"A fiduciary relationship may be either express or implied." *Maxwell v. First United Bank*, 782 So. 2d 931, 933 (Fla. 4th DCA 2001). No express fiduciary relationship is alleged to have existed between Govoni and the Center at the relevant time. To the contrary, Goldberg expressly alleges that Govoni "relinquished his official titles at the Center." Dkt. 1 at ¶ 161. Govoni and the Center also are not plausibly alleged to have had an implied fiduciary relationship. "A fiduciary relationship which is implied in law … may be found when 'confidence is reposed by one party and a trust accepted by the other.'" *Maxwell*, 782 So. at 934 (citations omitted). Goldberg alleges that Govoni *controlled* the Center, Dkt. 1 at ¶ 243, but he does not allege that the Center placed its trust in Govoni. More importantly, Goldberg never alleges that Govoni *accepted* the Center's trust. Accordingly, no implied fiduciary relationship existed between Govoni and the Center. *See Arbitrajes Financieros, S.A. v. Bank of Am., N.A.*, 605 Fed. Appx. 820, 824 (11th Cir. 2015) ("[A]ppellants … point to no facts that show BANA … accepted [their] confidence and trust.").

### 2.    No knowledge.

Even if Govoni owed the Center a fiduciary duty, Goldberg has not plausibly alleged that AMB *knew* that Govoni owed such a duty. After all, Goldberg expressly alleges that AMB knew that "Govoni had relinquished formal titles and other individuals now held those official titles," Dkt. 1 at ¶ 250(b), which supports an inference that, as far as AMB knew, Govoni did *not* owe the Center a fiduciary duty. And although Goldberg alleges that AMB knew that "the Center was controlled by Govoni," *id.* at ¶ 250(a), this allegation is conclusory—Goldberg never explains exactly how AMB allegedly had this knowledge. Goldberg never alleges, for example, that Govoni gave AMB directives relating to the Center's accounts or that AMB followed such (non-existent) directives. Rather, Goldberg affirmatively alleges that the complained-of transactions were directed by authorized users on the Center's accounts. *See, e.g., id.* at ¶ 170 ("Tracey Gregory,

9

who had the authority to make the transfers on her own, was on every request."). Regardless, alleged knowledge that Govoni controlled the Center is not the same thing as knowledge that Govoni owed the Center a fiduciary duty. Goldberg never alleges that AMB knew that the Center reposed its trust in the *former* officer, let alone that Govoni accepted any such trust.

Goldberg has also failed to allege that AMB knew about Govoni's alleged breach of the duty that he supposedly owed the Center. "[A] bank … has the right to assume that individuals who have the legal authority to handle the entity's accounts do not misuse the entity's funds." *O'Halloran*, 350 F.3d at 1205. Moreover, banks have no duty to ensure that "their customers [are] spending their money wisely." *Freeman v. Dean Witter Reynolds, Inc.*, 865 So. 2d 543, 549 (Fla. 2d DCA 2003). Accordingly, allegations that a bank merely "should have known" about a breach of fiduciary duty, including allegations "that a bank disregarded 'red flags,'" are "insufficient to establish knowledge." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014). Rather, as far as AMB is aware, the Eleventh Circuit has found that a bank had knowledge of a breach of fiduciary duty *only* in cases where a bank employee was *actively participating* in the underlying scheme. *See Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1096-97 (11th Cir. 2017); *Otto Candies, LLC v. Citigroup Inc.*, 137 F.4th 1158, 1181-82 (11th Cir. 2025).

Incredibly, Goldberg *affirmatively pleads* that AMB did not have actual knowledge of Govoni's alleged breach. The Complaint states: "Had the Bank implemented a proper risk management program …, it *would have discovered* what was happening with the Center's accounts." Dkt. 1 at ¶ 343 (emphasis added). In other words, Goldberg's position is that AMB "reasonably *should have known* of Govoni's misconduct." *Id.* at ¶ 162 (emphasis added). An allegation that a bank merely "should have known" about a breach of fiduciary duty is unequivocally "insufficient to establish knowledge." *Lamm*, 749 F.3d at 950.

10

The Court's analysis of the knowledge element can stop here—the Complaint affirmatively disclaims AMB's actual knowledge of Govoni's alleged breach. But if there is any doubt, consider the long, bulleted list of reasons Goldberg offers for why AMB supposedly "had actual knowledge of Govoni's breaches of fiduciary duty." Dkt. 1 at ¶ 250. As shown in the bullet-for-bullet response below (which combines Goldberg's bullets when the responses are similar), none of Goldberg's allegations allow for a reasonable inference that AMB had actual knowledge:

- AMB allegedly knew that "the Center accounts held at the Bank were SNTs," that "the Bank held accounts for over 100 other Govoni-owned or related entities which were obviously not trust accounts or trust-related," that "the SNT accounts were comingled in the Center, then transferred to BFG and other Govoni-related accounts," that "Govoni's business strategy was to invest SNT and Center funds with BFG and other Govoni-related endeavors," and that "the corporate structure of the Center, BFG, and dozens of other Govoni-related companies, were all controlled by Govoni for Govoni's benefit." *Id.* at ¶ 250(c)-(g). But alleged knowledge that a fiduciary has moved money from trust accounts into his individual account does not give rise to a reasonable inference of actual knowledge. *See Atlanta & St. A.B. Ry. Co. v. Barnes*, 95 F.2d 273, 275 (5th Cir. 1938) ("That a trustee, with the bank's knowledge, deposits trust money in his individual account i[s] not always nor ipso facto a conversion of it."); *see also B-Smith Enterprises, LP v. Bank of Am., N.A.*, 2023 WL 2034419, at *2 (11th Cir. Feb. 16, 2023). As discussed further below, the more reasonable inference is that AMB believed the transfers to BFG and other Govoni entities were legitimate investments by the Center. *Cf.* Main Case Dkt. 28 at ¶ 17 (Debtor's CRO attesting that certain trusts were "allocated a portion of the [BFG] loan as an investment").

- AMB allegedly knew that "the Center accounts lacked the liquidity to meaningfully administer Beneficiaries' SNTs." Dkt. 1 at ¶ 250(h). This allegation is conclusory. Moreover, it is directly contradicted by the Center's own account of its financial operations. When the Center filed for protection under Chapter 11, it made clear that "trust assets are managed by different financial advisory partners, which maintain investment accounts for the various trusts." Main Case Dkt. 18 at ¶ 7. When the Center "makes a payment for the benefit of a Trust Beneficiary, cash is distributed from the applicable Trust Investment Account, deposited into the designated Trust Bank Account, and then ultimately paid out from the Trust Bank Account for the benefit of the Trust Beneficiary." *Id.* at ¶ 10. AMB was the depository institution for eight of the Center's Trust Bank Accounts. *Id.* at ¶ 8. Critically, "[t]he funds that flow into and out of the trust bank accounts … typically only

11

remain in the account for a few days." *Id.* at p. 2. Goldberg has not plausibly explained how AMB, despite this limited role, knew about the Center's liquidity more generally. And in any event, a temporary lack of liquidity in the SNT accounts is, at most, a red flag that does not establish actual knowledge.

- AMB allegedly knew that "SNT funds were to be prudently invested, but were not so invested when they were placed into BFG's accounts and sent to Govoni's other related accounts thereafter." Dkt. 1 at 250(i). This allegation is also conclusory and implausible. Goldberg never explains how AMB would have known that the BFG transactions were not prudent investments. Moreover, AMB's custodial trustee agreement with the Center specifically provided that "[t]he Custodial Trustee shall have no responsibility to examine any disbursements … made by Administrative Trustee" and "shall have no responsibility or authority to make any decisions concerning the investment of trust assets." Dkt. 1-4 at 10. This agreement is consistent with the background legal principle that banks are allowed to assume that funds are not being misused and are not required to ensure that customers spend their money wisely. Accordingly, alleged knowledge that SNT funds were being invested in Govoni-controlled entities is, at most, knowledge of a red flag.

- AMB allegedly knew that "the Center printed and issued Beneficiary account statements using Bank letterhead with the Bank's explicit or implicit authorization." Dkt. 1 at ¶ 250(j). But while Goldberg alleges that these statements were false, *id.* at ¶ 114, he never alleges that AMB knew that they were false. Further, Goldberg's allegation that AMB authorized the Center to add its logo to these statements in order to give its imprimatur to the statements, *id.* at ¶ 261, is implausible. The statements that Goldberg attached to the Complaint only contain the words "American Momentum Distribution Account" at the top. *See* Dkt. 1-5 at 8. These words do not look like a logo at all (as a factual matter, they are *not* AMB's logo), and they do not reasonably imply that AMB endorsed the account statements. Instead, at most, they imply only that the funds described in the statement are held by the Center in an account at AMB. Finally, and most fundamentally, these false account statements are a wrong that *the Center* committed against *the beneficiaries*, not a wrong that *Govoni* committed against *the Center*, making this allegation completely irrelevant to the question of whether AMB knew that Govoni breached a fiduciary duty.

- AMB allegedly knew that "individuals without signatory authority directed fund transfers from the Center's and Govoni's accounts" and that "non-Center employees without signatory authority directed the Center to delete deposits from Center accounts." *Id.* at ¶ 250 (k)-(l). These allegations are also irrelevant because they do not involve a wrong that *Govoni* committed against *the Center*. Knowledge that non-signatories directed

12

transactions relating to Govoni's and the Center's accounts is not knowledge that Govoni breached a fiduciary duty that he owed to the Center. Additionally, as discussed in Part III.B.2, *infra*, Goldberg does not allege that these transactions by non-signatories were in fact unauthorized.

- AMB allegedly knew that it "was relaxing its standard operating procedures and banking procedures and regulations for its very good customers, i.e. Govoni and his hundreds of accounts." *Id.* ¶ 250(m). This allegation is also irrelevant to the knowledge inquiry because it does not involve any wrong committed by Govoni against the Center. Allegedly giving special treatment to a good customer is not the same thing as knowing that that customer was breaching a fiduciary duty.

- Goldberg alleges that AMB knew that "the Center routinely paid fees for banking services not rendered to the Center." *Id.* at ¶ 250(n). But again, banks are allowed to assume that funds are not being misused and have no duty to ensure that their customers are spending their money wisely. Further, Goldberg never alleges that the Center did not authorize the payment of these fees or that AMB did anything that the Center itself did not request it to do. Like the rest of Goldberg's actual knowledge allegations, AMB's alleged knowledge that the Center paid fees for services not rendered to it is, at most, knowledge of a red flag.

In short, Goldberg's claim that AMB knew about Govoni's supposed breach is based on allegations that are conclusory, implausible, contrary to the parties' agreements and the rules of Florida banking law, and/or nothing more than red flags. Additionally, many of the allegations are irrelevant because they do not involve any wrong that *Govoni* committed against *the Center*. Goldberg has thus failed to allege that AMB had knowledge of Govoni's alleged breach.

### 3.    No substantial assistance.

"[T]o establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud 'is the crucial element.'" *Chang*, 845 F.3d at 1098. Because Goldberg has failed to plausibly allege that AMB knew that Govoni was breaching a fiduciary duty that he supposedly owed to the Center, Goldberg has also failed to plausibly allege that AMB's provision of ordinary banking services to the Center and Govoni constituted substantial assistance to Govoni's scheme.

**B.    The Court should dismiss Goldberg's breach of fiduciary duty claim (count 2).**

Goldberg asserts a direct breach of fiduciary duty claim against AMB. Dkt. 1 at ¶¶ 259-77. "The elements of a claim for breach of fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002). Goldberg's breach of fiduciary duty claim should be dismissed because he fails to allege either the existence of a fiduciary relationship between the Center and AMB or the breach of any fiduciary duty that AMB might have owed the Center.

**1.    No duty.**

As discussed above, "[a] fiduciary relationship may be either express or implied." *Maxwell*, 782 So. 2d at 933. Goldberg wisely does not even attempt to argue that the Center and AMB had an express fiduciary relationship. Instead, Goldberg argues that "the Bank took on a special relationship with the Center, above and beyond that of a typical customer-bank relationship." Dkt. 1 at ¶ 270. But this argument contradicts the plain language of the contracts that Goldberg attached to the Complaint. The 2021 ACH Agreement states that "Financial Institution shall be responsible *only* for performing the services expressly provided for in this agreement." Dkt. 1-9 at 9 (§ 27(a)) (emphasis added). Similarly, the custodial trustee instruments provide that "[t]he Custodial Trustee shall have no responsibility to examine any disbursements or decisions to not make a disbursement made by Administrative Trustee…. *The only duty of the Custodial Trustee is to be the depository of the assets of the Trust*." Dkt. 1-4 at 10 (emphasis added). The contracts between the Center and AMB that Goldberg attached to the Complaint thus demonstrate that no fiduciary relationship existed between the parties.[3]

---

[3] Florida courts enforce such contractual disclaimers of a fiduciary relationship. *See, e.g.*, *Mac-Gray Services, Inc. v. DeGeorge*, 913 So. 2d 630, 633 (Fla. 4th DCA 2005) ("[T]he contract itself negates the existence of a fiduciary duty as the purchaser acknowledges that he is *not* relying on any expertise of the seller in entering into the contract.").

14

Goldberg's implied fiduciary relationship argument also fails on its own terms. According to Goldberg, AMB owed the Center fiduciary duties because "the Bank offered and provided guidance and assistance to Govoni in the creation of the Trust at the outset." *Id.* at ¶ 262. But the factual basis for Goldberg's claim that the Bank provided the Center with "guidance and assistance" is nothing more than a single email that AMB's President and COO allegedly sent to Govoni in August 2008 offering to introduce Govoni to various people *outside of the bank* who could help him form a trust company. *See id.* at ¶ 83 (text of email), ¶¶ 262-68 (describing AMB's alleged "guidance and assistance"). Referrals are a standard part of business relationships, and a fiduciary relationship does not exist simply because a bank introduces a client to a third party who might in turn offer the client advice.[4]

The conclusion that this alleged email is not enough to create a fiduciary relationship between AMB and the Center is confirmed by comparing the facts of this case to *Capital Bank v. MVB, Inc.* There, "a fiduciary relationship existed" because a bank official "expressly invited Battaglia's reliance by urging Battaglia to trust him and by reassuring Battaglia that he was part of the Capital Bank family." 644 So. 2d 515, 520 (Fla. 3d DCA 1994). The bank also "orchestrated and finalized the ultimate transaction." *Id.* These facts are a far cry from Goldberg's allegations that AMB merely offered to refer a customer to other professionals who could help him "form a trust company … *if you decide to take that route*." Dkt. 1 at ¶ 83 (emphasis added).

Further, even when a fiduciary relationship exists, the fiduciary is only "under a duty to act for or give advice for the benefit of another upon matters *within the scope of the relationship*." *Gracey*, 837 So. 2d at 353 (emphasis added). In this case, any fiduciary relationship that existed

---

[4] *Cf. In re Sherwood Investments Overseas Ltd., Inc.*, 2015 WL 4486470, at *16 (Bankr. M.D. Fla. July 22, 2015), *aff'd*, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016) ("A fiduciary relationship does not arise because one side of a business relationship depends on the other side. That is the case in virtually *every* business relationship.").

15

between the Center and AMB based on AMB's alleged "guidance and assistance to Govoni *in the creation of the Trust at the outset*," Dkt. 1 at ¶ 262 (emphasis added), would be limited in scope to, at most, advising on the initial formation of the trusts. Goldberg does not, however, complain about any of AMB's guidance and assistance during this initial period; rather, Goldberg claims that AMB breached its fiduciary duties by taking or failing to take various other actions after the Center was already an established trust company. *See id.* at ¶ 272(a)-(e). Goldberg is asking the Court to infer that allegedly offering to introduce Govoni to established trust companies and experienced attorneys that could held him to start a trust company somehow required AMB to act as a fiduciary to the Center with respect to *every aspect* of the Center's trust operations for the *rest of the Center's existence*. That is several bridges too far.[5]

Goldberg also suggests that AMB owed a fiduciary duty because "[t]he Bank was fully aware that the Center was depositing Beneficiary trust funds with the Bank" and "[t]he Bank also took on the role of a custodial trustee for certain of the SNTs." Dkt. 1 at ¶¶ 260, 269. However, "deposits made by those serving as fiduciaries such as trustees, executors, administrators, and agents are characterized as general deposits, and general deposits are merely arms-length transactions in which the bank owes no fiduciary responsibilities." *In re Meridian Asset Mgmt., Inc.*, 296 B.R. 243, 261 (Bankr. N.D. Fla. 2003). Moreover, as noted above, the trust instruments that allegedly identified AMB as a "custodial trustee" expressly provided that AMB's only duty was to serve as a depository. *See* Dkt. 1-4 at 10. AMB's alleged status as depository for and custodial trustee of certain trust funds therefore did not create a fiduciary relationship between it and the Center.

---

[5] *Cf. MediaXposure Ltd. v. Harrington*, 2012 WL 1805493, at *10 (M.D. Fla. May 17, 2012) ("The amended complaint does not allege facts demonstrating that, even if a fiduciary relationship were properly alleged, the scope of that relationship included a duty to cooperate with RETV's investigation of itself, or a duty to force the Harringtons to cooperate with the RETV investigation.").

### 2.    No breach.

Even if AMB did owe the Center a fiduciary duty, Goldberg does not plausibly allege that AMB breached that duty. The Complaint includes another bulleted list of allegations that Goldberg claims support an inference of breach. AMB will again respond bullet-by-bullet:

- AMB allegedly breached by "[t]ransferring trust funds from the Center to Govoni's other entities without proper authorization." Dkt. 1 at ¶ 272(a). The key word in that sentence is "proper." Goldberg never alleges that the transfers were not actually *authorized* by the Center. Rather, the most Goldberg ever alleges is that AMB "allow[ed] transfers ordered by individuals lacking signatory and corporate authority over designated accounts." *Id.* at ¶ 233. And even this conclusory allegation is directly contradicted elsewhere in the Complaint. *See id.* at ¶ 170 ("Tracey Gregory, who had the authority to make the transfers on her own, was on every request."). Goldberg also details AMB's verification of those authorized transactions with the Center's vice president. *See id.* Goldberg has not identified a single transfer of funds or a single individual who transferred funds from the Center to Govoni without authorization from the Center. *Cf. id.* at ¶ 178 ("Tracey Gregory was copied on the communications requesting that the Bank execute each one of these transfers."); *id.* at ¶ 192 ("The Bank identified that the check was not executed by an authorized signer and required an authorized signer … to execute a verification form.").

- AMB allegedly breached by "[a]ssisting Govoni's agents to conceal the improper use of trust funds held by the Bank by allowing its letterhead to be used." *Id.* at ¶ 272(b). But it was "*the Center*" that allegedly "printed and issued Beneficiary account statements using Bank letterhead." *Id.* at ¶ 250(j). AMB cannot have breached a duty it owed *the Center* based on an action that *the Center* itself took.

- AMB allegedly breached by "[f]ailing to notify the Center and its formal officers of … the alarmingly insufficient amounts of funds at the combination of the Center and Govoni's other entities to service the SNTs, that unauthorized individuals were transferring funds from Center accounts at the Bank to Govoni affiliated accounts, that return transfers were miniscule in comparison, or that its own suspicious activity or fraud internal alerts were raising major concerns." *Id.* at ¶ 272(c). But since this alleged suspicious activity was all known to the Center, AMB's alleged failure to disclose cannot form the basis of a breach of fiduciary duty claim. *See Jaffe v. Bank of Am., N.A.*, 395 Fed. Appx. 583, 590 (11th Cir. 2010). Further, the Center's own bankruptcy filings show that AMB would not have known about the Center's lack of liquidity. *See* pp. 11-12, *supra*.

- AMB allegedly breached by "providing certifications as to specific amounts held on behalf of Beneficiaries at the Center despite the Bank's inability to verify how much it held on behalf of specific Beneficiaries." Dkt. 1 at ¶ 272(d). But AMB made these alleged certifications based on "information from the Center." *Id.* at ¶ 147. AMB cannot have breached a duty that it owed *the Center* by relying on information provided by *the Center.*

- AMB allegedly breached by "[a]ssisting Govoni and entities under his direction and control to receive trust funds which were held in Center accounts at the Bank." *Id.* at ¶ 272(e). But as discussed above, Goldberg does not allege that any of these transactions were unauthorized by the Center. AMB's processing of authorized transactions cannot give rise to liability. *See O'Halloran*, 350 F.3d at 1205.

In sum, Goldberg seeks to hold AMB liable for breach of its supposed fiduciary duty to the Center based on (1) actions allegedly taken by AMB that were directed by the Center; (2) actions taken by the Center itself; (3) actions allegedly taken by AMB based on information provided to it by the Center; and (4) AMB's alleged failure to disclose to the Center information that the Center already knew. These allegations do not give rise to a breach of fiduciary duty claim.

### C.    The Court should dismiss Goldberg's avoidance claim (count 3).

Goldberg alleges that certain "'account analysis charges' totaling at least $133,754 are avoidable pursuant to § 544" because "[t]he transactions … are avoidable by the Internal Revenue Service, which as of the Petition Date holds an unsecured claim in this case." Dkt. 1 at ¶¶ 278-90.  But Section 544 is merely an enabler claim providing a trustee with strong-arm powers to avoid transfers based on other "applicable law." *See* 11 U.S.C. § 544(b)(1). Because Goldberg does not state what "applicable law" he is attempting to invoke, he does not state a § 544 claim.

Additionally, Goldberg cannot stand in the shoes of the IRS for the simple reason that the IRS has no claim in this case.  *See* POC 4-4 (stating a $0 claim of the IRS); *see also* Fed. R. Bankr. P. 3001(f) ("A proof of claim … is prima facie evidence of the claim's validity and amount.").

18

**D.       The Court should dismiss Goldberg's breach of contract claim (count 6).**

Goldberg claims that AMB breached the ACH Agreements between the Center and AMB. *See* Dkt. 1 at ¶¶ 327-50. This argument fails for a number of reasons. First, Goldberg's primary argument is not that AMB breached any promises contained within the four corners of the ACH Agreements but rather that AMB violated NACHA Rules 1.2.4 and 2.2.3 and that the ACH Agreements "explicitly incorporate the NACHA Rules as part of their terms," making any violation of the NACHA rules a violation of the ACH Agreements. Dkt. 1 at ¶ 346; *see also id.* at ¶¶ 330-39. However, the ACH Agreements state that "*Customer* agrees to comply with and be subject to the Rules of NACHA in existence at the date of this Agreement." Dkt. 1-9 at 2 (emphasis added). The ACH Agreements thus bind *the Center* to the NACHA Rules, not AMB.[6]

Second, the ACH Agreements also provide that "Financial Institution shall be responsible *only* for performing the services *expressly* provided for in this agreement, and shall be liable *only* for its gross negligence or willful misconduct in performing those services," Dkt. 1-9 at 9 (§27(a)) (emphases added). Adherence to NACHA Rules 1.2.4 and 2.2.3 is certainly not a service *expressly* provided for in the ACH Agreements (since at most those rules are incorporated by reference through a general allusion to the NACHA Rules), and a violation of the NACHA Rules is not the same thing as "gross negligence or willful misconduct." Accordingly, even if the ACH Agreements did incorporate the NACHA Rules with respect to AMB (which they do not), Goldberg still could not hold AMB *liable* based on any alleged violation of the NACHA Rules.

Third, the NACHA Rules similarly provide that "[n]othing in these rules is intended to, and nothing in these rules shall be implied to, give any legal or equitable right, remedy, or claim to other entity, including to any … ***Receiver***." *Clinton Plumbing & Heating of Trenton, Inc. v.*

---

[6] *See Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1033 (11th Cir. 2017) ("There must be some expression in the incorporating document of an intention to be bound by the collateral document." (cleaned up)).

*Ciaccio*, 2010 WL 4224473, at \*10 (E.D. Pa. Oct. 22, 2010) (quoting NACHA Rule 1.9). "A ***Receiver*** is the consumer whose account is accessed." *Id.* at \*8. Rule 1.9 thus confirms that even if the ACH Agreements incorporated the NACHA Rules, the Center still could not sue AMB based on an alleged violation of those rules. *See id.* at \*10 ("Since CPH has receiver status, it does not have standing to bring a breach of warranty claim under NACHA.").

Fourth, Goldberg does not plausibly allege that the NACHA Rules even apply to this dispute. According to Goldberg, AMB's alleged violations of those rules allowed "Govoni and his associates … to funnel over \$100,000,000 in trust funds to entities and accounts controlled by Govoni and his associates." Dkt. 1 at ¶ 349. However, "[t]he *NACHA Rules* establish the contractual obligations between the parties *to ACH transactions*," *Clinton*, 2010 WL 4224473, at \*8 (second emphasis added), and Goldberg does not allege that the transfers from the Center to Govoni were effectuated *through ACH*, as opposed to some other transfer mechanism. Accordingly, even if the Center could theoretically sue AMB based on a violation of the NACHA Rules, Goldberg had not plausibly alleged that those rules have any relevance here.

Fifth, even if the NACHA Rules gave rise to a cause of action, Goldberg's conclusory assertion that AMB violated those rules by failing "to implement and/or follow a risk management program," Dkt. 1 at ¶ 346, is implausible because Goldberg *affirmatively alleges* that AMB in fact did implement and followed a risk management plan. *See id.* at ¶ 341. *Of course* a highly regulated bank implemented a risk management program. Goldberg's theory seems to be that AMB did not "implement[] a *proper* risk management program," because if it had done so it "would have discovered what was happening with the Center's accounts." *Id.* at ¶ 343 (emphasis added). But Goldberg never identifies any specific aspects of the bank's risk management programs that were not "proper" and never explains exactly how a different risk management plan would have enabled

AMB to uncover the Center's fraudulent scheme. Notably, his examples of how AMB allegedly "relaxed and ignored its own internal controls," *id.* at ¶ 344, self-evidently have nothing to do with the Center's loan to BFG, *see id.* at ¶ 345(a)-(e). Goldberg also never alleges that there actually were insufficient funds to cover any transaction or that any transaction actually was unauthorized. The fact that the Center was able to hide its fraudulent scheme from AMB thus does not give rise to a reasonable inference that AMB did not implement a "proper" risk management program. The Court should reject Goldberg's attempt to turn the NACHA Rules into a strict liability regime.

Finally, Goldberg claims that the ACH Agreements also imposed on AMB an "obligation to not act with gross negligence or willful misconduct" and that AMB breached this obligation. Dkt. 1 at ¶ 348. But the Agreements in fact provide: "Financial Institution shall be liable for customer's actual damages due to claims arising *solely* from financial institution's gross negligence or willful misconduct." Dkt. 1-1 at 9 (§ 27(b)) (emphasis added). This clause—which comes from the "Limitation of Liability" section of the ACH Agreements—is *not* a contractual promise by AMB not to commit gross negligence. Rather, it is a promise *by the Center* not to sue AMB for anything other than gross negligence or willful misconduct. This reading is confirmed by Section 27(a), which states that "Financial Institution shall be … liable *only* for its gross negligence or willful misconduct in performing those services." Dkt. 1-1 at 9 (§ 27(a)) (emphasis added). In other words, the ACH Agreement does not allow Goldberg to sue for breach of contract based on AMB's alleged gross negligence; rather, the provision that Goldberg is relying on serves to *limit* AMB's potential liability to the Center.[7]

For all these reasons, Goldberg fails to state a claim for breach of the ACH Agreements.

---

[7] In any event, Goldberg has not plausibly alleged that AMB was grossly negligent or engaged in willful misconduct. *See generally* Parts III.A-B, *supra*. The allegation that "there is little doubt that the actions of the Bank described in this Count, but also paragraphs 1 through 241 constitute gross negligence and willful misconduct," Dkt. 1 at ¶ 348, is conclusory. Notably, Goldberg has *not* sued AMB for either negligence or gross negligence.

**E.      The Court should dismiss Goldberg's contract in fact claim (count 7).**

Finally, Goldberg raises a claim for breach of contract in fact. Dkt. 1 at ¶¶ 351-61. "A contract implied in fact is one form of an enforceable contract; it is based on a tacit promise, one that is inferred in whole or in part from the parties' conduct, not solely from their words." *Rhythm & Hues, LLC v. Nature's Lawn Care, Inc.*, 368 So. 3d 12, 15 (Fla. 4th DCA 2023). Goldberg's claim that a contract implied in fact existed between the Center and AMB is based on the same underlying facts that Goldberg claims created a fiduciary relationship—namely, the email that AMB's president sent to Govoni in 2008 offering to introduce him to people who could held him start a trust company. *Compare* Dkt. 1 at ¶¶ 352-54 (contract implied in fact allegations), *with id.* at ¶¶ 262-68 (fiduciary relationship allegations), *and id.* at ¶ 83 (text of email). According to Goldberg, through this single email, "the Bank offered to act as an agent to address the Center's banking and trust company needs and provide services to help expand the Center's trust services beyond being a mere depository account provider." *Id.* at ¶ 355.

As an initial matter, this alleged email is simply an offer to introduce Govoni to various people who could potentially help him form a trust company. *See id.* at ¶ 83. Thus, just as with any fiduciary relationship supposedly created by the email, the scope of any contract implied in fact would be limited to facilitating those meetings. *See* pp. 15-16, *supra* (describing limited scope of any fiduciary relationship). In other words, even if some contract implied in fact existed, there was certainly no implied contract between AMB and the Center that required AMB to "assist with the administration of the Center's SNTs" in perpetuity. Dkt. 1 at ¶ 357. Goldberg's contract implied in fact claim can be easily dismissed on this basis alone.[8]

---

[8] Goldberg also states that "[t]he Bank then took actions which led to the Center's fair expectation that the Bank … would assist with the administration of the Center's SNTs," Dkt. 1 at ¶ 357, but he never says what these actions were. This conclusory allegation can be disregarded.

However, Goldberg's contract implied in fact claim also fails for a more fundamental reason—no implied contract existed at all. "An implied contract requires the same elements as an express contract, and differs only in the parties' method of expressing mutual consent." *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 275 F. Supp. 3d 1332, 1342 (S.D. Fla. 2017). "A valid contract … is generally composed of four basic elements: offer, acceptance, consideration, and sufficient specification of essential terms." *Rauch, Weaver, Norfleet, Kurtz & Co., Inc. v. AJP Pine Island Warehouses, Inc.*, 313 So. 3d 625, 630 (Fla. 4th DCA 2021).

Goldberg fails to plausibly allege an offer and acceptance, tacit or otherwise. Importantly, "[a] contract implied in fact requires *actual agreement*." *Sheppard v. M & R Plumbing, Inc.*, 82 So. 3d 950, 952 n.2 (Fla. 1st DCA 2011) (emphasis added). This is not a case where the parties clearly came to an agreement that simply was not stated in express terms. *Cf., e.g.*, *Rhythm & Hues*, 368 So. 3d at 15. Rather, Goldberg alleges only that an AMB executive volunteered to arrange meetings for a client who was thinking about getting into a new business. Goldberg never even alleges that these meetings actually occurred—just that the Center and AMB subsequently had a banking relationship. *See* Dkt. 1 at ¶ 356. Goldberg thus does not plausibly allege that AMB and the Center actually agreed to anything at all. He only alleges that AMB volunteered to do a favor for a customer. No meeting of the minds can be plausibly inferred from these allegations.

Moreover, "an enforceable contract exists only if … the parties to the contract have sufficiently defined all essential terms." *Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows, Inc.*, 683 Fed. Appx. 764, 767 (11th Cir. 2017). Any general agreement that the Center and AMB might have had about AMB "assist[ing] with the administration of the Center's SNTs" would be too indefinite to be enforceable. Goldberg does not allege that the parties defined (either explicitly or implicitly) *any* of the essential terms.

23

Goldberg also does not plausibly allege that AMB received any consideration in exchange for its alleged promise to assist in the administration of the SNTs. Although Goldberg might claim that AMB received consideration because the Center continued to use AMB as its bank, *see* Dkt. 1 at ¶ 356, the idea that AMB agreed to share responsibility for the proper administration of the trusts in exchange for nothing more than $133,754.40 in account fees allegedly paid over more than a decade, *see* Dkt. 1 at ¶¶ 279, 290, is absurd.

Finally, "a court will not imply a contract in fact where there is an express agreement addressing the matter at hand." *Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*, 67 F.4th 1312, 1318 (11th Cir. 2023). Of course, the Center had an express agreement addressing its depository relationship with AMB; to assume otherwise would be implausible. And as discussed above, both the ACH Agreements and the trust instruments that allegedly identified AMB as a "custodial trustee" expressly limit the responsibilities of AMB and the duties that AMB owed to the Center. *See* p. 14, *supra*. The existence of express contracts regarding AMB's responsibilities to the Center foreclose Goldberg's reliance on a supposed implied contract dating back to 2008 that required AMB to "assist with the administration of the Center's SNTs," Dkt. 1 at ¶ 357, indefinitely and without adequate compensation. *See Glob. Network*, 67 F.4th at 1318-19 ("[T]he 2017 contract provided the negotiated-for security measures…. [W]e will not imply another contract to replace the parties' agreed-upon terms.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss counts 1, 2, 6, and 7 without prejudice for lack of subject matter jurisdiction; alternatively, the Court should dismiss those counts on the merits because they are barred by *in pari* delicto and the applicable statutes of limitations and they fail to state a claim. The Court should dismiss count 3 on the merits for failure to state a claim.

Respectfully submitted on February 20, 2026.

By:  */s/ Marcos Rosales*
Marcos Rosales
TX Bar No. 24074979
(Admitted *Pro Hac Vice*)
mrosales@beckredden.com
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, TX  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

*/s/ Donald R. Kirk*
Donald R. Kirk
FL Bar No. 105767
dkirk@carltonfields.com
Ryan Yant
FL Bar No. 104849
ryant@carltonfields.com
**CARLTON FIELDS, PA**
4221 W Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
Telephone: (813) 229-4334
Facsimile: (813) 229-4133

*Counsel for Defendant*
*American Momentum Bank*

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2026, I electronically filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, thereby serving all registered users in this case.

*/s/  Donald R. Kirk*
Donald R. Kirk