**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                                                 Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                          Chapter 11

     Debtor.
_____

Michael Goldberg, Chapter 11 Trustee                   Adversary Pro. No. 8-26-ap-00015-RCT

     Plaintiff,

v.

AMERICAN MOMENTUM BANK,

     Defendant.
_____/

**CHAPTER 11 TRUSTEE'S RESPONSE TO**
**AMERICAN MOMENTUM BANK'S MOTION TO DISMISS**

Plaintiff, Michael Goldberg, in his capacity as Chapter 11 Trustee ("**Trustee**") of the

bankruptcy estate of The Center for Special Needs Trust Administration, Inc., files his Response

to American Momentum Bank's ("**AMB**" or the "**Bank**") Motion to Dismiss ("**MTD**") the

Trustee's complaint ("**Complaint**") (Doc. 14) and in support thereof states:

**SUMMARY OF ARGUMENT**

In assessing the Motion to Dismiss, it is crucial that the Court analyze the Complaint

actually filed by the Trustee, not the one that AMB wishes the Trustee filed or AMB's incorrect

characterization of a complaint the Trustee filed. In its very first description of the Complaint,

AMB asserts "Goldberg claims that the Center … operated a Ponzi scheme." This sentence

highlights the infirmities throughout the MTD, because within the 203 pages of the Complaint and

1

its attachments, there is no reference to a Ponzi scheme or a "claim" by the Trustee that the Center operated a Ponzi scheme. Yet, AMB's strawman argument is largely reliant upon the fallacy that the Trustee has alleged the Center was a Ponzi scheme.

As outlined herein, the Trustee explicitly alleges and describes the legitimate business functions of the Center in providing services to those beneficiaries with special needs, and how AMB knew of and assisted Govoni and Boston Finance Group ("**BFG**") to directly harm the Center and its legitimate business purposes.  This stands in direct contrast to most, if not all, of the cases upon which AMB relies which arise from companies where the operation of a fraudulent "Ponzi" scheme is the entire purpose of such business.  In contrast, here it is alleged, and well pled, that the Center suffered direct harm, so the Trustee has standing to bring the claims asserted in the Complaint.

It is no surprise that AMB seeks to obtain a victory based upon another party's conduct and to prevent any light from being shed on its own conduct: because the conduct of AMB in assisting Govoni, BFG (not the Center), and Govoni's other non-Center entities, including intentionally turning a blind eye to the conduct of one of its largest client groups, was so blatant that they wish for it to remain hidden.

The Trustee, however, has properly pled his claims, has standing to bring them, and has not alleged facts that would definitively determine the application of any affirmative defenses. AMB's introductory paragraph is not the only place where it appears AMB has read a different complaint and set of allegations than those actually pled by the Trustee. The Trustee hopes this Court will analyze the actual allegations, not the characterization of them put forth by AMB.  The Trustee hopes this brief and its attachment assist the Court in its task.[1]

---

[1] As just one more introductory example, AMB alleges as early as page 3 of the MTD that "Goldberg affirmatively alleges that AMB did not have actual knowledge of Govoni's alleged breach." This is, again, untrue. Rather the

### I.      Legal Framework

The Court employs Fed. R. Civ. P. 12(b)[2] to evaluate the sufficiency of the Complaint, accepting all factual allegations as true *and* construing them in the light most favorable to the Trustee. *Otto Candies, LLC v. Citigroup Inc*., 137 F.4th 1158, 1177 (11th Cir. 2025) (citation omitted). The standard provides that AMB is entitled to notice through a short and plain statement of claims against it and the grounds on which they rest showing that the Trustee is entitled to relief.[3] The Complaint need not 'prove' the Trustee's case, but merely assert enough factual allegations, taken as true, to raise the Trustee's right to relief above the speculative level of possibility, to that of plausibility. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

The Trustee provides a chart, as **Exhibit A** ("**Appendix**"), pin-citing many of his allegations compared to the claims AMB suggests or wishes were made in an effort to seek dismissal. When reviewing the *Trustee's* allegations, and taking them as true, the Court will find he has demonstrably met his burden. The Complaint goes well beyond 'naked assertions' and lays out factual support for each of the Trustee's claims below, showing liability is plausible.

### II.     ARGUMENT

#### A.  Neither AMB's standing nor in pari delicto arguments justify dismissal.

##### i.   The Trustee has standing to bring tort actions against AMB.

AMB seeks dismissal for lack of standing and under the *in pari delicto* defense. Standing requires an injury in fact (to the Debtor), causation, and redressability (*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, (1992)), whereas *in pari delicto* is an affirmative defense which

---

Complaint has several sections that have titles concerning the scope of AMB's knowledge, explains facts supporting those allegations, and contains the explicit allegation "The Bank had actual knowledge of Govoni's breaches of fiduciary duty to the Center." Complaint at ¶ 250.  It is difficult to understand how AMB makes its argument in light of these extensive allegations regarding AMB's actual knowledge.

[2] Applicable to bankruptcy proceedings by Fed. R. Bank. Pro. 7012(b).

[3] Adv. Pro. No. 8:25-ap-00347-RCT, at 2 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted)).

"may be asserted at the motion to dismiss stage only where the facts establishing the defense: (1) are **definitively** ascertainable from the complaint and other allowable sources of information, and (2) suffice to establish the affirmative defense **with certitude**." *In re Rollaguard Sec., LLC*, 570 B.R. 859, 882 (Bankr. S.D. Fla. 2017) (emphasis added).

Importantly here, "an analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto*." *Off. Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1149 (11th Cir. 2006).  The two concepts are related and based on varying degrees of fault. Cases finding that a fiduciary lacks standing has required a showing that the company was a complete sham, such as an entity existing solely or primarily to operate a Ponzi scheme. A trustee who stands in the shoes of a sham debtor is not permitted to recover for alleged "harm" to the sham. *In re Phoenix Diversified Inv. Corp.*, 439 B.R. 231, 240 (Bankr. S.D. Fla. 2010);[4] *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303, 1311 (11th Cir. 2024). *In pari delicto*, on the other hand, is based on an agency theory, and a defendant may avoid liability if a debtor's liability was greater than the bank's liability. *See infra* at I(A)(ii).

The Bank first advances a standing argument, with inapposite facts, to circumvent cases stating *in pari delicto* is not appropriately resolved at the motion to dismiss stage. *Quiller v. Barclays American/Credit, Inc.*, 727 F.2d 1067, 1069 (11th Cir. 1984).[5]  Here, Trustee adequately (i) alleges injury to the Debtor's estate as a result of the scheme, (ii) does not allege the Debtor was a Ponzi scheme, (iii) alleges the legitimate aspects of the Debtor's business operations, and

---

[4] "A bankruptcy trustee stands in the shoes of the debtor and has standing to bring any suit that the debtor could have instituted had it not been thrown into bankruptcy." *O'Halloran v. First Union Nat. Bank of Fla.*, 350 F.3d 1197, 1202 (11th Cir. 2003).

[5] Many cases follow this logic. *See also In re Fundamental Long Term Care, Inc.*, 507 B.R. 359, 385 (Bankr. M.D. Fla. 2014)(reasoning the *in pari delicto* defense was an inappropriate basis to dismiss because adjudication was unclear on the face of pleadings); *In re Skyway Commc'ns Holding Corp.,* 389 B.R. 801, 810 (Bankr. M.D. Fla. 2008)(finding *in pari delicto* is not suitable for disposition on a motion to dismiss and a court should deny a motion to dismiss to allow the development of factual predicates of the defense and balancing of relative fault).

(iv) standing is simply not an issue. The Complaint identifies the harm to the Center in extensive allegations. S*ee e.g.,* Complaint at ¶ 85-105 (discussing the BFG loan,[6] and after bankruptcy the Center was owed over $120 million), ¶ 16, 110, 176 (no intention or ability to repay the Loan), ¶ 184 (Center had to scramble to find liquidity for legitimate trust needs), ¶ 229 (Center had inadequate funds make beneficiaries whole), ¶ 230 (Center lost residual pooled trust value), ¶ 255-256 (summarizing damages suffered by the Center, including the loss of its own funds, its business, and its ability to recover residual pooled trust funds, as well as the $100 million owed to Beneficiaries).

The Complaint also alleges that the Center operated a legitimate business which administered thousands of trusts for SNT Beneficiaries. See Complaint at ¶ 33-42 (describing the trust business), ¶ 43-44, 50-56 (discussing the ongoing business), ¶ 65 (annual reporting), ¶ 112-116 (dissemination of reports to Beneficiaries), ¶ 144-149 (discussing the custodial trustee requirements for trust administration), and none of the bad acts even benefited the Center. *Id*. at ¶ 3, 10, 255–256. The wrongful acts of Govoni through BFG did not commence until 2009, nine years into the operations of the Center (*Id*. at ¶ 86) and continued even after Govoni was fully severed from the Center in 2022 until the bankruptcy filing (*Id*. at ¶ 46, 216-228). The Center was looted by Govoni and his related companies, including BFG (*Id*. at ¶ 86-111), for his personal gain and in contravention of the Center's legitimate operations.

Despite these allegations, the Bank argues that the Trustee alleges the Center was the key actor perpetrating a scheme and therefore does not have standing to bring common law claims. MTD, at 4.  See Appendix (Standing), highlighting the dichotomy—this is not what the Trustee alleged. The estate (the Center) was not the perpetrator of the scheme, but the victim of it.

---

[6] Unless otherwise defined, any capitalized words used herein shall have the meaning ascribed to them by the Trustee in the Complaint.

In contrast, in *Wiand*, the estate of Oasis International Group, Ltd. ("**Oasis**") was a classic Ponzi scheme, a "a singular enterprise entirely controlled by fraudsters" with no real earnings and no real operations. *Id*. at 1307. The receiver lacked standing because Oasis could not be separated from the scheme, it *was* the scheme. *Wiand*, 96 F.4th at 1311. The Court noted the applicable standard:

> To establish that a receivership estate is separate and distinct from a Ponzi scheme, the receiver must allege the presence of innocent decision-makers within the corporation to whom fraudulent conduct could be reported. So if Wiand admits that Oasis was "wholly dominated by persons engaged in wrongdoing," ***and*** if his complaint is "devoid of any allegation" that Oasis "engaged in any legitimate activities," then Wiand lacks standing to bring any common-law tort claims.
>
> …
>
> [However] If Oasis was an 'honest corporation with rogue employees,' the corporate entity can complain that it was injured by the torts of rogue insiders and their accomplices. But if Oasis was "a sham corporation created as the centerpiece of a Ponzi scheme," the corporate entity could not have suffered any injury from its *own* fraudulent scheme, and Wiand, as receiver, lacks standing to maintain the tort claims.

*Wiand* 96 F.4th at 1310 (citing *Isaiah v. JPMorgan Chase Bank, N.A.,* 960 F.3d 1296, 1301–02 (11th Cir. 2020) (emphasis added)). *See also O'Halloran v. First Union* 350 F.3d at 1202-03 ("Even if phrases such as "sham corporation" or "alter ego" were never used in the complaint to describe Greater Ministries, the complaint does pervasively describe Greater Ministries as an organization run by Payne for the sole purpose of perpetrating his Ponzi scheme," and describing the company's "primary existence" as a "perpetrator of the Ponzi scheme.); *PSA, Inc. v. Edwards,* 437 F.3d at 1155 ("Laddin's complaint alleged that ETS was the hub of the Ponzi scheme to defraud investors."); *O'Halloran v. PricewaterhouseCoopers LLP,* 969 So. 2d 1039, 1046 (Fla. 2d DCA 2007) ("For example, a "corporation, 'whose primary existence was as a perpetrator of [a] Ponzi scheme, cannot be said to have suffered injury from the scheme it perpetrated.").

The Center is far from the fact pattern in *Wiand* where Oasis was "masquerading as a foreign currency investment fund" without earnings. *Wiand*, 96 F.4th at 1306. No doubt the Center

was impacted by Govoni's scheme, but it was not a sham.  If anything, the Center was the victim of a Ponzi scheme perpetrated by BFG, who took the Center's funds by purporting to invest them for the Beneficiaries through the "BFG Prime" investments. Complaint at ¶ 15, 107, 113, 185, 188. BFG sent these funds to Govoni's other entities, and none of them intended to repay the BFG Loan or return the Beneficiaries' investments. *Id.* at ¶ 15-16, 171, 174, 176.  BFG was an illegitimate company created solely to feed funds to Govoni's other companies.  It relied on new funds from later Beneficiaries to further its illegitimate existence and cover any loan proceeds or other liquidity needs for Beneficiaries. *Id.* at ¶ 9, 15, 85-105, 175, 184-185, 188, 203.

Govoni may have controlled the Center regarding the BFG Loan scheme (in part to keep it hidden), but others were involved in the legitimate trust administration side of the business which conducted regular meetings and operated for the benefit of Beneficiaries (*Id.* at ¶ 33-44, 49-50, 21-228).  Govoni and his bad actor directees breached their duties by, among other things, causing BFG and other non-Center entities to misuse the Beneficiaries' invested funds for personal gain (*Id*. at ¶ at 6-10, 14-26, 174-177) to the detriment of the Center and its legitimate purpose.

As alleged, Govoni's actions were concealed from the Center's non-Govoni related directors and decision makers via an intricate web of transactions and processes, obviating any suggestion the Center was a Ponzi scheme which could preclude the Trustee's standing to bring his claims. *Id.* at ¶ 106-107 (cryptic reporting), ¶ 50, 150- 158 (use of non-Center Govoni entities and siloed employees), ¶ 126-127 (use of spreadsheets) ¶ 174-177 (funneling funds to Govoni's other entities) ¶ 176 (additional purported loans to other entities) ¶ 236-238 (concealment of wrongdoing). When independent decision makers found out about Govoni and BFG's scheme, they acted, removed him, and attempted to continue providing the Center's legitimate services. *Id*. at ¶ 216.

The Trustee's Complaint properly pleads facts to support his standing. The cases cited by AMB regarding complete sham companies/"Ponzi" schemes are not applicable where the Complaint does not allege the existence of a Ponzi scheme and describes the harm to the Center's legitimate business functions due to AMB's substantial assistance.

### ii. *In Pari Delicto* does not mandate dismissal at this stage, as balancing weight of harms is premature, and imputation of harm by the Center (if any) may not even be plausible.

*In pari delicto* differs from standing in two significant ways. Procedurally, it is an affirmative defense and blame apportionment is not appropriate to determine at the motion to dismiss stage. *Phoenix Diversified,* 439 B.R. at, 241; *Fortner,* 983 F.2d at 1028; *Burton Wiand,* 2007 WL 963165, at *7. Second, *in pari delicto* literally means "in equal fault" in Latin. *O'Halloran v. PricewaterhouseCoopers LLP,* 969 So. 2d 1039, 1044 (Fla. 2d DCA 2007). *In pari delicto* is narrowly limited to situations where a plaintiff truly bears at least "**substantially equal responsibility**" for an injury. *Id.* at 1044 (emphasis added) (citing *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 306–07 (1985)). Even if a balancing analysis was applicable here, which the Trustee disputes because the Center was a victim, "[i]n cases where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*; for there may be, and often are, very different degrees in their guilt." *Id.; see also Kapila v. Grant Thornton, LLP,* 2017 WL 2590975, at *2 (S.D. Fla. Mar. 9, 2017) (discussing benefit to a company vs its insiders).

AMB again tries to rewrite the Trustee's Complaint by attempting to paint the Center as an "active participant" in the wrongdoing, rather than Govoni and his directees (MTD, top of page 6, citing Complaint ¶ 2, 6, 85-111, 174, 176, 184-186). The Complaint says otherwise. See Appendix

at IPD and other Aff. Defenses.  Even the Bank's direct citations relate to the BFG Loan and related transfers orchestrated by Govoni who disguised their true purpose.

Unlike a typical Ponzi scheme, where the company's primary existence is the scam and it therefore benefits from each new investment to continue its scam, the Center did not benefit from the BFG Loan, it did not prepare the false financials to the Beneficiaries (FTAS did, *see id.* at ¶ 24-25, 106), and it did not send the funds to Govoni's other entities, irretrievably dissipating them (BFG did) (*Id.* at ¶ 174-175). Imputation of wrongdoing on the victim of fraud is improper. *Seidman & Seidman v. Gee*, 625 So. 2d 1, 3 (Fla. Dist. Ct. App. 1992).

Even if AMB properly characterized the allegations, Florida law does not state that domination by the wrongdoer alone defeats recovery.[7] Rather, the inquiry is whether the insiders acted "entirely for [their] own purposes" and against the corporation's interests. *Id* at 3. Where insiders loot or divert corporate assets for personal benefit, the conduct is adverse and not imputable. *Id.* ¶ at 2-3 (noting "misconduct of the corporation's managers should be imputed to the corporation only where the acts are performed on behalf of the corporation.").

Here, as discussed above, the Trustee alleges that the trust administration process continued at the Center despite the wrongdoing occurring through BFG transfers, innocent decision makers were kept in the dark, the Debtor never benefitted from the looting or BFG Loan, and the Center was distinct from the wrongdoing perpetrated by Govoni and BFG.

As such, when looking at the Trustee's Complaint, not AMB's re-characterization, the Court does not even need to weigh the balances of harm because imputation is not at issue. *In re Skyway Commc'ns Holding Corp.,* 389 B.R. 801, 810 (Bankr. M.D. Fla. 2008).  Even if it did, the Bank cannot overcome the weight of claims contending Govoni, BFG, and the Bank were the

---

[7] MTD at 5 contending that allegations of Govoni's control are an automatic bar to recovery.  This is not the law.

causes of the harm, and any balance of harm analysis should be construed in favor of the Trustee at this stage.[8]

**B. AMB's "failure-to-state-a-claim" affirmative defenses are, at best, reaches that are belied by the Trustee's allegations.**

**i. Count I – the Trustee plausibly alleged aiding and abetting breach of fiduciary duty.**

The elements of an aiding and abetting breach of fiduciary duty claim are "1) a fiduciary duty on the part of a primary wrongdoer; 2) a breach of that fiduciary duty; 3) knowledge of the breach by the alleged aider and abettor; and 4) the aider and abettor's substantial assistance or encouragement of the wrongdoing." *Fonseca v. Taverna Imports, Inc.,* 212 So. 3d 431, 442 (Fla. 3d DCA 2017).

**a. The Complaint sufficiently alleges that Govoni, and others, owed the Center fiduciary duties.**

A fiduciary relationship exists when one party is under a duty to act for or to give advice for the benefit of another on matters within the scope of that relationship. *Doe v. Evans*, 814 So. 2d 370, 374-375 (Fla. 2002) ("[T]he relation and duties involved *need not be legal*; they may be moral, social, domestic, or personal. If a relation of trust and confidence exists between the parties (that is to say, where confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused), that is sufficient as a predicate for relief." *Id*. at 2 (emphasis added). A fiduciary duty can arise expressly or impliedly. *Cap. Bank v. MVB, Inc.,* 644 So. 2d 515, 518 (Fla. 3d DCA 1994).

Because Govoni continued to oversee the Center's pooled trusts' investments and BFG

---

[8] AMB contributed to the scheme by allowing false letterhead to be used to deceive Beneficiaries and provide false trust (Complaint at ¶ 261), overlooking massive deficiencies in its accounts (¶ 183), attesting to amounts and swearing documents under oath that it knew it had no ability to certify (¶ 118), relaxing banking standards to cater to its valuable customer (¶ 250) and facilitating unauthorized transfers (¶ 233).

Loan after resignation, he owed a fiduciary duty to the Center by operation of law. *Id*. at 244. He also owed a duty because the Center, unwittingly, continued to place its trust in Govoni to make decisions over the Center, including those investment decisions, Beneficiary accounting statements, and movement of trusts' funds. Complaint at ¶ 152-158. Govoni continued to grow and oversee transfers from the Center to BFG and others (*Id*. at ¶ 152). He oversaw bank accounts and investment strategies for the trusts (*Id*. at ¶ 250(f), 244), and continued to exert influence over the Center's operations and finances to the extent necessary to conceal his scheme through select employees and officers (*Id*., see also at *Id*. at ¶ 150-151). Simultaneously the SNT business continued as normal as others were siloed (*Id*. at ¶ 108, 111, 150-161, 170, 179, 222).

Tellingly, once the BFG Loan was discovered, the Center's trust in Govoni was broken. Directors and officers who learned of his breaches removed Govoni and his influence, attempted to regain controls exerted by Govoni, and began an investigation. *Id*. at ¶ 216-227, 243. The length of time Govoni continued to oversee the trust business and investment strategies (2009-2022) after his formal resignation demonstrate the trust the Center placed in Govoni, who accepted that trust and continued management of the Center (at least as to the BFG Loan and investments). The Trustee has alleged a breach of duty owed by Govoni to the Center, both as his role overseeing the trusts, and because of the trust place in Govoni until he was ousted. *See also* Appendix at Count I.

### b. The Complaint plausibly alleges that AMB knew Govoni owed fiduciary duties to the Center.

The Bank's suggestion that the Trustee failed to allege the Bank knew of Govoni's duties is also plain wrong, if not simply bizarre. *See* Appendix at Count I.   The Trustee alleges the Center was controlled by Govoni (Complaint at ¶ 250(a)) and the Bank treated Govoni as the owner of the Center and all of Govoni's other entities (*Id*. at ¶ 161, 250, treating them as one big company for which Govoni was the principal)). This alone is sufficient considering the duties of a trustee of

11

the SNT's and the Bank's knowledge of Govoni's control over the SNTs. *Id.* at ¶ 247.

The Trustee also added that the Bank asked for meetings *with Govoni* and learned more about the inter-workings of all of Govoni's companies even after his formal resignation. (*Id*. at ¶ 195). The Bank allowed Govoni to dictate transfers of Center funds to BFG and elsewhere (*Id*. at ¶ 5, 59, 92-93,151-153). Even before the world knew, the Bank knew Govoni's business strategy was to invest SNT and Center funds with BFG and other Govoni-related endeavors (*Id*. at ¶ 250). The Bank does not plausibly show that the Trustee has not alleged the Bank's knowledge of Govoni's duties to the Cetner.

### c. The Complaint sufficiency alleges that AMB had knowledge of the breaches of duty.

"A defendant has knowledge of an underlying fraud if it has a general awareness that its role was part of an overall improper activity." *Otto Candies,* 137 F.4th at 1178 (citing *Gilison v. Flagler Bank*, 303 So. 3d 999, 1003 (Fla. Dist. Ct. App. 2020)). The Trustee has pled factual allegations to draw the "reasonable inference" that AMB knew about the alleged wrongdoings and breaches of duty. *Id*. at 1180 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009)).

The Bank's contentions that the Trustee failed to allege actual knowledge again asks the Court to disregard direct allegations in the Complaint to the contrary. See Appendix, Count I.  The Trustee alleges the Bank had special knowledge of the SNT industry Complaint at ¶ 129, it knew the Center administered SNTs and its accounts held trust funds for vulnerable beneficiaries, ¶ 58, 163, 260-261, the SNT funds were subject to heighted fiduciary duties, ¶ 212, Govoni controlled all the non-Center bank accounts including BFG, and accounts for liquor licenses, planes, and timber holdings, ¶ 202, where the trust funds were going, ¶ 174-175, 202–203, the purpose of each account, corporate structure of Govoni's companies, and  companies' business strategies, ¶ 194, that the Center (or BFG) should have been holding $100 million of trust funds but was holding far

12

less, ¶ 158, 183, because the funds went to BFG, and then to Govoni's other companies instead ¶ 203-205, 250(a)-(n). See Appendix, Count I. These allegations are more than sufficient to allege the Bank's knowledge of Govoni's breaches of duty.

The existence of red flags only buttresses the Bank's specific and direct knowledge of Govoni's breaches of duty. Knowledge of wrongdoing is plausible when "the numbers don't add up" or where there are significant accounting "discrepancies" (such as liabilities owed to the Center of $100s million, and most years the total figures across all Center and BFG accounts was substantially lower than even $10 million) (Complaint at ¶ 158, 183). *Otto Candies,* at 1182 ("the discrepancies between the cash-advance values and the underlying [] contracts render it plausible that Citigroup knew of the fraud.").[9]

Based on these extensive allegations, and the sheer lack of valid explanations for Govoni's conduct, it is absurd to suggest the Trustee has not plausibly alleged the Bank had the requisite knowledge, particularly when the Court can and should draw inferences under *Otto Candies,* in favor of the Trustee.

### d. The Trustee alleges AMB substantially assisted in the breaches of duty.

Substantial assistance occurs when a defendant affirmatively assists, helps conceal, or fails to act when required to do so, which enables a breach of duty to occur. *Otto Candies,* 137 F.4th at 1183 (citing *Chang,* 845 F.3d at 1098 (quotation omitted)). A defendant may provide substantial assistance by actions or failure to act when it was required to do so. *Dubai Islamic Bank v. Citibank, N.A.,* 256 F. Supp. 2d 158, 167 (S.D.N.Y. 2003).

---

[9] AMB's contention that the only way to impute knowledge is through one of AMB's employee's "active participation" in a scheme, is wrong and futile, considering AMB's knowledge and active participation in the scheme. *See* MTD, at 10-11 (citing *Otto Candies*, 137 F.4th at 1181-1182, and *In re Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1096 (11th Cir. 2017).

13

As with the knowledge component, the Trustee's allegations of assistance are plentiful. Complaint at ¶ 132-135, 138-142, 250 (relaxed standards); ¶ 114-118 (false accounts statements and logos); ¶ 146–148, 250, 251(c), 165 (certifying accounts despite lack of knowledge); ¶ 146–148, 302–303 (failing to act on suspicious activity); ¶ 251(j) (failing to implement proper risk management procedures despite known issues); ¶ 231-232, 283-285 (failing to notify the Center's formal officers of the suspicious activity); ¶ 248, 250(f), 250(h) ¶ 252-254) (even encouraging the breaches to continue). The scheme could not have occurred or continued for so long but for the amalgamation of these efforts (*Id.* at ¶ 5-11, 82-93, 112-149, 162-183).[10]

The Bank takes a summary approach by suggesting the Bank was merely providing "ordinary banking services." The repeated allegations in the Complaint, however, alleges the Bank's conduct was far from ordinary and that the Bank provided far more than ordinary banking services (*Id.* at ¶ 118-125, 1455-146, 148, 251). See Appendix Count I (special circumstances).

Even if the Bank's characterization was correct, the Bank's "performance of ordinary business transactions" alone is sufficient because the Bank actually knew the transactions were assisting a tort. *Otto Candies,* 137 F.4th 1158, at 1184-1185 (finding that because Citigroup employees knew the bank's basic transactions were aiding a fraud, continuing to perform those functions constituted substantial assistance for aiding and abetting purposes).

---

[10] The factual similarities in *Otto Candies* provide helpful guidance. *Compare Otto Candies*, 137 F.4th at 1183 (approval voluminous cash advances to OSA far exceeded the value of the Pemex contracts, which also furthered the fraud) *with* the Complaint at ¶ 158, 183 (AMB knew the Center should have been holding $100 million of trust funds but was holding far less on a regular basis because the funds went to BFG). *Also compare Otto Candies*, 137 F.4th at 1183-84 (bank advances provided the imprimatur of stability and convinced plaintiffs to invest in what looked like a lucrative investment opportunity, and without representation like these, liquidity would have dried up), *with* Complaint at ¶ 114-118 (AMB allowed the Center to use its logo on falsified account statements provided to beneficiaries, which gave the false impression that the Bank had verified the accuracy of the statements). It is not surprising that, in *Otto Candies* and here, a highly regarded bank's blessing would provide an assumption of reliability and control, which adds to a bank's substantial assistance.

Therefore, the Complaint has more than sufficiently alleged grounds to support a claim against the Bank for aiding and abetting a breach of fiduciary duty. The Bank's actions, as specifically alleged in the Complaint and construed most favorable to the Trustee, plausibly demonstrate AMB's substantial assistance of breaches of duties which enabled and furthered the harm to the Center.

### ii.   Count II – the Trustee plausibly alleged breach of fiduciary duty.

### a.   The Bank owed a duty to the Center.

A fiduciary relationship develops between a bank and a customer from the parties' established relationship of trust and confidence. *Cap. Bank v. MVB, Inc.,* 644 So. 2d 515, 518 (Fla. Dist. Ct. App. 1994) (citing *Barnett Bank of West Florida v. Hooper,* 498 So.2d at 923). A bank must know or have reason to know "that the customer is placing his trust and confidence in the bank and is relying on the bank so to counsel and inform him." *Id*. at 519 (citing *Klein v. First Edina Nat'l Bank,* 293 Minn. 418, 196 N.W.2d 619, 923 (1972)).

"Special circumstances" can also impose a fiduciary duty, such as when a bank takes on *extra* services for a customer, receives a greater benefit than expected from a transaction, or exercises extensive contro*l. Id.* at 518 (citing *Tokarz v. Frontier Fed. Sav. & Loan Ass'n,* 33 Wash.App. 456, 656 P.2d 1089, at 1094 (1982)).[11]

The Trustee adequately alleges the Center's placement of trust with the Bank to not only manage its deposit accounts, lend its banking name, but hold trust funds, review trust documents, and certify account statements, among other roles that form the basis for a fiduciary relationship.

---

[11] Even banks owe their customers "a baseline duty of care," absent a special relationship.  *Leader Trade Sols. Corp. v. Dell World Trade LP, L.L.C.,* 2010 WL 11506346, at *6-7 (S.D. Fla. Feb. 16, 2010) (bank owed a duty of care to refrain from allowing withdrawal of funds from plaintiffs accounts, absent authority or apparent authority to do so, despite bank's knowledge of the lack of authority, and to refrain from placing deposits into plaintiffs' accounts into a completely different customer account).

Complaint at ¶ 116, 118-125, 145-146, 148, 251, 263, 261, 269-271; *See* Appendix, Count II. The Trustee alleges additional special circumstances including that the Bank acted as a custodial trustee for certain special needs trusts (Complaint at ¶ 144-145, 260-263) and certified bank balances without independent verification (*Id.* at ¶ 144-148); *See* Appendix, Count II. The Complaint plausibly alleges the Center trusted the bank and relied on its candor and accuracy in certifying amounts held because an independent, unregulated trustee could falsify reports or provide incomplete or inaccurate information to beneficiaries (*Id.* at ¶ 115).

The Bank would have the Court believe that its ACH disclaimer extends to the extra duties the Bank took on as a part of its growing and abundant relationship with its good customer. The ACH agreements, however, are distinct from and do not relate to the special circumstances or the expanded scope of the fiduciary duties. A defendant who takes on additional roles related to a plaintiff's business dealings which fall outside their contractual agreement can be liable for breaches of these extra duties. *Myers v. Provident Life & Accident Ins. Co.,* 2023 WL 348859, at *6 (M.D. Fla. Jan. 20, 2023) (citing *Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So.2d 204, 206 (Fla. 3d DCA 2003)); *Cap. Bank,* 644 So. 2d at 521 ("Where the lender has voluntarily assumed additional roles, accompanying responsibilities properly follow").

AMB contends its ACH Agreements do not cover these extra duties, but the Bank cannot have it both ways. Either a contract disclaimer covers obligations spelled out in a contract, or the contract is not applicable to extra obligations the Bank takes on. The Trustee has plausibly alleged the Bank owed the Center fiduciary duties, but in the unlikely event the Court has any doubt, the factually intensive nature of an implied fiduciary duty dictates that these claims should be addressed at summary judgment or trial. *Susan Fixel,* 842 So. 2d at, 208.

**b.   The Bank Breached its Duty to the Center.**

The Trustee asserts the Bank breached its duty of loyalty, duty not to take unfair advantage, duty to act in the best interest of the Center, and duty to disclose material facts by, among other things, assisting in the transfer of BFG Loan funds to Govoni's other entities without proper authorization (Complaint at ¶ 168, 233) assisting the concealment of the wrongdoing by allowing the use of its letterhead (¶ 116, 118-125, 301); certifying funds it knew it had no ability to certify (¶ 3, 146-148); and generally assisting Govoni to receive funds from the Center (¶ 272(a)-(e)). See Appendix, Count II.

The Bank also stood by and did nothing after asking the Center to stop using its logo and letterhead on the statements (Complaint at ¶ 122-125, 304). A failure to act when obligated to constitutes a breach of duty. *Cap. Bank,* 644 So. 2d at 520 (bank breached its fiduciary duty by failing to disclose material facts).

Shockingly, AMB suggests the Bank's swearing to amounts allegedly held in its accounts, without the ability to do so, is acceptable because the Center provided AMB - the Bank - with the figures in its own accounts. MTD, at 15.  These contentions are beyond comprehension. AMB had a duty to speak up (*See Cap. Bank,* 644 So. 2d at 520) and a duty not to certify facts to which it did not have knowledge.

The Bank misconstrues the Complaint's extensive allegations and argues the Trustee fails to allege there were unauthorized transfers from AMB accounts. MTD, at 14. This argument ignores the Trustee's allegations of fiduciary duties concerning the trust nature of the Center's business, AMB's demand for the trust documents, knowledge, and offer of assistance, yet ultimately allowing Govoni and BFG to send those trust fund dollars elsewhere. *See* Complaint at ¶ 182 (Bank knew CSNTA was trust administrator), ¶ 191-194 (Bank knew trust funds were going

to BFG), ¶ 57,60-66, 202-207 (Bank knew funds were then going to other Govoni entity accounts that held liquor licenses and planes).

The Trustee asserts factual allegations that the Center was siloed and innocent directors, decision makers, and employees were unaware of Govoni's concealed scheme. Complaint at ¶ 126, 185 (employees only worked from spreadsheets, not BFG statements) ¶ 158, 222 (siloed employees were only provided limited information); *See* Appendix, Count II. Despite these direct allegations to the contrary, AMB amazingly argues the suspicious activity was all known to the Center so the Bank could not have breached by not coming forward itself. MTD, at 14. *But see Complaint* at ¶ 108, 150-151, 157-158 (activities were siloed, everyone didn't know).  The Trustee properly alleged the Bank's breach.

### c.  The Complaint alleges proximate damages.

A bank's substantial assistance and demonstration of breaches causing proximate harm are nearly synonymous. *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC,* 479 F. Supp. 2d 349, 370 (S.D.N.Y. 2007) (substantial assistance is intimately related to the concept of proximate cause); *Dubai,* 256 F. Supp. at 167 (citing *AIA Holdings,* 2002 WL 88226, at *12) ("Substantial assistance requires a defendant's participation to be the proximate cause of plaintiff's injury."); *Otto Candies,* 137 F.4th at 1183 (referring to substantial assistance and noting a plaintiff must allege actions "proximately caused the harm on which the primary liability is predicated.").

This Response already outlines the extensive damages caused by AMB's substantial assistance to Govoni and BFG's scheme. *See* Complaint at ¶ 5, 228-229 (destroyed its mission and forced to file Chp. 11), ¶ 85-105 (discussing the BFG loan,  and after bankruptcy the Center was owed over $120 million), ¶ 16, 110, 176 (no intention or ability to repay the Loan), ¶ 184 (Center had to scramble to find liquidity for legitimate trust needs), ¶ 229 (Center had inadequate funds

18

make beneficiaries whole), ¶ 230, 255–256 (Center lost residual pooled trust value and overall business. The Trustee has met his burden to allege damages through the repeated and extensive allegations above and AMB failed to meet theirs.

### iii.   Trustee's Claim for Avoidance is properly alleged.

The Bank charged the Center "account analysis charges" for non-Center accounts associated with Govoni's other business interests. *Id.* at ¶ 284 and Ex. G. The Center had no obligation to pay the 'account analysis charge' associated with the non-Center bank accounts. *Id*. at ¶ 285. The Center received no benefit from the payment of these fees for non-Center accounts, nor did it receive reasonably equivalent for the payment of fees for non-debtor entities. *Id*. at ¶ 287. The IRS has preexisting claims, and the Trustee can step into the IRS's shoes as a pre-existing creditor to avoid the transfers. *Id*. at ¶ 288. These are the necessary elements to state a cause of action under Fla. Stat. § 726.105 for constructive fraudulent transfers and the Trustee's allegations are sufficient. A trustee can use § 544's strong arm powers to avoid such transfers.[12]

The IRS filed its initial claim on March 12, 2024, and has amended its claim four times since. *See* Epiq[13] claims 11, 52, 88, and 198.  While the most recently filed IRS amendment (claim 198) has amended the amount owed to $0.00, Claim 198 notes that the amount of Center's tax liability for the 2023 tax year is "not yet assessed" and that the "claim may be amended as necessary upon assessment of the liability or examination of debtor tax return." Claim 198 at. 4.

Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief. AMB has open notice of the allegations of constructive fraud asserted in Count III.  The Trustee's allegations and reference to "constructive fraud" alone are sufficient. *Davis v.*

---

[12] The Trustee can stand in the shoes of the IRS's claim to avoid constructively fraudulent transfers. *In re Maxus Energy Corp.,* 641 B.R. 467, 543 (Bankr. D. Del. 2022).

[13] Epiq as appointed as the Debtor's claims agent on February 16, 2024, effective as of the commencement of the Debtor's chapter 11 case. (*In re: The Center for Special Needs Trust Administration, Inc.* Case 8:24-bk-00676-RCT

*DiStefano*, 2025 WL 568072 (2025) (a court must examine the substance of a complaint rather than labels affixed to each count). The Complaint appropriately contains allegations, not legal argument.

### iv.    Count VI – Breach of Contract Claim is proper.

To state a claim for breach of contract under Florida law, the Trustee must allege (1) the existence of a valid contract; (2) a material breach; and (3) damages.  *Beck v. Lazard Feres & Co, LLC*, 175 F.3d 913, 914 (11th Cir. 1999).[14] There is no dispute that an ACH Agreement exists, nor does AMB dispute that the Center was damaged.  Rather, AMB asserts that a violation of NACHA Rules is not a breach of the ACH Agreement because the NACHA rules are incorporated, but not attached, to the ACH Agreement and only binding on the Center.

Both points are inaccurate. A contract may incorporate by reference terms contained in a separate document where the contract (1) specifically provides that it is subject to the incorporated collateral document and (2) the collateral document is sufficiently described or referred to in the incorporating agreement so that the intent of the parties may be ascertained. *Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1033 (11th Cir. 2017). The first requirement is met where there is "some expression in the incorporating document of an intention to be bound by the collateral document." *Azure College, Inc. v. Bank of America, N.A.*, 629 F.Supp.3d 1200, 1207 (S.D. Fla. 2022) (express language that the conduct governed by a contract is subject to rules or regulations in another document suffices to incorporate those rules into the contract). The second requirement is met where "a writing expressly refers to and sufficiently describes another document." *Id.*

AMB ignores that the NACHA Rules are a bargained for part of the ACH Agreements and

---

[14] Plaintiffs do not appear to dispute that Florida law governs the interpretation of the applicable contracts.

enforceable. In *Azure,* the agreement at issue stated "for each ACH transaction, you agree that the transaction is subject to [NACHA Rules] and any local ACH Operating rules then in effect." *Azure* 629 F. Supp.3d at 1208.  In denying a motion to dismiss, the court determined that the language indicated a clear intention to be bound by the rules and sufficiently described the collateral document to be incorporated. *Id.*

Similarly, here, the language in the ACH Agreements specifically provides that the transactions are to be covered by NACHA Rules.  Paragraph 1 of the 2021 ACH Agreement uses language almost identical to that in *Azure*, stating "Customer [Center] wishes to initiate credit and or debit Entries through the Financial Institution … by means of the Automated Clearing House Network ("ACH') pursuant to the terms of this [2021 ACH] Agreement and the rules of [NACHA]" Complaint at ¶ 330. The 2021 ACH Agreement also explicitly identifies the NACHA rules in a separate section within document. See 2021 ACH Agreement at para. 1.

As a result, AMB's liability stems from the bargained-for mutual compliance with NACHA rules as set forth in the introductory paragraph of the ACH Agreement. The Trustee has alleged that AMB failed to comply with numerous NACHA Rules, including NACHA Rule 1.2.4 which requires AMB to conduct a risk assessment of its ACH activities and implement a risk management program on the basis of such assessment  (Complaint at ¶ 333-336).[15] The Trustee has also alleged AMB failed to implement proper risk management procedures (*Id.* at ¶ 346-347) or act in the face of obvious risks and suspicious activity (¶ 253, 341-347) which are violations of NACHA Rules.

Finally, the ACH Agreements expressly include provisions that AMB will be liable for

---

[15] Under NACHA Rule 1.2.4, AMB was required to: "(a) conduct, or have conducted, an assessment of risks of its ACH activities; (b) implement, or have implemented, a risk management program on the basis of such an assessment; and (c) comply with the requirements of its regulator(s) with respect to such assessment and risk management program."

damages caused by gross negligence or willful misconduct. Complaint at ¶ 331. The Complaint has several allegations demonstrating the Bank's gross negligence and willful misconduct, which themselves constitute breaches under the ACH Agreements. *Id.* at ¶ 331, 338, 348. The Trustee need not sue under separate counts of negligence and willful misconduct, as long as the Trustee asserts the Bank's gross negligence or willful misconduct as a breach of the ACH Agreements. *See Monsoon v. Inc. Bizjet International Sales & Support Inc.*, 2017 WL 747555, *9 (S.D. Fla. Feb. 27, 2017) ("Even though Count Three alleging gross negligence and willful misconduct is dismissed pursuant to the economic loss doctrine, this result does not preclude Plaintiffs from proving damages in their breach of contract claim in excess of the amount of the invoice if Plaintiffs can demonstrate gross negligence[16] or willful misconduct").[17] To interpret the language of the ACH Agreement to only bind the Center to comply with the NACHA rules is at odds with the very purpose of the ACH Agreement, as set forth by its plain language.

AMB does not even attempt to refute the Trustee's allegations of damages caused by the breaches of the ACH Agreements. Complaint, at ¶349-350.

The Trustee adequately pled a claim for breach of contract under Count VI.

### v. Count VII – Breach of contract in fact is proper.

Florida courts have long recognized an implied contract may arise, even when there is also

---

[16] The Trustee has adequately alleged gross negligence, which in Florida requires "(1) circumstances constituting an imminent or clear and present danger amounting to a more than normal or usual peril, (2) knowledge or awareness of the imminent danger on the part of the tortfeasor and (3) an act or omission that evinces a conscious disregard of the consequences." *Electric Boat Corporation v. Fallen*, 343 So.3d 1218, 1220 (Fla. 5th DCA 2022). See Complaint at ¶ 130, 195-202 (knowledge of the Center's and other entities' financials including high exposure); ¶118-125 (use of AMB's logo), ¶143 (allowing many exceptions); ¶ 146–148, 250, 251(c), 165 (certifying accounts despite lack of ability to do so); ¶181 (transactions should have triggered fraud or suspicious activity alerts), ¶344-347 (items highlighted in count VI).

[17] The Trustee has adequately alleged willful misconduct, which in Florida requires "conduct of a quasi-criminal nature, the intentional doing of something either with the knowledge that it is likely to result in serious injury, or with a wanton and reckless disregard of its probable consequences." *Gregory v. McKesson & Robbins*, 54 So.2d 682, 686 (Fla. 1951). *See* FN 16 regarding Complaint allegations.

an express contract covering some services, where one party performs 'extras' not covered by the written contract. *Rhythm & Hues, LLC v. Nature's Lawn Care, Inc.,* 368 So. 3d 12, 14 (Fla. Dist. Ct. App. 2023); *See F.H. Paschen, S.N. Nielsen & Associates, LLC v. B&B Site Development, Inc.*, 311 So.3d 39, 49 (Fla. 3rd DCA 2021) ("Reliance upon a theory of implied contract is barred only if an express contract concerns the same subject matter as the implied contract.").

By definition, a contract implied in fact is a contract that is "inferred in whole or in part from the parties' conduct, not solely from their words." *Florida Emergency Physicians Kang & Associates, M.D., Inc. v. United Healthcare of Florida, Inc*., 526 F. Supp.3d 1282, 1303 (S.F. Fla. 2021). That is why, when "evaluating a claim based on an implied contract, a fact finder must examine and interpret the parties' conduct to give definition to their unspoken agreement." *Id*.  As a result, "undefined" essential terms exist.

The Complaint alleges AMB took on numerous additional services beyond the language of the ACH agreements to: assist with the Center's nationwide expansion, (Complaint at ¶ 353), assist with the trusts (¶ 129, 358), certify to courts and government agencies regarding the accuracy of the Center's financial reporting (¶ 58, 145-49), and approve the Center's use of AMB's logo and false statements (¶ 116-118, 121-125, 129). These "extras" were not otherwise within the scope of the written agreements.

Rather, AMB's argument, that the foregoing actions did not give rise to an agreement with consideration,[18] appears to instead be a factual dispute which is inappropriate for resolution at this stage. *Florida Emergency Physicians,* 526 F. Supp.3d at 1303 ("The Court finds that disagreements as to whether the [p]arties conduct gives rise to an implied in fact contract would

---

[18] The Trustee properly alleged consideration in the Complaint. In addition to receiving bank fees ¶279, 290, Center and Govoni's entities were some of Bank's largest clients ¶7, by 2016, the Bank had received so much value from the accounts that the Bank president reached out to Govoni ¶197; and the Bank relationship grew so much from Govoni's business that the Bank started offering discounts ¶198.

best be evaluated on a more complete record at a later stage in the litigation.").[19]

Therefore, when taken as true, the Trustee's allegations are more than sufficient to establish a prima facie case of breach of a contract implied in fact.

### vi. The Complaint does not demonstrate a definitive affirmative statute of limitations defense

The Complaint alleges information was concealed from the Center (Complaint at¶ 108, 111, 150-161, 170, 179, 222), and misdeeds and harm continued through the date of the bankruptcy (*Id*. at ¶ 85 and Exhibit 1). AMB acknowledges that a statute of limitations does not support dismissal where, as here, factual issues exist that the Court must address. MTD, at 8 (citing *Mesonez v. Estevez*, 2021 WL 3721324, at *2 n. 2 (11th Cir. Aug. 23, 2021). Defenses such as the first injury rule, equitable tolling, and delayed discovery rely on a factual dispute that is not appropriate at this stage of the case. *See e.g., Hearndon v. Graham,* 767 So.2d 1179, 1184 (Fla.2000) (discussing the "delayed discovery" exception which postpones accrual of a cause of action "until the plaintiff either knows or reasonably should know of the tortious act giving rise to the cause of action.").[20]

Taken as true, the allegations of the Complaint do not definitively form the basis for a dismissal due to a statute of limitations.

WHEREFORE, based on all the foregoing reasons as alleged in the Complaint, the Trustee requests that the Court deny AMB's Motion to Dismiss.

---

[19] Notably, in *Aldora Aluminum & Glass Products, Inc. v. Poma Glass & Specialty Windows, Inc.*, relied on by AMB, the matter was before the Eleventh Circuit after the district court had ruled on summary judgment after the court had the opportunity to consider evidence, after denying a motion to dismiss.

[20] AMB provides the Court with inaccurate facts and case law to suggest the Trustee can never succeed on a statute of limitation argument because he stands in the shoes of the Debtor which, AMB argues, is a "Ponzi scheme" (MTD, at 7). AMB can yell "Ponzi scheme" at the top of its lungs, but the Trustee does not allege it, and it is factually inaccurate. The Center operated a valid trust administration business, despite Govoni's scheme which siphoned away millions of Beneficiaries' funds. *Compare with Wiand v. ATC Brokers Ltd.,* 96 F.4th 1303 (11th Cir. 2024) (key finding that the debtor entity operated "as one common enterprise" as compared to a valid business with rogue employees).

Respectfully submitted on April 6, 2026.

By: /s/*Megan W. Murray*
Megan W. Murray
Florida Bar Number 0093922
Scott A. Underwood
Florida Bar Number 730041
Adam Gilbert
Florida Bar Number 1011637
Melissa J. Sydow
Florida Bar Number 39102
UNDERWOOD MURRAY, P.A.
100 N Tampa Street, Suite 2325
Tampa, Florida 33602
Tel: (813) 540-8401 │ Fax: (813)
4553-5345
mmurray@underwoodmurray.com
sunderwood@underwoodmurray.com
agilbert@underwoodmurray.com
msydow@underwoodmurray.com
*Special Counsel to the Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 6, 2026, a true copy of the foregoing has been filed with the Clerk of the Court using CM/ECF and is served on all counsel or parties of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/*Megan W. Murray*

25

**<u>APPENDIX</u>**

| AMB STATEMENT | Mot. pg. | COMPLAINT ALLEGATIONS CONTRADICTING AMB'S STATEMENT | Complaint Paragraph(s) Citation(s) |
|---|---|---|---|
| **STANDING** | | | |
| Complaint makes no allegation the Center was separate from the scheme | 3, 4 | Center was a 501(c)(3) that provided trust administration services | ¶33-42 |
| | | Center's ongoing adminstration of more than 6k SNTs until its Chapter 11 filing in 2024, one of the largest SNT companies in US | ¶43-44, 50-56, 84 |
| | | Center's annual reporting | ¶65 |
| | | Center's dissemination of reports to Beneficiaries | ¶112-116 |
| | | Center's custodial trustee requirements for trust administration | ¶144-149 |
| | | The illegitimate transactions from the Center to BFG did not commence until 2009, nine years into the operations of the Center | ¶ 86 |
| Center was a Ponzi Scheme | 3 | See line above re: Center's operation of legitimate business operations for more than 6k trust over decades | |
| | | Center was the victim of BFG and Govoni's scheme | ¶2, 5 |
| | | BFG and Govoni's scheme destroyed the Center's mission | ¶5 |
| | | Center suffered financial losses exceeding $150 million | ¶11 |
| | | Center was forced to file Chapter 11 | ¶228-229 |
| | | Center lost ability to recovery residual pooled trusts | ¶255-256 |
| | | None of Govoni's or his non-Center entities' actions benefitted the Center | ¶ 3, 10, 85-105, 255–256 |
| **IPD AND OTHER AFFIRMATIVE DEFENSES** | | | |
| Center was an active participant in the scheme. | 4, 6 | Siloed employees and other decision makers were shieleded from facts | ¶108, 150, 151, 157, and 158 |
| | | Could only work from spreadsheets, not BFG statements | ¶126, 185 |
| | | Diebert and Davis were only provided limited information | ¶222 |
| | | Concealment of wrongdoing | ¶236-237 |
| Center was wholly dominated by persons engaged in wrongdoing | 7 | Center followed formal practices as its directors and decision makers met for Board of Director meetings and kept minutes | ¶49 |
| | | Center's decision makers and employees "siloed" operating the Center separate from the scheme | ¶111, 150-161, 170, 179, 222 |
| | | Wrongdoing concealed from the Center's directors and decision makers via an intricate web of transactions and processes | ¶236-237 |
| Harmful conduct ceased in 2020 | 8 | Harmful conduct continued through bankruptcy filing as the loan payable increased through 2024 | Ex. 1, ¶ 85-105 |
| | | Through 2022, Govoni and/or his directees attended board meetings and knew of BFG Loan and transfer, but failed to disclose | ¶109 |
| | | Bank allows employess of non-Center Govoni entity to "delete" a check the Center presented for deposit | ¶141 |
| | | March 2021 Davis discovers transfers that were not tracked | ¶214 |
| | | June 2009 to April 30, 2024, Center funded approximately $1mill of SNT comingled funds to BFG on account of BFG Loan | ¶85 |
| **COUNT 1 - Aiding and Abetting Breach of Fiduciary Duty** | | | |
| No plausible allegation Govoni owed the Center a duty. | 9 | Bank had actual knowledge of Govoni's breaches of fiduciary duty to the Center | ¶250 |
| | | Govoni owed a fiduciary duty to the Trusts by operation of law | ¶244 |
| | | Govoni attended board meetings, got involved in trust issues, continued to grow and oversee transfers to BFG and others | ¶152 |
| | | Belisle trusted Govoni to administer BFG loan in the best interest of Beneficiaries | ¶111 |
| | | Govoni was removed in 2022 when the BFG Loan was discovered and trust was broken | ¶216-227, 243 |
| No allegation AMB knew about Govoni's duty | 9 | Bank knew the purpose, business strategy, and corporate structure of the Center and each non-Center Govonit entity | ¶95–202 |
| | | Bank allowed transfers ordered by individuals lacking signatory and corporate authority over designated accounts | ¶233 |
| | | Continued to fulfill requests of Govoni and his directees, non-Center employees, not authorized signors, no corporate authority | ¶168 |
| | | Bank treated Govoni as owner of the Center | ¶161, 165 |
| | | Bank treated Govoni entities as one big company | ¶231 |
| Allegations of knowledge of breach are conclusory | 9, 10 | See line above re: knowledge of duty. Also, Bank's actual knowledge of Govoni's fiducary duties. | ¶250 |
| | | Bank's held the trust instruments and knew of Center's role as a trustee was disbursement of funds was for narrow purposes | ¶58, 60-67 |
| | | Specific knowledge of transfers between Center and non-Center Govoni's entities | ¶174-175, 202–203 |
| | | Specific knowledge of Govoni owned accounts including BFG, liquor licenses, timber holdings, and various others | ¶202 |
| | | Center should have been holding $100 million of trust funds but held far less | ¶158, 183, 203-205 |
| No allegation AMB substantially assisted in the breach | 13 | See "Special Circumstances," below. Also Bank relaxed rules and banking standards ,false accounts statements and logos | ¶ 250, 114-118, 132-135, 138-142, 146–148,, 251(c), 165 |
| | | Certifed accounts absent knowledge, failed to act on suspicious activity or implement proper risk management procedures | ¶146–148, 302–303, 251(j), 231–232, 283–285 |
| | | Failed to notify Center's formal officers of suspicious activity, encouraged breaches to continue | ¶ 248, 250(f), 250(h), 252-254 |
| No allegation Govoni gave AMB directives re Accounts | 9 | Govoni used Gregory and Janicki, among others, as his directees | ¶150,152-153 |
| | | Used non-Center entities with directees to control information flow re: BFG Loan | ¶154-157 |
| No allegation that AMB followed directives | 9 | Bank delt with and followed requests of Govoni's directees | ¶168 |
| | | Gregory regularly processed BFG Loan reequests with the Bank | ¶189-190 |
| No knowledge of Govoni's breach of duty | 10 | See knowledge (Allegations of knowledge of duty and breach are conclusory), infra. | |
| Center lacking liquidity is conclusory | 11-12 | Knew Center had far less than necessary to cover trust liabilities because Bank held all accounts | ¶158,182-183, 229. |
| | | Bank monitored the Center accounts and non-Center accounts for insufficient funds | ¶252-253 |
| Bank knew funds were not prudently invested is conclusory | 12 | See allegations of knowledge of duty and breach (Allegations of knowledge of duty and breach are conclusory), infra. | |
| | | See lacking liquidity (allegations Center lacking liquidity), infra. | |
| No allegation AMB knew false statements were indeed false | 12 | Statements were not created by AMB and knew Center produced the statements | ¶114, 121 |
| | | Bank could not verify amounts represented in the statements and knew it | ¶116-122, 145-148 |
| | | Bank asked to stop using but later tacitly agreed | ¶118-125 |
| No allegation transactions were unauthorized. | 12, 13, 18, 19 | Bank knew CSNTA was trust administrator | ¶182 |
| | | Bank knew trust funds were transferred to BFG, then transferred to accounts holding liquor licenses and planes | ¶191-194, 57,60-66, 202-207 |

| AMB STATEMENT | Mot. pg. | COMPLAINT ALLEGATIONS CONTRADICTING AMB'S STATEMENT | Complaint Paragraph(s) Citation(s) |
|---|---|---|---|
| | | **Count II - Breach of Fiduciary Duty** | |
| No allegation of a fiduciary duty between the Bank and Center. | 10, 14 | Special circumstances exceed normal banking relationship and contracts,reviewing trust instruments | ¶58, 79-81 |
| | | Allowed Center to use its logo and assisted in furthering false statements going to beneficiares | ¶116, 124 |
| | | Agreed to review and execute probate forms to be filed in the public records | Exhibit E.  ¶146 |
| | | Attestations to the Dept. of Veteran's Affairs and collection of substantial assistance | ¶148, 251, 262 |
| | | Bank became custodial trustee and therefore had a special relationship | ¶144-145, 260-263, 269-271 |
| No allegation of breach of fiduciary duty | | Bank assisted in the transfer of BFG Loan funds to Govoni's other entities without proper authorization | ¶168, 233 |
| | | Bank assisted in concealment of the wrongdoing by allowing the use of its letterhead | ¶116, 118-125, 301 |
| | | Bank certifed funds it knew it had no ability to certify | ¶ 3, 146-148 |
| | | Bank assisted Govoni to receive funds from the Center | ¶ 272(a)-(e) |
| Bank's guidance was only a single email at the inception of the relationshp | 15 | See line above. (No allegation of a fiduciary duty between the Bank and Center). | |
| Suspicious activity was all known to the Center | 17 | See above lack of knowledge of scheme (Center was an active participant in the scheme) | |
| | | **Count IV - Breach of ACH Agreements** | |
| Trustee does not argue breaches of ACH agreements, only NACHA Rules | 19 | Breaches of ACH Agreement includes Gross negligence and willful misconduct are breaches of the ACH Agreements | ¶331 |
| No plausible allegation NACHA Rules apply | 20 | NACHA rules incorpoated and require risk assessment and risk management programs  which appy to banks | ¶333-338 |
| Inadquate and implausible allegation that Bank failed to follow a proper risk management program | 20 | Bank relaxed standards and made many exceptions to rules | ¶130, 137, 138,  143, 251 |
| | | Followed no proper risk management program | ¶343, ¶344, |
| | | Aware of its obilgations under NACHA, even cited them to others, yet faied to follow them | ¶337-342 |
| | | **Count VII - Breach of Contract In Fact** | |
| No allegation funds were insufficient | 21 | Center had to search for liquidity | ¶188 |
|  to cover transactions | | Bank lifted account restrictions to cover insufficient funds Center was transferring $99 million in cash to BFG, while BFG was transferring these funds to Govoni's other projects and companies, funds in CSNTA account were far less than trust liabiltiies | ¶ 138-139, 174, 229 |
| No allegation of offer and acceptance of implied contract. | 23 | **OFFER**: Bank  represented knowledge of SNT industry and offered  services to the Center  to operate such a business Bank offered | ¶129 |
| | | ACCEPTANCE: Center accepted Bank as custodial trustee,Bank signed attestations relating to accounts, then filed in probate courts or sent to VA 145-149; Bank asked for and obtained trust documents,  Bank provided approval of and Center accepted use of logo and false statements  Bank modified statements to aid continued scheme | ¶58, 116-118, 121-125, 129 |
| No plausible allegation Bank received consideration in exchange for helping with Center's trust accounts | 24 | In addition to receiving bank fees, Center and Govoni's entities were some of Bank's largest clients, by 2016, Bank had received so much value from the accounts Bank president reached out; Bank krelationship grew so much Bank started offering discounts | ¶7, 279, 290, 197-198 |