**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re:                                              Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC.,                         Chapter 11

    Debtor.

_____

Michael Goldberg, Chapter 11 Trustee               Adversary Pro. No. 8-26-ap-00015-RCT

    Plaintiff,

v.

AMERICAN MOMENTUM BANK,

    Defendant.

_____/


**DEFENDANT AMERICAN MOMENTUM BANK'S**
**REPLY IN SUPPORT OF MOTION TO DISMISS**

## INTRODUCTION

Goldberg's primary argument in his Response is that the Center was not the perpetrator of a fraudulent scheme but rather a victim. According to Goldberg, the Center cannot have operated a Ponzi scheme because "within the 203 pages of the Complaint and its attachments, there is no reference to a Ponzi scheme." Dkt. 21 at 1-2. Goldberg derides the idea that "the Center was a Ponzi scheme" as a "fallacy" and urges the Court to "analyze the actual allegations, not the characterization of them put forth by AMB." *Id.* at 2.

In fact, Goldberg's "actual allegations" make it clear that the Center operated as a Ponzi scheme. The Complaint explains how "the modus operandi for … the Center" was to "us[e] 'Beneficiary A's' funds to cover 'Beneficiary B's' expenses." Dkt. 1 at ¶ 184. Moreover, the Complaint makes it clear that "improper investments" were made by both "Govoni *and* the Center." *Id.* at ¶ 49 (emphasis added). Thus, although the Complaint meticulously avoids using the word "Ponzi," it clearly alleges that the Center itself perpetrated a fraudulent scheme.

But if there is any doubt, the Court does not need to rely on AMB's "characterization" of Goldberg's allegations. Rather, the Court can rely on the representations that Goldberg has previously made to this Court. Most obviously, in Case No. 8-24-bk-00676-RCT, Ad. Pro. No. 8-25-ap-00347 ("Class Action Case"), Goldberg alleged that "the Center … us[ed] … a classic Ponzi-scheme model." Class Action Case Dkt. 1 at ¶ 4. He cannot claim that AMB is mischaracterizing his position after having made this representation to the Court in a related proceeding.

Once Goldberg is taken at his word that the Center operated as a Ponzi scheme, his entire case against AMB falls apart. Most importantly, the Center's wrongdoing means that Goldberg lacks standing and that his common law claims are barred by *in pari delicto* and limitations. Goldberg's affirmative claims also all fail on the merits. His Complaint should be dismissed.

1

**ARGUMENT**

**I.     The Court should dismiss counts 1, 2, 6, and 7 for lack of standing.**

As AMB explained in its Motion, *Wiand v. ATC Brokers Ltd.*, 96 F.4th 1303 (11th Cir. 2024) holds that the estate of an entity that perpetrated a fraudulent scheme does not have standing to bring common law claims against the entity's alleged accomplices if the entity was controlled exclusively by persons engaged in the fraudulent scheme. Dkt. 14 at 3-4. Under this rule, Goldberg lacks standing to bring his common law claims against AMB because he unequivocally alleges both that he was appointed Trustee in the wake of a fraudulent scheme perpetrated by the Center and Govoni and that Govoni completely controlled the Center during the relevant period. *Id.* at 4-5. Goldberg's common law claims should therefore be dismissed for lack of standing.

In his Response, Goldberg describes the argument that "the Center was a Ponzi scheme" as a "strawman" and argues that "[t]he estate (the Center) was not the perpetrator of the scheme, but the victim of it." Dkt. 21 at 2, 5. This claim is contradicted by Goldberg's actual allegations:

> When BFG or other Govoni-related non-Center entities had funding needs, they reached into the Center for liquidity, often using available SNT funds that were comingled with the Center's own funds. This became the modus operandi for all of Govoni's entities, ***including the Center***, where employees "look[ed] for liquidity" to make distributions for Beneficiaries under their applicable trust documents— using "Beneficiary A's" funds to cover "Beneficiary B's" expenses, because Beneficiary B's funds (or the overall large pot of comingled funds) had been used to fund the BFG Loan and were not liquid to pay the Beneficiary's ongoing needs.

Dkt. 1 at ¶ 184 (emphasis added); *see also id.* at ¶ 49. The Center's admitted use of the funds of one investor to make payments to another is the very definition of a Ponzi scheme.[1]

---

[1] *See Wiand*, 96 F.4th at 1306 ("Oasis was a $78 million Ponzi scheme masquerading as a foreign currency investment fund…. It raised $78 million from over 700 investors and, ***like all Ponzis***, failed to invest those funds as promised. Oasis concealed $20 million of trading losses, misappropriated $10 million to pay its principals, and paid out $28 million in fictitious returns to early investors, leaving later ones with nothing." (emphasis added)); *see also O'Halloran v. First Union Nat. Bank of Florida*, 350 F.3d 1197, 1202 (11th Cir. 2003) ("Even if phrases such as 'sham corporation' or 'alter ego' were never used in the complaint to describe Greater Ministries, the complaint does pervasively describe Greater Ministries as an organization run by Payne for the sole purpose of perpetrating his Ponzi scheme.").

2

But if there is any doubt about whether Goldberg alleges that the Center was a Ponzi scheme, consider the representations that Goldberg made to this Court in the Class Action Case. Goldberg alleged in the complaint he filed in that adversary proceeding that "*the Center* treated beneficiaries' funds as fungible, using one beneficiary's liquid funds to cover the expenses of another beneficiary, whose funds had been stolen—*a classic Ponzi-scheme model*." Class Action Case Dkt. 1 at ¶ 4 (emphases added). Goldberg specifically described this admitted Ponzi scheme as "*the Center's* scheme." *Id.* at ¶¶ 16, 22 (emphasis added). Goldberg cannot now claim that the Center was a victim of Govoni's scheme when he has alleged—both in this case and the Class Action Case—that the Center was a perpetrator of that scheme.

Goldberg alternatively argues that even if the Center operated a Ponzi scheme, it also "operated a legitimate business which administered thousands of trusts for SNT Beneficiaries." Dkt. 21 at 5. But whether there were legitimate aspects to the Center's business is irrelevant. The question under *Wiand* is whether the entity's "'primary existence' before the receivership 'was as a perpetrator of the Ponzi scheme.'" 96 F.4th at 1311 (citation omitted). The above-quoted allegations show that even if the Center allegedly had some legitimate aspects, it *primarily* functioned as a Ponzi scheme. *See, e.g.*, Dkt. 1 at ¶ 184 (describing Ponzi behavior as the Center's "modus operandi"); *see also id.* at ¶ 8 (discovery of the scheme caused the Center to "spiral[] into bankruptcy," which only makes sense if the scheme was the Center's primary business).

Finally, Goldberg suggests that he has standing because there were individuals at the Center who were unaware of its fraudulent scheme. *See* Dkt. 21 at 7 ("[O]thers were involved in the legitimate trust administration side of the business."). This point is also irrelevant under *Wiand*. It does not matter if there were some innocent individuals affiliated with the entity. The question is whether "the now-receivership estate 'was *controlled* exclusively by persons engaging in its

3

fraudulent scheme,'" 96 F.4th at 1311 (citation omitted), and Goldberg expressly alleges that "Govoni exerted complete control over the Center … through 2022." Dkt. 1 at ¶ 160. Accordingly, the alleged presence of innocent individuals at the Center does not save Goldberg's standing.[2]

## II.    The Court should dismiss counts 1, 2, 6, and 7 on *in pari delicto* grounds.

"The doctrine of *in pari delicto* is an equitable doctrine that states 'a plaintiff who has participated in wrongdoing may not recover damages resulting from the wrongdoing.'" *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1152 (11th Cir. 2006). Even if the Court were to somehow determine that Goldberg has standing, the Complaint should still be dismissed on *in pari delicto* grounds because there can be no serious dispute that the Center participated in the alleged wrongdoing. *See* Dkt. 14 at 5-6.

Goldberg argues that "*in pari delicto* literally means 'in equal fault' in Latin" and that "any balance of harm analysis should be construed in favor of the Trustee at this stage." Dkt. 21 at 8, 10. But Goldberg's complaint in the Class Action Case makes it clear that the Center affirmatively breached a fiduciary duty that it owed to the Beneficiaries, while AMB is merely alleged to have aided and abetted the Center's breach. *See* Class Action Case Dkt. 1 at ¶¶ 330-36. Since Goldberg has previously alleged that the Center, not AMB, is the primary wrongdoer, he cannot now claim that AMB is at more fault than the Center.[3]

---

[2] To the extent that Goldberg suggests that Govoni only "controlled the Center regarding the BFG Loan scheme," Dkt. 21 at 7, his Complaint makes it clear that Govoni in fact allegedly controlled *all* aspects of the Center. *See e.g.*, Dkt. 1 at ¶ 46 ("[A]fter his nominal resignation, Govoni maintained significant control and influence over the Center and various of his directees who had control within the Center, and he continued to dictate the Center's staffing, finances, and decision making until at least 2022."); *id* at ¶ 110 (alleging that the president of the Center "acted solely at the direction and control of Govoni"); *id.* at ¶ 150 ("After Govoni resigned from the Center's Board in 2009, in the Center's own view, 'Govoni continued to control and exert his influence over The Center's operations and finances.'"); *id.* at ¶ 153 ("Govoni continued to control the Center through, among things, communications with Janicki (his daughter) related to SNT issues, through Witeck related to trust accounting issues, and through Tracey Gregory to control funds through the Bank's accounts."); *id.* at ¶ 158 ("Using these means of control and bully tactics, from 2009 to 2022, Govoni continued to oversee nearly all facets of the Center.").

[3] *See Fonseca v. Taverna Imports, Inc.*, 212 So. 3d 431, 442 (Fla. 3d DCA 2017) ("A cause of action for aiding and abetting the breach of a fiduciary duty requires a plaintiff to establish: 1) a fiduciary duty on the part of **a primary**

Goldberg also asserts that "[w]here insiders loot or divert corporate assets for personal benefit, the conduct is adverse and not imputable." *Id.* at 9. Goldberg appears to be attempting to invoke the adverse interest exception to *in pari delicto*. However, Florida courts hold that the adverse interest exception does not apply "[w]here a corporation is wholly dominated by persons engaged in wrongdoing," because in such cases "the corporation has itself become the instrument of wrongdoing." Dkt. 14 at 6 (quoting *O'Halloran v. PricewaterhouseCoopers LLP*, 969 So. 2d 1039, 1045 (Fla. 2d DCA 2007)). Here, of course, Goldberg expressly alleges that Govoni and his agents wholly dominated the Center. *See* Dkt. 1 at ¶ 160; *see also* fn. 2, *supra*. Accordingly, the adverse interest exception does not prevent the Court from dismissing the Complaint.[4]

Finally, Goldberg briefly suggests that *in pari delicto* does not apply because Govoni and BFG are at greater fault than the Center. Dkt. 21 at 9-10. But while this point might mean that *in pari delicto* does not prevent Goldberg from bringing claims against Govoni and BFG, it is irrelevant to the question of whether the doctrine bars his claims *against AMB*.

### III.    Each affirmative count of the Complaint should be dismissed for failure to state a claim.

#### A.    Aiding and Abetting Breach of Fiduciary Duty

As AMB explained in its Motion, Goldberg's aiding and abetting breach of fiduciary duty claim should be dismissed because the Complaint does not plausibly allege that Govoni owed the Center a fiduciary duty, that AMB knew about any duty Govoni might have owed the Center, that AMB knew about any breach of such a duty, or that AMB substantially assisted in any breach. *See* Dkt. 14 at 8-13. Goldberg's Response does not change these conclusions.

---

*wrongdoer* …." (emphasis added)); *see also In re Rollaguard Sec., LLC*, 570 B.R. 859, 882-84 (Bankr. S.D. Fla. 2017) (dismissing aiding and abetting claim brought by trustee on *in pari delicto* grounds).

[4] Goldberg's assertion that "Florida law does not state that domination by the wrongdoer alone defeats recovery," Dkt. 21 at 9, is incorrect. Notably, he cites a case that did not involve *in pari delicto* and completely ignores *O'Halloran*, which did involve *in pari delicto*. *O'Halloran* controls this issue.

### 1.      No fiduciary relationship.

Goldberg argues that Govoni "owed a fiduciary duty to the Center by operation of law." Dkt. 21 at 11. Although Govoni does not elaborate on this argument in his Response, his theory seems to be that Govoni owed the Center fiduciary duties because he controlled the Center. *See* Dkt. 1 at ¶¶ 160, 244.

There are two obvious problems with this argument. First, Goldberg's claim that Govoni owed a fiduciary duty because Govoni controlled the Center is strikingly inconsistent with his claim that he has standing because Govoni did *not* control the Center. Under Goldberg's view of the law, *either* Goldberg has standing but Govoni did not owe the Center a fiduciary duty *or* Govoni owed a fiduciary duty but Goldberg lacks standing; both cannot be true at the same time.

The second problem is that Goldberg does not cite any legal authority supporting his argument that Govoni owed fiduciary duties "by operation of law"—he only cites his Complaint. The Court is required to credit the factual assertions in the Complaint, not the legal conclusions. Thus, even if Goldberg somehow did have standing in spite of Govoni's control over the Center, he has given the Court no basis to conclude that this control created a fiduciary relationship.

Since Goldberg has not shown that a fiduciary duty was imposed "by operation of law," a fiduciary relationship existed only if "confidence is reposed by one party and a trust accepted by the other." *Maxwell v. First United Bank*, 782 So. 2d 931, 934 (Fla. 4th DCA 2001). Goldberg asserts in his response that the Center trusted Govoni and that "Govoni … accepted that trust," Dkt. 21 at 11, but Goldberg's claim that Govoni accepted the Center's is unsupported by a citation to the Complaint. And indeed, the Complaint never makes such an allegation. *See* Dkt. 14 at 9. Accordingly, the Trustee has not adequately alleged the existence of a fiduciary relationship.[5]

---

[5] The response also makes a vague reference to fiduciary duties owed by "others" but never explains this assertion. Dkt. 21 at 10. AMB has already explained why this vague claim fails. *See* Dkt. 14 at 8 n.2.

6

### 2.    No knowledge.

Goldberg argues that AMB's argument that it is not alleged to have known about Govoni's alleged fiduciary duty is "simply bizarre" because of "the duties of a trustee of the SNT's and the Bank's knowledge of Govoni's control over the SNTs." Dkt. 21 at 11-12. But again, Govoni cites no legal authority supporting his argument that control imposes fiduciary duties by operation of law. Moreover, as explained in AMB's Motion, Goldberg's allegation that AMB knew that Govoni controlled the Center is conclusory. *See* Dkt. 14 at 9-10. None of the Complaint paragraphs cited in the Response contain factual matter leading to a plausible inference that AMB knew about Govoni's control. Rather, the cited paragraphs show that Govoni interacted with AMB primarily through intermediaries. *See, e.g.*, Dkt. 1 at ¶ 153 ("Govoni continued to control the Center through, among things, communications with … Tracey Gregory to control funds through the Bank's accounts."). Accordingly, Goldberg has not plausibly alleged AMB's knowledge of any fiduciary duty that Govoni might have owed the Center "by operation of law." Indeed, because the Complaint expressly alleges that AMB knew that "Govoni had relinquished formal titles" at the Center, the most plausible inference is that, as far as AMB knew, Govoni did *not* owe the Center a fiduciary duty. *See* Dkt. 14 at 9.

Goldberg has also failed to allege that AMB knew about Govoni's alleged breach of the fiduciary duty that he supposedly owed the Center. Goldberg barely responds to the extensive legal and factual arguments that AMB made on this point in its Motion, instead simply relisting without elaboration allegations that AMB has already shown do not allow for a reasonable inference of actual knowledge. *Compare* Dkt. 21 at 12-13 *with* Dkt. 14 at 10-13. Again, these allegations suggest, at most, only that AMB knew that the SNT funds were trust funds and that Govoni was managing those funds in a suspicious manner. And it is well established that because "a bank … has the right to assume that individuals who have the legal authority to handle the entity's accounts

7

do not misuse the entity's funds," *O'Halloran*, 350 F.3d at 1205, allegations that a bank merely "should have known" about a breach of fiduciary duty, including allegations "that a bank disregarded 'red flags,'" are "insufficient to establish knowledge." *Lamm v. State St. Bank & Tr.*, 749 F.3d 938, 950 (11th Cir. 2014). Because Goldberg's knowledge allegations amount to nothing more than a claim that AMB disregarded red flags, he has failed to allege actual knowledge.

Goldberg claims that "[k]nowledge of wrongdoing is plausible when 'the numbers don't add up' or where there are significant accounting 'discrepancies' (such as liabilities owed to the Center of $100s million, and most years the total figures across all Center and BFG accounts was substantially lower than even $10 million)." Dkt. 21 at 13. But as AMB explained in its Motion, "[t]he funds that flow into and out of the trust bank accounts … typically only remain in the account for a few days," and AMB's "limited role" in holding trust funds means that it is not plausible that AMB "knew about the Center's liquidity more generally." Dkt. 14 at 11-12. Thus, it is not plausible that AMB had actual knowledge that any "numbers" did not "add up." Goldberg did not respond to this factual argument based on representations that Goldberg or the Center made to this Court.

Finally, Goldberg argues in a footnote that "AMB's contention that the only way to impute knowledge is through one of AMB's employee's 'active participation' in a scheme, is wrong and futile, considering AMB's knowledge and active participation in the scheme." Dkt. 21 at 13 n.9. But Goldberg does not cite any case suggesting that this legal proposition is incorrect. Moreover, he does not cite any allegations in the Complaint that allow the Court to infer that AMB actively participated in the scheme. This last attempt to show AMB's knowledge therefore also fails.

### 3.    No substantial assistance.

As AMB explained in its Motion, because Goldberg's knowledge argument fails, Goldberg's substantial assistance argument also fails. *See* Dkt. 14 at 13.

### B.      Breach of Fiduciary Duty

### 1.      No duty.

Goldberg primarily argued in his Complaint that AMB owed the Center a fiduciary duty because "the Bank offered and provided guidance and assistance to Govoni in the creation of the Trust at the outset." Dkt. 1 at ¶ 262. AMB explained in the Motion why this alleged "guidance and assistance" did not create a fiduciary relationship as a matter of law. *See* Dkt. 14 at 15-16. Goldberg appears to have conceded the point, because he does not mention this supposed basis for a fiduciary relationship at all in his Response. Instead, Goldberg focuses on the ordinary banking services that AMB provided to the Center and its SNT accounts. *See* Dkt. 21 at 15-16. Goldberg's theory seems to be that AMB owed a fiduciary duty simply because the Center deposited trust funds at the Bank.

This argument is contrary to black letter law. "[D]eposits made by those serving as fiduciaries such as trustees, executors, administrators, and agents are characterized as general deposits, and general deposits are merely arms-length transactions in which the bank owes no fiduciary responsibilities." *In re Meridian Asset Mgmt., Inc.*, 296 B.R. 243, 261 (Bankr. N.D. Fla. 2003). AMB thus did not owe fiduciary duties simply because it held funds deposited by a trustee.

Goldberg asserts that there were "additional special circumstances including that the Bank acted as a custodial trustee for certain special needs trusts and certified bank balances without independent verification." Dkt. 21 at 16 (citation omitted). However, he ignores that the custodial trustee documents expressly provided that AMB's only duty was to serve as a depository. Dkt. 1-4 at 10. Further, AMB's alleged certification of account balances *based on information from the Center*, *see* Dkt. 1 at ¶¶ 146-48, in no way imposes fiduciary duties on AMB—if anything, it is AMB that was trusting *the Center* to provide it with accurate information.

Finally, Goldberg discounts the disclaimer in the ACH Agreement. *See* Dkt. 21 at 16. But even if the ACH Agreement does not conclusively negate the existence of a fiduciary relationship,

it is consistent with an inference that no such relationship exists. The more important point is that none of the allegations Goldberg points to in his response affirmatively support an inference that AMB owed the Center fiduciary duties. *Compare* Dkt. 21 at 15-16 (summarizing duty allegations) *with Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 519-20 (Fla. 3d DCA 1994) (illustrating kind of facts necessary for an implied fiduciary relationship to exist between a bank and a customer).

### 2. No breach.

Goldberg also fails to allege that AMB breached any fiduciary duty it might have owed the Center. Goldberg does not deny that the actions he complains of were all either directed by, taken by, or done based on information provided by the Center. *Compare* Dkt. 21 at 17-18 *with* Dkt. 14 at 17-18. Such actions cannot possibly constitute a breach of any fiduciary duty owed to the Center.

Goldberg argues in his Response that even though it was the Center that allegedly put AMB's logo on false account statements, AMB "stood by and did nothing after asking the Center to stop using its logo and letterhead on the statements." Dkt. 21 at 17. He then cites a case holding that a "bank breached its fiduciary duty by failing to disclose material facts." *Id.* (citing *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 520 (Fla. 3d DCA 1994)). But Goldberg does not allege a failure to disclose here; rather, he alleges a failure to *affirmatively prevent* a customer from using a bank's logo when that customer was engaged in intentional wrongdoing. Accordingly, *Capital Bank* is completely inapposite. There is no case that AMB is aware of holding that a fiduciary has a duty to prevent its client from acting under such circumstances. Such a rule would be absurd.

In the next paragraph, Goldberg complains about AMB "swearing to amounts allegedly held in its accounts, without the ability to do so." *Id.* Goldberg dismisses as "beyond comprehension" the notion that this alleged action was "acceptable because the Center provided AMB - the Bank - with the figures in its own accounts," insisting that "AMB had a duty to speak up and a duty not to certify facts to which it did not have knowledge." *Id.* (citing *Capital Bank*,

10

644 So. 2d at 520). But Capital Bank holds only that a fiduciary bank has "a duty to disclose facts material to the transaction, ***peculiarly within its knowledge, and not otherwise available to the customer***." 644 So. 2d at 520 (emphasis added) (citation omitted). AMB had no duty to disclose to the Center facts that the Center already knew, such as the alleged fact that AMB was relying on the accuracy of the Center's information when making these alleged certifications.

Goldberg also argues that "the Center was siloed" and "everyone didn't know." Dkt. 21 at 18. But the question is whether the Center "knew ***or should have known***." *Jaffe v. Bank of Am., N.A.*, 395 Fed. Appx. 583, 590 (11th Cir. 2010) (emphasis added). And the Center certainly *should have known* the relevant information, because "a corporation is charged with ***constructive knowledge***, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice …, even though the officer or agent does not in fact communicate the knowledge to the corporation." *Gutter v. E.I. Dupont De Nemours*, 124 F. Supp. 2d 1291, 1309 (S.D. Fla. 2000) (emphasis added). Accordingly, the ignorance of certain Center employees is irrelevant.

Finally, Goldberg asserts that AMB's argument that "the Trustee fails to allege there were unauthorized transfers from AMB accounts …. ignores the Trustee's allegations of fiduciary duties concerning the trust nature of the Center's business, AMB's demand for the trust documents, knowledge, and offer of assistance." Dkt. 21 at 17. Goldberg thus does not dispute that these transactions were in fact directed and approved by the Center, *see* Dkt. 14 at 17; rather, his theory seems to be that the transactions themselves were a breach of fiduciary duty. But as Goldberg has correctly alleged elsewhere, the transactions between the Center and BFG were a breach of *the Center*'s duty *to the Beneficiaries*. *See* Class Action Case Dkt. 1 at ¶¶ 114-58 ("The Center's Breaches of Fiduciary Duty"). *AMB* did not breach any fiduciary duty it owed *to the Center* by processing transactions as directed by the Center.

### C.     Avoidance.

As AMB explained in its Motion, Goldberg's "Avoidance" claim fails because (1) the Complaint does not state what "applicable law" he is attempting to invoke and (2) he is attempting to stand in the shoes of the IRS but the IRS does not have a claim in this case. Dkt. 14 at 18.

Goldberg argues that he is relying on Fla. Stat. § 726.105. *See* Dkt. 21 at 19. But he cannot raise this claim for the first time in his Response. Goldberg's failure to *plead* the applicable law is, by itself, grounds for dismissal.[6]

Even if Goldberg had properly pled the applicable law, his avoidance claim would still fail because the IRS does not have a claim in this case. Goldberg admits that "the most recently filed IRS amendment … has amended the amount owed to $0.00" but argues that the "claim may be amended" again. *Id.* However, the IRS's current claim for $0 is "prima facie evidence" that the IRS does not have a claim. Fed. R. Bankr. P. 3001(f). Moreover, the IRS has not amended its claim in over a year, and the claims bar date has passed. Goldberg thus has not *plausibly* alleged that the IRS is a triggering creditor for purposes for Section 544.

### D.     Breach of ACH Agreements

Goldberg completely fails to respond to most of AMB's arguments regarding his claim that AMB breached the ACH Agreements. AMB pointed out that: (1) the ACH Agreements state only that "*Customer* agrees to comply with and be subject to the Rules of NACHA," Dkt. 14 at 19; (2) the ACH Agreements provide that "Financial Institution shall be responsible *only* for performing the services *expressly* provided for in this agreement," *id.*; (3) the NACHA Rules

---

[6] *See Burgess v. Religious Tech. Ctr., Inc.*, 600 Fed. Appx. 657, 665 (11th Cir. 2015) ("We repeatedly have held that plaintiffs cannot amend their complaint through a response to a motion to dismiss."); *In re CLK Energy Partners, LLC*, 2010 WL 1930065, at *4 (Bankr. W.D. La. May 12, 2010) ("The Trustee's section 544(b) allegations, however, do not satisfy Rule 8(a) because they fail to identify the non-bankruptcy law upon which the Trustee's section 544(b) claim is grounded."); *In re Pitt Penn Holding Co., Inc.*, 2011 WL 4352373, at *11 (Bankr. D. Del. Sept. 16, 2011) (dismissing Section 544 claim where the "applicable law" was only cited in a response).

expressly decline to create a cause of action, *id.* at 19-20; (4) Goldberg does not allege that the transfers from the Center to Govoni were even effectuated through ACH, which is required for the NACHA Rules to apply, *id.* at 20; and (5) Goldberg affirmatively alleges that AMB implemented and followed a risk management plan, which contradicts his claim that AMB violated the NACHA Rules, *id.* at 20-21 Goldberg has no response to any of these arguments.

Goldberg makes only two substantive points regarding the ACH Agreements. First, he argues that the ACH Agreements contain similar language to a case where the court found that the NACHA Rules were incorporated by reference. Dkt. 21 at 21. But in *Azure College, Inc. v. Bank of America, N.A.*, the contract stated that "the ***transaction*** is subject to the [NACHA] Rules." 629 F. Supp. 3d 1200, 1208 (S.D. Fla. 2022) (emphasis added). Thus, both parties to the transaction were bound by the Rules. Here, by contrast, Goldberg relies on contractual language stating that "*Customer [Center]* wishes to initiate credit and or debit Entries through the Financial Institution … pursuant to … the rules of [NACHA]." Dkt. 21 at 21 (emphasis added). Just like the contractual language that AMB quoted in point one above, this language provides that the ACH Agreements only bind *the Customer* to the NACHA Rules. In any event, even if the ACH Agreements did incorporate the NACHA Rules as to AMB as well as the Center, Goldberg's contract claim would still fail in light of the other arguments summarized above.

Goldberg also argues that "the Bank's gross negligence and willful misconduct … themselves constitute breaches under the ACH Agreements." Dkt. 21 at 22. But AMB already explained that the text of the ACH Agreements plainly "does not allow Goldberg to sue for breach of contract based on AMB's alleged gross negligence [or willful misconduct]; rather, the provision that Goldberg is relying on serves to *limit* AMB's potential liability to the Center." Dkt. 14 at 21. Again, Goldberg does not even attempt to respond to this argument. Goldberg does cite *Monsoon*

*v. Inc. Bizjet International Sales & Support Inc.*, 2017 WL 747555 (S.D. Fla. Feb. 27, 2017), but that case held only that a contractual provision limiting liability for negligence but not gross negligence meant that the plaintiffs could recover "damages in their breach of contract claim in excess of the amount of the invoice if Plaintiffs can demonstrate gross negligence or willful misconduct." *Id.* at *9. *Monsoon* in no way suggested that the plaintiffs could bring a breach of contract claim based on solely on gross negligence; rather, the court held only that if the plaintiff could prove both breach *and* gross negligence, then a contractual damages cap did not apply.[7]

### E.    Breach of Contract in Fact

Goldberg's contract in fact claim fails for numerous reasons. First and foremost, Goldberg completely misunderstands the nature of an implied contract. Goldberg argues that AMB and the Center had an implied contract that AMB would help the Center perform its trust responsibilities because "an implied contract may arise … where one party performs 'extras' not covered by the written contract" and "[t]he Complaint alleges AMB took on numerous additional services beyond the language of the ACH agreements." Dkt. 21 at 22-23 (citing *Rhythm & Hues, LLC v. Nature's Lawn Care, Inc.,* 368 So. 3d 12, 14 (Fla. Dist. Ct. App. 2023)). The glaring problem with this argument is that in cases where one party performs "extras," a contract is generally implied to make sure that the performing party is *compensated*. *See Rhythm & Hues,* 368 So. 3d at 15 ("[T]he parties understood and intended that compensation was to be paid."). Goldberg is attempting to completely flip this paradigm, arguing that because AMB allegedly performed some "extras," a contract should be implied that required it to perform even more "extras." The law simply does not work this way.

---

[7] Goldberg has also failed to allege gross negligence or willful misconduct. *See* Dkt. 14 at 21 n.7. Goldberg's arguments to the contrary, *see* Dkt. 21 at 22 nn.16-17, fail because, at a minimum, the Complaint fails to allege the knowledge elements. *See* Part III.A.2, *supra*; *see also* Dkt. 14 at 9-13.

Goldberg's contract in fact claim also fails for the other reasons given in AMB's Motion. *See* Dkt. 14 at 22-24. Goldberg does not respond at all to AMB's arguments regarding the scope of any implied contract and his failure to allege a meeting of the minds. Goldberg argues that "'undefined' essential terms exist" in an implied contract, Dkt. 21 at 23, thereby implying that the terms of an implied contract are not required to be as definite as those in a written contract, but in fact "[t]he only distinction between an express and implied-in-fact contract is the manner in which the parties' assent is manifested or proven." *Baron v. Osman*, 39 So. 3d 449, 451 (Fla. 5th DCA 2010). Goldberg argues that he alleged consideration, Dkt. 21 at 23 n.18, but the consideration he describes was paid in exchange for other services that AMB was already providing to the Center, not trust administration services that it did not and was not required to provide. And finally, Goldberg argues that the express contract rule does not apply when the "extras" performed are "not covered by the written contract," *id.* at 23, but here, the contracts were not simply silent; rather, they affirmatively disclaimed that AMB had extra-contractual responsibilities. *See* Dkt. 14 at 14. Such express disclaimers prevent courts from implying contractual obligations.[8]

**IV.     The Court should dismiss Counts 1, 2, 6, and 7 on statute of limitations grounds.**

Goldberg does not meaningfully respond to AMB's argument regarding the statute of limitations. His attempt to invoke the "delayed discovery" exception, Dkt. 21 at 24, is futile because Goldberg expressly alleged that the Center was aware of the wrongdoing. *See* Dkt. 1 at ¶ 109 ("[E]ach of these board members … knew about the BFG Loan."). The allegations in the Complaint make it clear that Goldberg's claims are barred by limitations.

#### CONCLUSION

AMB renews the request for relief stated in its Motion to Dismiss.

---

[8] *See Glob. Network Mgmt., LTD. v. Centurylink Latin Am. Sols., LLC*, 67 F.4th 1312, 1318-19 (11th Cir. 2023); *see also Rojas v. Univ. of Florida Bd. of Trustees*, 419 So. 3d 593, 604 (Fla. 2025).

Respectfully submitted on April 24, 2026.

By:   /s/ Marcos Rosales
Marcos Rosales
TX Bar No. 24074979
(Admitted *Pro Hac Vice*)
mrosales@beckredden.com
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, TX  77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

/s/ Donald R. Kirk
Donald R. Kirk
FL Bar No. 105767
dkirk@carltonfields.com
Ryan Yant
FL Bar No. 104849
ryant@carltonfields.com
**CARLTON FIELDS, PA**
4221 W Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
Telephone: (813) 229-4334
Facsimile: (813) 229-4133

***Counsel for Defendant***
***American Momentum Bank***

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2026, I electronically filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, thereby serving all registered users in this case.

/s/  Marcos Rosales
Marcos Rosales

16