**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

In re: Case No. 8-24-bk-00676-RCT

THE CENTER FOR SPECIAL NEEDS
TRUST ADMINISTRATION, INC., Chapter 11

Debtor.
_________________________________

Michael Goldberg, Chapter 11 Trustee Adversary Pro. No. 8-26-ap-00015-RCT

Plaintiff,

v.

AMERICAN MOMENTUM BANK,

Defendant.
_________________________________/

**DEFENDANT AMERICAN MOMENTUM BANK'S MOTION TO DISMISS AMENDED COMPLAINT (DKT. 50) AND INCORPORATED MEMORANDUM OF LAW**

NOTICE OF OPPORTUNITY TO OBJECT AND REQUEST FOR HEARING

If you object to the relief requested in this paper you must file a response with the Clerk of Court at 801 North Florida Avenue, Tampa, Florida 33602 within fourteen days from the date of the attached proof of service, plus an additional three days if this paper was served on any party by U.S. Mail.

If you file and serve a response within the time permitted, the Court will either notify you of a hearing date or the Court will consider the response and grant or deny the relief requested in this paper without a hearing. If you do not file a response within the time permitted, the Court will consider that you do not oppose the relief requested in the paper, and the Court may grant or deny the relief requested without further notice or hearing.

You should read these papers carefully and discuss them with your attorney if you have one. If the paper is an objection to your claim in this bankruptcy case, your claim may be reduced, modified, or eliminated if you do not timely file and serve a response.

Defendant American Momentum Bank ("AMB" or the "Bank") respectfully moves the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, for an order dismissing counts 3 and 6 of Plaintiff's Amended Complaint (the "Complaint"). AMB does not consent to the entry of final orders or judgment by the Bankruptcy Court or to a jury trial being conducted by the Bankruptcy Court. In support of its Motion to Dismiss, AMB respectfully shows as follows:

## INTRODUCTION AND BACKGROUND

The Court is familiar with the facts of this case. In brief, Plaintiff alleges that the Center for Special Needs Trust Administration (the "Center") loaned $100 million from special needs trust ("SNT") accounts that it administered to an entity controlled by Leo Govoni, the Center's founder, who then allegedly used the funds for his own purposes without the ability or intention to repay them. *See* Dkt. 50 at ¶¶ 6, 85-111, 177, 179. Plaintiff further alleges that AMB is the bank that processed these transactions. *See, e.g.*, *id.* at ¶ 178. Plaintiff accuses AMB of aiding and abetting a breach of fiduciary duty that Govoni supposedly owed to the Center, of breaching a fiduciary that it supposedly owed to the Center, and of breaching contractual obligations that it supposedly owed to the Center. *See id.* at ¶¶ 245-80, 334-54. Plaintiff also raises an avoidance claim and objects to AMB's proof of claim against the Center based on AMB's alleged wrongdoing. *See id.* at ¶¶ 281-333.

AMB filed a motion to dismiss Plaintiff's Original Complaint, Dkt. 14, which the Court granted in part, dismissing without prejudice Plaintiff's avoidance and contractual claims, Dkt. 41. Plaintiff then filed this Amended Complaint, which renews his avoidance claim and his claim that AMB breached the ACH Agreements. *See* Dkt. 50 at ¶ 281-97, 334-54. However, Plaintiff failed to fix the deficiencies in those two renewed claims. Accordingly, AMB files this targeted motion to dismiss those two claims with prejudice.

## LEGAL STANDARD

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *see* Fed. R. Bankr. P. 7012(b). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (cleaned up). "[W]hen determining whether the complaint crosses 'the line between possibility and plausibility of entitlement to relief,' 'courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.'" *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (citations omitted).

## ARGUMENT

### I. The Court should dismiss Plaintiff's avoidance claim (count 3).

Plaintiff seeks to avoid account fees paid to the Bank pursuant to § 544 (via F.S. § 726.105(1)(b)) and § 548 dating back ten years from the Petition Date. Plaintiff argues that "the Debtor owed taxes every year to the IRS and as such, the IRS was a creditor each year of the Debtor's existence" and that "[t]o the extent the Court determines the IRS can be considered a triggering creditor …, the account analysis charges totaling at least $109,187.12 (Ten Years) are avoidable." Dkt. 50 at ¶ 294. However, the Court has already ruled that "because the IRS filed an amended proof of claim for $0, the IRS cannot be used as a triggering creditor in whose shoes Plaintiff may stand." Dkt. 41 at 22. The Court should re-affirm this ruling. Nothing has changed—the IRS's operative proof of claim is still $0.

Plaintiff suggests that "[t]he IRS may also have additional claims, or possibly amended amounts due from prior years." Dkt. 50 at ¶ 295. However, accepting this argument would have the effect of extending the statute of limitation for essentially *all* § 544 claims to ten years. *See* 26 U.S.C. § 6502 (ten year statute of limitations for IRS). After all, under Plaintiff's theory, the IRS could be a triggering creditor in almost every case, since the IRS theoretically could always have additional claims or amend its proof of claim. This cannot be the law.

Plaintiff also claims that "[t]he transactions identified in Exhibit G," which date back to 2010, "are avoidable by every Beneficiary with a deficient balance existing on the Petition Date." Dkt. 50 at ¶ 291; *see* Dkt. 50-7 at 2-3. However, Plaintiff later concedes, correctly, that under this theory, it in fact cannot avoid transfers that occurred more than four years prior to the Petition Date. *See* Dkt. 50 at ¶ 293; *see also* F.S. § 726.110(2). Accordingly, Plaintiff's avoidance claim should be dismissed to the extent that Plaintiff seeks to avoid transactions beyond four years.[1]

## II. The Court should dismiss Plaintiff's breach of contract claim (count 6).

Plaintiff claims that AMB breached the ACH Agreements between the Center and AMB. *See* Dkt. 50 at ¶¶ 334-54. This argument fails for several independent reasons.

### A. Plaintiff cannot sue AMB based on an alleged violation of the NACHA Rules.

Plaintiff's primary argument is not that AMB breached any promises contained within the four corners of the ACH Agreements but rather that the ACH Agreements "explicitly incorporate National Automated Clearing House Association rules ('NACHA Rules') and their definitions" and that AMB violated "NACHA Rule 1.2.4 and NACHA Rule 2.2.3, each of which in turn are breaches of the AMB ACH Agreements." *Id.* at ¶¶ 335, 351.

[1] Additionally, to the extent that Plaintiff is attempting to state a § 548 claim, Plaintiff fails to do so. Plaintiff does not articulate what subsection of § 548 he is invoking. He also does not identify the amount of transfers "made or incurred on or within 2 years before the date of the filing of the petition," 11 U.S.C. § 548(a)(1), that he is seeking to avoid—the "wherefore" clause only seeks avoidance of either ten years' or four years' worth of transfers. *See* Dkt. 50 at p. 56. Accordingly, Plaintiff does not properly assert a § 548 claim.

However, Plaintiff cannot sue AMB for breach of the ACH Agreements based on an alleged violation of the NACHA Rules. Under Florida law, "there must be some expression in the incorporating document of an intention to be bound by the collateral document." *Glob. Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1033 (11th Cir. 2017) (cleaned up)). But the ACH Agreements do not express such an intent with respect to AMB. Rather, they state only that "*Customer* agrees to comply with and be subject to the Rules of NACHA." Dkt. 50-9 at 2 (emphasis added). The Agreements thus only bind *the Center* to the NACHA Rules, not AMB.

The NACHA Rules themself also preclude Plaintiff from suing AMB based on an alleged violation of those rules. The Rules provide that "[n]othing in these rules is intended to, and nothing in these rules shall be implied to, give any legal or equitable right, remedy, or claim to other entity, including to any … ***Receiver***." *Clinton Plumbing & Heating of Trenton, Inc. v. Ciaccio*, 2010 WL 4224473, at *10 (E.D. Pa. Oct. 22, 2010) (quoting NACHA Rule 1.9). "A ***Receiver*** is the consumer whose account is accessed." *Id.* at *8. Rule 1.9 thus confirms that even if the ACH Agreements incorporated the NACHA Rules with respect to AMB (which they did not), Plaintiff still could not sue AMB based on an alleged violation of those rules. *See id.* at *10 ("Since CPH has receiver status, it does not have standing to bring a breach of warranty claim under NACHA.").

In short, Plaintiff's claim that AMB breached the ACH Agreements by violating the NACHA Rules fails right out of the gate. Neither the ACH Agreements nor the NACHA Rules allow Plaintiff to sue AMB based on an alleged violation of the NACHA Rules.

**B. Plaintiff does not plausibly allege that AMB violated the NACHA Rules.**

Even if Plaintiff could theoretically sue AMB for breach of the ACH Agreements based on an alleged violation of the NACHA Rules, Plaintiff's assertion that AMB violated NACHA Rules 1.2.4 and 2.2.3 by failing "to undertake its duty to properly implement a proper risk management program," Dkt. 50 at ¶ 353, is insufficient to state a claim, for at least three reasons.

*First*, the Court previously found that "dismissal of this claim is warranted because Plaintiff has not identified any of Govoni's transactions that were effectuated through ACH, as opposed to some other transfer mechanism." Dkt. 41 at 23. Plaintiff's new Complaint does not remedy this deficiency. Although Plaintiff now alleges that "thousands of ACHs were made in and out of the Center's account at the Bank," Plaintiff admits that most of "the Center's ACH transactions were clearly attributed to proper, Beneficiary-related expenses." Dkt. 50 at ¶¶ 341-42. Plaintiff does allege that a few "[s]eemingly improper ACH payments were also made from the Center's account, including to American Express (which could be the AMEX cards held by Govoni and Boston Asset Management), and to make donations to places like the Liverpool Institute for Performing Arts." *Id.* at ¶ 342. However, this allegation is facially insufficient—Plaintiff's use of the terms "seemingly" and "could be" make it obvious that it is at most possible, rather than plausible, that these transactions were in fact improper. *See Iqbal*, 556 U.S. at 678; *see also Doe*, 29 F.4th at 686 (courts can infer "obvious alternative explanations").

Notably, Plaintiff has had the assistance of forensic accounts, who have provided more than $1 million worth of services since March of 2024. *See* Bkr. Dkt. 138 (order approving retention of forensic accountant); Bkr. Dkt. 361 (first fee application, including $563,775.80 in fees); Bkr. Dkt. 661 (second fee application, including $568,644.40 in fees). Nonetheless, Plaintiff is *still* unable to identify a single transaction that he can definitively claim is an improper ACH transaction and must instead resort to transactions that "seemingly" "could be" improper.

Moreover, the credit card payments and donations allegedly made through ACH *are not even the transactions that Plaintiff is complaining about in this litigation*. Rather, Plaintiff affirmatively alleges that the "internal Bank transfers from the Center to BFG" that are at the heart of this case, along with the subsequent "transactions to other Govoni- related entities," were

"transactions where both the sender and receiver accounts are at the same Bank, allowing for direct internal processing *rather than routing through an external ACH network*." Dkt. 50 at ¶¶ 343, 345 (emphasis added); *see also id.* at ¶¶ 85-111, 177 (complaining about transfers from the Center to BFG and from BFG to other Govoni entities, not improper credit card payments and donations). Thus, Plaintiff still has not "identified any of *Govoni's transactions* that were effectuated *through ACH*," Dkt. 41 at 23 (emphases added), meaning that Plaintiff still has not alleged that the ACH Agreements apply this dispute.[2]

*Second*, even if the ACH Agreements (1) did apply in this dispute and (2) did allow Plaintiff to sue AMB based on an alleged violation of the NACHA Rules (neither of which is true), Plaintiff has not alleged that the NACHA Rules themselves apply to this dispute. Plaintiff alleges that Rule 1.2.4 imposed on AMB "a duty to conduct a risk assessment *of its ACH activities* and implement a risk management program *on the basis of such assessment*." Dkt. 50 at ¶ 337 (emphases added). However, as just noted, the only "[s]eemingly improper" ACH activities mentioned in the Complaint are a few "donations" and "American Express" payments. *Id.* at ¶ 342. At most, then, Rule 1.2.4 would require AMB to create a risk management program with respect to credit card payments and donations made by the Center through ACH—AMB would not be required to include the internal transfers of which Plaintiff complains in that risk management plan.

The other NACHA Rule invoked by Plaintiff, Rule 2.2.3, has even less application to this case. This rule allegedly imposes on AMB "a duty to assess the nature and risk of an originator's ACH activity and to 'establish, implement, and periodically review an exposure limit for the [o]riginator.'" *Id.* at ¶ 338. But again, the complained-of transactions were *not* ACH transactions,

[2] Plaintiff's new effort to hold AMB liable based on the ACH Agreements' references to "On Us Entries" will be discussed below. *See* Part II.C, *infra*.

so they have no connection to any ACH "exposure limit." Further, Plaintiff has not alleged that AMB did not establish, implement, and review an appropriate ACH exposure limit for the Center based on the few "[s]eemingly improper" ACH activities that Plaintiff mentions, *id.* at ¶ 342, let alone that the Center exceeded such a limit.

*Third*, even assuming that the NACHA Rules apply to this case, Plaintiff fails to plausibly allege that AMB violated those rules by "fail[ing] to implement proper risk management procedures and fail[ing] to properly conduct risk assessments" with respect to the Center's ACH activities. *Id.* at ¶ 348. Plaintiff never identifies any specific aspects of the Bank's risk management programs that were not "proper" and never explains how a different risk management plan would have enabled AMB to uncover the Center's fraudulent scheme. Plaintiff's loss equals liability argument seeks to replace actual legal rules with a strict liability regime. This cannot stand.

Plaintiff does allege that "the Bank knowingly and willingly relaxed and ignored its own internal controls and policies to accommodate requests made by Govoni and his directees at the Center," *id.* at ¶ 349, but this allegation is conclusory. Moreover, Plaintiff conspicuously does not allege that any AMB internal controls or policies were relaxed or ignored *with respect to ACH transactions*. Plaintiff alleges that "[t]he Bank also actively skirted its own risk management controls" in several ways. *Id.* at ¶ 350. However, "allowing *BFG* to wire out funds it did not have available," *id.* (emphasis added), is not covered by the agreement between AMB and *the Center*, and in any event, Plaintiff never alleges that there actually were insufficient funds to cover any transaction. Moreover, "deleting a check that had been presented for deposit by the Center without the knowledge or request of the Center" and "allowing for bank accounts to be opened without typical documentation," *id.*, have nothing to do with ACH transactions; Plaintiff also never alleges that these activities were in fact unauthorized or improper. Finally, Plaintiff alleges that AMB

"fail[ed] to consider and report on all Entries and transactions covered under the AMB ACH Agreements, including 'On Us' Entries between the Center and BFG," *id.* at ¶ 350, but Plaintiff still does not identify any *ACH* transactions relevant to this case that AMB failed "to consider and report on"—again, the internal transfers between the Center and BFG were *not* ACH transactions and therefore were not covered by the NACHA Rules.

**C. Plaintiff's allegations relating to gross negligence, willful misconduct, and "On Us Entries" do not give rise to a claim for breach of the ACH Agreements.**

In addition to arguing that AMB violated the NACHA Rules, Plaintiff argues that AMB violated the "On Us Entries" and gross negligence/willful misconduct provisions of the ACH Agreements. These allegations are also insufficient to state a claim.

Plaintiff alleges that "[t]he AMB ACH Agreements specifically covered On Us Entries (including for example, internal Bank transfers from the Center to BFG)." *Id.* at ¶ 343. Plaintiff then suggests that "an assessment of the Center's … 'On Us' activities" should have been included in the "proper risk management program" supposedly required by the NACHA Rules. *Id.* at ¶ 348.

This argument fails for at least two reasons. First, Plaintiff's claim that the contractual phrase "On Us Entries" includes "internal Bank transfers," *id.* at ¶ 343, is demonstrably false. Rather, in the ACH Agreements, "On Us Entries" plainly refers to On Us *ACH* Entries. Plaintiff specifically alleges that the Agreements incorporate the NACHA Rules "and their definitions," *id.* at ¶ 335, and "Entry" is a defined term in the NACHA Rules:

## Section 8.37 "Entry "

(a) an order or request for the transfer of money to the deposit account or loan account of a Receiver, or general ledger account of an RDFI (a "credit Entry");

(b) an order or request for the withdrawal of money from the deposit account of a Receiver, or general ledger account of an RDFI (a "debit Entry"); and

(c) a Non-Monetary Entry to the deposit account or loan account of a Receiver, or general ledger account of an RDFI.

An Entry must comply with the requirements of Appendix Three (ACH Record Format Specifications), Appendix Four (Return Entries), Appendix Five (Notification of Change), or Appendix Six (Acknowledgment Entries), as applicable. For all Entries except RCK Entries, each debit Entry shall be deemed an "item" within the meaning of Revised Article 4 of the Uniform Commercial Code (1990 Official Text) and that Article shall apply to such Entries except where the application is inconsistent with these Rules, in which case these Rules shall control. An RCK Entry is an item as that term is defined by Revised Article 4 of the Uniform Commercial Code only for the limited purposes of presentment as set forth in Article 4-110(c) and notice of dishonor as set forth in Article 4-301(a)(2).

Thus, the ACH Agreements have nothing to do with non-ACH "On Us" transactions, such as "On Us" checks, wire transfers, or internal transfers. Plaintiff's claim that AMB breached the ACH Agreements with respect to such transactions can be dismissed for this reason alone—again, Plaintiff has not identified any relevant *ACH* activities that were actually improper.

Additionally, even if "On Us Entries" did include non-ACH transactions (which it does not), Plaintiff still has not alleged that AMB breached the ACH Agreements with respect to such transactions. The provisions in the ACH Agreements concerning "On Us Entries" that Plaintiff cites only concern the date on which "Financial Institution shall credit the Receiver's account" when such transactions occur, *id.* at ¶ 343; they say nothing about including those transactions in a risk management program or otherwise provide that the NACHA Rules apply to such transactions. Moreover, Plaintiff points to no provision of the NACHA Rules that would require non-ACH "On Us" transactions to be a part of a risk management program; to the contrary, the Complaint specifically alleges that Rules 1.2.4 and 2.2.3 apply only to "ACH activities." *Id.* at ¶ 337; *see id.* at ¶ 338 ("ACH activity"). Thus, Plaintiff does not plausibly allege that AMB was required to consider non-ACH "On Us" transactions as part of its ACH risk management program.

Plaintiff further alleges that the "ACH Agreements also contain provisions acknowledging that the Bank will be liable for damages arising from the Bank's gross negligence or willful misconduct" and that, in addition to violating the NACHA Rules, "[t]he Bank's actions and omissions are also breaches of the AMB ACH Agreements because they are evidence of the Bank's gross negligence or willful misconduct." *Id.* at ¶¶ 336, 352. However, acting with gross negligence or willful misconduct is *not* a breach of the ACH Agreements. Plaintiff is relying on Section 27(b) of the ACH Agreements, *id.* at ¶ 336, which provides: "Financial Institution shall be liable for customer's actual damages due to claims arising *solely* from financial institution's gross

negligence or willful misconduct." Dkt. 50-9 at 9 (emphasis added). This clause is *not* a contractual promise by AMB not to commit gross negligence. Rather, it comes from the "Limitation of Liability" section of the ACH Agreements, and it is a promise *by the Center* not to sue AMB for anything other than gross negligence or willful misconduct. This reading is confirmed by Section 27(a), which states that "Financial Institution shall be … liable *only* for its gross negligence or willful misconduct in performing those services." *Id.* (emphasis added). Thus, the ACH Agreement does not allow Plaintiff to sue for breach of contract based on AMB's alleged gross negligence; rather, the provision that Plaintiff cites *limits* AMB's potential liability to the Center by prohibiting lawsuits for anything other than gross negligence or willful misconduct.[3]

For these reasons, Plaintiff's allegations relating to gross negligence, willful misconduct, and "On Us Entries" do not give rise to a claim for breach of the ACH Agreements. This claim should be dismissed again—this time with prejudice.

## CONCLUSION

For the foregoing reasons, the Court should dismiss count 6 with prejudice. Further, to the extent that count 3 seeks to avoid transfers that occurred more than four years prior to the Petition Date or to state a claim under § 548, the Court should dismiss count 3 with prejudice.

---

[3] Even if Plaintiff could sue AMB for breach of contract based on gross negligence or willful misconduct, Plaintiff has not plausibly alleged that AMB was grossly negligent or engaged in willful misconduct. Plaintiff alleges only that AMB "turn[ed] a blind eye to suspicious transactions." Dkt. 50 at ¶ 347. Turning a "blind eye" to the misconduct of others is not "willful misconduct." Moreover, "Florida law defines gross negligence as an act or omission that a reasonable, prudent person would know is likely to result in injury to another. In other words, gross negligence must be predicated on a showing of *chargeable knowledge* or awareness of the imminent danger spoken of and the act or omission complained of must occur in a manner which evinces a *conscious disregard of consequences,* as distinguished from a careless disregard thereof." *In re Palm Beach Fin. Partners, L.P.*, 488 B.R. 758, 780 (Bankr. S.D. Fla. 2013) (cleaned up) (emphases in original). Plaintiff has made no effort to allege any of these elements. Notably, Plaintiff has *not* sued AMB for gross negligence.

Respectfully submitted on August 5, 2026.

By: */s/ Marcos Rosales*
Marcos Rosales
TX Bar No. 24074979
(Admitted *Pro Hac Vice*)
mrosales@beckredden.com
Eric B. Williams II
TX Bar No. 24131767
(Admitted *Pro Hac Vice*)
ewilliams@beckredden.com
**BECK REDDEN LLP**
1221 McKinney, Suite 4500
Houston, TX 77010-2010
Telephone: (713) 951-3700
Facsimile: (713) 951-3720

Donald R. Kirk
FL Bar No. 105767
dkirk@carltonfields.com
Ryan Yant
FL Bar No. 104849
ryant@carltonfields.com
**CARLTON FIELDS, PA**
4221 W Boy Scout Boulevard, Suite 1000
Tampa, FL 33607
Telephone: (813) 229-4334
Facsimile: (813) 229-4133

***Counsel for Defendant***
***American Momentum Bank***

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I electronically filed a true and correct copy of the foregoing with the United States Bankruptcy Court for the Middle District of Florida using the Court's CM/ECF system, thereby serving all registered users in this case.

/s/ *Marcos Rosales*
Marcos Rosales