ORDERED.

**Dated: October 13, 2026**

Roberta A. Colton
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:

The Center for Special Needs Trust Administration, Inc.,

Debtor.

Case No. 8:24-bk-00676-RCT
Chapter 11

______________________________________/

Michael Goldberg, as Chapter 11 Trustee of the estate of Debtor, The Center for Special Needs Trust Administration, Inc.

Plaintiff,

v.

American Momentum Bank,

Defendant.

Case No. 8:26-ap-00015-RCT

______________________________________/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

This case came before the Court, without a hearing, on Defendant's Motion to Dismiss Amended Complaint. (Doc. 56). Plaintiff opposes the motion (Doc. 66), and Defendant filed a reply (Doc. 72). This Court directed Plaintiff to file a copy of the NACHA Rules and allowed Defendant to file a supplement in response, and both parties complied. (Docs. 81, 82).

As explained below, Defendant's motion is granted to the extent that the Court concludes that Plaintiff has not sufficiently alleged: (1) the IRS is a proper triggering creditor in Count III,

and (2) that On Us Entries were ACH transactions that were required to be considered when assessing risk. Otherwise, the motion is denied.

## I. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)[1] evaluates the sufficiency of a complaint to determine whether it sets forth sufficient factual allegations to state a claim for relief. Thus, a court must determine whether the complaint satisfies Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief so that the defendant is given fair notice of what the claim is and the grounds upon which it rests.[2] To survive a Rule 12(b) motion, the complaint must contain enough factual allegations, taken as true, to raise the right to relief above the speculative level.[3]

## II. Background

Plaintiff Michael Goldberg, as Chapter 11 Trustee of the Estate of Debtor, The Center for Special Needs Trust Administration, Inc., alleges the following in his amended complaint (Doc. 50). Leo Govoni was a businessman who founded Debtor, The Center for Special Needs Trust Administration, Inc. ("the Center"), in 2000 for the purpose of administering special needs trusts ("SNTs"). The Center is a Florida 501(c)(3) corporation that managed funds for more than 6,000 SNT beneficiaries from 2000 until its Chapter 11 filing in 2024.

The Center deposited the SNT funds with Defendant American Momentum Bank ("the Bank"). Plaintiff alleges that Govoni had more than 140 accounts at the Bank and that most were not Center-related, but instead, they were opened by Govoni to pursue pet projects and ill-conceived endeavors to the detriment of the Center and its beneficiaries. Plaintiff alleges the

---

[1] Rule 12(b)(6) is made applicable to adversary proceedings via Federal Rule of Bankruptcy Procedure 7012(b).
[2] *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
[3] *See id.*

Bank catered to Govoni because he controlled one of the Bank's largest related group of customers.

From June 1, 2009, through January 1, 2012, Govoni caused the Center to loan $100 million to one of his companies, Boston Finance Group, LLC ("BFG"), via a revolving line of credit, which was fully funded by the end of 2020. The BFG loan was a purported "investment" vehicle; however, Govoni subsequently distributed or "loaned" the money from BFG to his other entities for his personal ventures and non-investment grade asset acquisitions. The Bank allowed the Center to transfer SNT funds that were held at the Bank to Govoni's BFG account at the Bank, and then the Bank allowed BFG to transfer the funds to dozens of Govoni's related accounts at the Bank, even though the Bank knew the trust nature of the funds. Nearly every Govoni-related entity into which SNTs' funds flowed utilized the Bank as its primary depository.

In 2022, the BFG loan was discovered. A new Board of Directors was selected for the Center to attempt to fix the wrongs that had occurred for over a decade. On February 9, 2024, the Board made the decision to put the Center into a Chapter 11 bankruptcy.

Plaintiff, as the Chapter 11 Trustee, filed an adversary proceeding against the Bank to recover the more than $150 million in financial losses suffered because of the Bank's alleged substantial assistance to Govoni's breach of fiduciary duty owed to the Center, as well as the Bank's own breaches of fiduciary duty to the Center. In his amended complaint, Plaintiff asserts six claims against the Bank: Count I: aiding and abetting Govoni's breach of fiduciary duty to the Center, Count II: breach of fiduciary duty by the Bank, Count III: avoidance of improperly paid account fees pursuant to 11 U.S.C. § 544 and § 548, as well as recovery under 11 U.S.C. § 550, Count IV: objection to the Bank's proof of claim, Count V: equitable subordination of

the Bank's claim, and Count VI: breach of the ACH agreements.

## III. Motion to Dismiss

The Bank moves to dismiss Counts III and VI of the amended complaint for failure to state a claim. Accordingly, the Court will analyze each claim.

### A. Count III: Avoidance and Recovery of Improper Fees under § 544, § 548, and § 550

In the amended complaint, Plaintiff alleges that beginning in 2010, the Bank charged the Center fees for the account servicing the Bank provided, but the fees charged related to both the Center's accounts and Govoni-owned non-Center accounts. Further, Plaintiff alleges that not only should the Center not have been charged fees relating to the non-Center accounts, but it also should not have paid any account service fees relating to its own accounts given that the Bank allowed Govoni to pilfer the Center's accounts under its watch.

Plaintiff alleges two types of triggering creditors for its avoidance claim—the SNT Beneficiaries with a deficient balance existing on the petition date and the IRS. Using the SNT Beneficiaries as triggering creditors under § 544 and Florida Statute § 726.105(1)(b) would provide a four-year lookback window, with improper fees totaling $11,046. Using the IRS as a triggering creditor under § 544 and Florida Statute § 726.105(1)(b) would provide a ten-year lookback window, with improper fees totaling $109,187.12.

The Bank argues that the Court should dismiss Count III, in which Plaintiff asserts a claim for avoidance of improperly paid account fees pursuant to 11 U.S.C. § 544 and § 548. Specifically, the Bank argues that Plaintiff cannot stand in the shoes of the IRS to seek avoidance under § 544, because the IRS has no claim in the bankruptcy case. Additionally, the Bank argues that Plaintiff has failed to sufficiently state a claim under § 548. The Court agrees with the Bank that the IRS is not a proper triggering creditor.

**1. Avoidance Under § 544**

Plaintiff seeks avoidance of the improper fees under § 544. Section 544 provides, in relevant part, that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502."[4] Thus, Plaintiff's § 544(b) claim can be explained as follows:

> The IRS is a creditor holding an unsecured claim allowable under § 502 and, on the filing date of this bankruptcy case, the IRS could have timely filed a complaint to avoid the [payment of the account service fees] under applicable Florida fraudulent transfer law [Florida Statute § 726.105(1)(b)[5]]. Therefore, the Trustee, pursuant to § 544(b), can now step into the shoes of the IRS to avoid these transfers . . . and utilize the IRS ten-year collection window.[6]

However, the Bank correctly points out that because the IRS filed an amended proof of claim for $0, the IRS cannot be used as a triggering creditor in whose shoes Plaintiff may stand.[7] As explained by one court:

> Under present law, the Complaint[] must include factual allegations that plausibly support each element of the claim. The existence of a triggering creditor is an explicit element of the Trustee's claims under section 544. It is not sufficient to allege generally that there are triggering creditors. The Trustee must identify by name at least one creditor with an allowable unsecured claim that could have sought avoidance of the transfer in question

[4] 11 U.S.C. § 544(b)(1).

[5] Florida Statute § 726.105(1)(b) provides: "A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . [was either (1)] engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) [i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

[6] *In re Kipnis*, 555 B.R. 877, 881 (Bankr. S.D. Fla. 2016). The ten-year collection window comes from 26 U.S.C. § 6502.

[7] Proof of Claim 4-4.

under Florida law.[8]

Plaintiff identifies two types of triggering creditors in the amended complaint—the SNT Beneficiaries with a deficient balance on the petition date and the IRS. To the extent that Plaintiff relies on the SNT Beneficiaries with a deficient balance on the petition date as triggering creditors, Count III is sufficiently pled. However, the same is not true with respect to the IRS as a triggering creditor.

Plaintiff makes the following allegations with respect to the IRS as a triggering creditor in the amended complaint:

> [T]he Debtor owed taxes every year to the IRS and as such, the IRS was a creditor each year of the Debtor's existence. . . . The IRS may also have additional claims, or possibly amended amounts due from prior years as a result of the now discovered nature of Govoni's actions upon the Center's income and investments.[9]

However, at this point in time, the IRS does not have a claim given that it amended its proof of claim to $0. Because the IRS does not currently have an allowable unsecured claim, it could not seek avoidance of the transfers in question.

Plaintiff challenges this conclusion by arguing that because the IRS filed a proof of claim that is subject to modification, if the IRS does later modify its proof of claim, it could be an appropriate triggering creditor. However, this Court is analyzing the amended complaint based on the facts currently alleged and in existence. Plaintiff does not cite any authority for this Court to do otherwise.

Plaintiff argues that the case of *In re Polichuk*[10] provides support for his position,

---

[8] *In re Rollaguard Security, LLC*, 570 B.R. 859, 881–82 (Bankr. S.D. Fla. 2017) (footnote and citation omitted).

[9] Doc. 50, ¶ 294-95.

[10] 506 B.R. 405 (Bankr. E.D. Pa. 2014).

because tax liability is a fact that must be proven at trial. However, in *Polichuk*, the plaintiff alleged that the IRS was an actual creditor and also pled additional facts that could support that allegation.[11]

In this case, Plaintiff does not allege that there is a known tax liability (even if not yet assessed) or allege facts that would give rise to a tax liability for Debtor, a § 501(c)(3) entity. Instead, Plaintiff argues that the IRS may later discover that a tax liability exists. Such is not sufficient, because the pleading standard is that the complaint must contain enough factual allegations, taken as true, to raise the right to relief above the speculative level.

Accordingly, the Court finds that Plaintiff has not sufficiently alleged the IRS to be an appropriate triggering creditor. If facts are later discovered to support an assertion of tax liability, Plaintiff can move to amend Count III to add the IRS as a triggering creditor.

**2. Avoidance Under § 548**

The Bank seeks dismissal of Count III to the extent it is based on § 548, which provides a two-year lookback period, because Plaintiff has not set forth the amount being sought during the two-year period. However, notice pleading does not require Plaintiff to allege the amount being sought within two years as opposed to four years. The Bank has fair notice of what is alleged to be avoidable under § 548. Indeed, every transaction is detailed on Exhibit G to the amended complaint.[12] As such, dismissal of Count III to the extent that it is based on § 548 is denied.

**B. Count VI: Breach of ACH Agreements**

Next, the Bank argues that the Court should dismiss Count VI, in which Plaintiff asserts

[11] *See id* at 420.
[12] Doc. 50-7.

a claim for breach of the ACH agreements. In the amended complaint, Plaintiff alleges the following:

> 154. Govoni continued to direct most of the Beneficiaries' investments through, among things, communications with . . . Tracey Gregory, who oversaw movement of funds through the Bank's accounts, including via transactions covered by the applicable AMB ACH Agreements (as defined in Count VI below).
>
> * * *
>
> 335. The Bank entered into an ACH Agreement with the Center in 2013 and 2021 (see Composite Exhibit I), and presumably years before and after, beginning in 2008 when the relationship with the Bank and the Center began. See Composite Exhibit I (collectively the "AMB ACH Agreements")). The AMB ACH Agreements explicitly incorporate National Automated Clearing House Association rules ("NACHA Rules") and their definitions.
>
> * * *
>
> 337. Pursuant to NACHA Rule 1.2.4, a participating financial institution like the Bank has a duty to conduct a risk assessment of its ACH activities and implement a risk management program on the basis of such assessment.
>
> 338. Under NACHA Rule 2.2.3, an Originating Depository Financial Institution ("ODFI"), such as the Bank, has a duty to assess the nature and risk of an originator's ACH activity and to "establish, implement, and periodically review an exposure limit for the [o]riginator."
>
> * * *
>
> 342. . . . Seemingly improper ACH payments were . . . made from the Center's account, including to American Express (which could be the AMEX cards held by Govoni and Boston Asset Management), and to make donations to places like the Liverpool Institute for Performing Arts.
>
> 343. The AMB ACH Agreements also incorporates and provides guidelines for "On Us" transactions. "On Us Entries" are transactions where both the sender and receiver accounts are at the same Bank, allowing for direct internal processing rather than routing through an external ACH network.
>
> * * *
>
> 346. . . . [A] review of the Bank's audit and alert histories for the Center show that the Bank ignored "On Us" transfers between Govoni-related accounts when considering risks.
>
> * * *

> 348. The Bank failed to implement proper risk management procedures and failed to properly conduct risk assessments, thereby allowing this $100,000,000 million Govoni Scheme to be perpetuated for over a decade. Had the Bank implemented a proper risk management program based on an assessment of the Center's ACHs and "On Us" activities, $100,000,000 million of trust funds would not have been compromised.
>
> * * *
>
> 351. The Bank's failure to implement and/or follow a risk management program are violations of NACHA Rule 1.2.4, and NACHA Rule 2.2.3, each of which in turn are breaches of the AMB ACH Agreements.
>
> * * *
>
> 354. As a result of the Bank's breaches of the AMB ACH Agreements (including the failure to comply with NACHA Rule 1.2.4, NACHA Rule 2.2.3, and the Bank acting with gross negligence and/or willful misconduct, by ignoring On Us transactions and not properly flagging concerning ACH transactions), Govoni and his associates were able to funnel over $100,000,000 in Beneficiary trust funds to entities and accounts controlled by Govoni and his associates, causing the Center to be unable to meet its financial requirements to the Beneficiaries.[13]

Based on the above, Plaintiff generally alleges that the Bank violated NACHA Rules 1.2.4 and 2.2.3[14] by failing to conduct a risk assessment of its ACH activities (including "On Us Entries") and then implementing a risk management program based on such assessment. Plaintiff specifically identifies certain ACH transactions that occurred—the payments to AMEX and donations to places like the Liverpool Institute for Performing Arts. However, with respect to the "On Us Entries," Plaintiff has not sufficiently alleged that such transactions are ACH transactions. Plaintiff alleges that "'On Us Entries' are transactions where both the sender and receiver accounts are at the same Bank, allowing for direct internal processing r**ather than routing through an external ACH network**."[15] If the "On Us Entries" are not ACH

[13] Doc. 50.
[14] The NACHA Rules are filed under seal at Doc. 81.
[15] Doc. 50, ¶ 343 (emphasis added).

transactions, then consideration of such transactions when conducting a risk assessment of its ACH activities is not required.

This conclusion is supported by the NACHA Rules themselves. NACHA Rule 1.1 specifically states that "[t]hese Rules apply to all Entries[16] Transmitted[17] through one or more ACH Operators."[18]

Accordingly, because Plaintiff has sufficiently alleged a breach of the ACH agreements (due to the Bank's alleged failure to conduct a risk assessment of its ACH activities and then implementing a risk management program based on such assessment) and has identified ACH transactions (AMEX and donations), Count VI is not subject to dismissal. However, to the extent that Count VI is based on the Bank's failure to consider the "On Us Entries" when conducting its risk assessment, Plaintiff has not sufficiently alleged that such entries are ACH transactions that the NACHA Rules required the Bank to consider.

The Bank also argues that Count VI is subject to dismissal, because the ACH agreements only bind bank customers to comply with the NACHA Rules. The Court rejects this argument.

The 2013 ACH agreement states:

> **Customer wishes to initiate credit and/or debit Entries** through the Financial Institution to accounts maintained at Financial Institution and in other depository financial institutions by means of the Automated Clearing House Network ("ACH") **pursuant to the terms of this Agreement and the rules of the National Automated Clearing House Association ("NACHA")** and Financial Institution's operating rules and procedures for

[16] An entry is defined, in part, as "(a) an order or request for the transfer of money to the deposit account or loan account of a Receiver, or general ledger account of an RDFI (a "credit Entry"); (b) an order or request for the withdrawal of money from the deposit account of a Receiver, or general ledger account of an RDFI (a "debit Entry"); and (c) a Non-Monetary Entry to the deposit account or loan account of a Receiver, or general ledger account of an RDFI." (NACHA Rule 8.37).
[17] Transmit means "to send by Electronic means of communication." (NACHA Rule 8.116).
[18] ACH Operator is defined as "an entity that acts as a central facility for the clearing, delivery, and settlement of Entries between or among Participating [Depository Financial Institutions]." (NACHA Rule 8.11).

> electronic entries, including any exhibits or appendices thereto now in effect, or as may be amended from time to time, (the "Rules"), and Financial Institution is willing to act as an Originating Depository Financial Institution ("ODFI") with respect to such Entries. **This Agreement sets forth the terms and conditions pursuant to which Financial institution will provide to Customer the ACH Services outlined herein ("Services").**
>
> * * *
>
> **Customer agrees to comply with and be subject to the Rules of NACHA in existence at the date of this Agreement, and any amendments to these Rules made from time to time.**[19]

The 2013 ACH agreement specifically states that the Customer agrees to comply with the NACHA Rules, because the Bank is already required to comply with the NACHA Rules.

Next, the Bank argues that this claim is subject to dismissal because the NACHA Rules specifically state: "Nothing in these Rules is intended to, and nothing in these Rules is implied to, give any legal or equitable right, remedy, or claim to any other entity, including to any . . . Receiver [Customer]. . . ."[20] Plaintiff points to the flaw in the Bank's argument—Plaintiff's claim is not a stand-alone violation of the NACHA Rules. Instead, the ACH agreements incorporated by reference the NACHA Rules, making them terms of the ACH agreements. Plaintiff is alleging a breach of certain NACHA Rules, all of which have been incorporated into, and thus become terms of, the ACH agreements.

Next, the Bank argues that Plaintiff is improperly alleging that the Bank acted with gross negligence or willful misconduct, which is its own breach of the ACH agreements. The Court agrees with the Bank that gross negligence or willful misconduct is not its own breach of the ACH agreements. Instead, the ACH agreements limit the Bank's liability—the Bank's conduct

---

[19] Doc. 50-9, p. 29 (emphasis added).
[20] NACHA Rule 1.9.

in breaching the ACH agreement must amount to gross negligence or willful misconduct in order to subject the Bank to liability.

The 2013 ACH agreement contains the following with regards to the Bank's liability:

> **27. LIMITATION OF LIABILITY.**
> (a) IN THE PERFORMANCE OF THE SERVICES REQUIRED BY THIS AGREEMENT, FINANCIAL INSTITUTION SHALL BE ENTITLED TO RELY SOLELY ON THE INFORMATION, REPRESENTATIONS, AND WARRANTIES PROVIDED BY CUSTOMER PURSUANT TO THIS AGREEMENT, AND SHALL NOT BE RESPONSIBLE FOR THE ACCURACY OR COMPLETENESS THEREOF. **FINANCIAL INSTITUTION SHALL BE RESPONSIBLE ONLY FOR PERFORMING THE SERVICES EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, AND SHALL BE LIABLE ONLY FOR ITS GROSS NEGLIGENCE OR WILLFUL MISCONDUCT IN PERFORMING THOSE SERVICES.**[21]

Based on the above, in order to hold the Bank liable for its actions when performing the services expressly provided for in the ACH agreement, the Bank's actions must amount to gross negligence or willful misconduct when performing such services. Further, the 2013 ACH agreement specifically defines "services" on the first page of the agreement, stating: "This Agreement sets forth the terms and conditions pursuant to which Financial institution will provide to Customer the ACH Services outlined herein ('Services')."[22] As such, in order to hold the Bank liable, Plaintiff must show that the Bank's actions in performing the ACH services outlined in the ACH agreement amounted to gross negligence or willful misconduct. Stated differently, the Bank's conduct in breaching the ACH agreement must amount to gross negligence or willful misconduct. Otherwise, the Bank cannot be held liable for the breach.

---

[21] Doc. 50-9, p. 36 (emphasis added).
[22] Doc. 50-9, p. 29.

Next, the Bank argues that Plaintiff has not alleged specific aspects of the Bank's risk management program that was not proper or how a different risk management program would have enabled the Bank to uncover Govoni's fraudulent scheme. The Court rejects this argument in part.

Plaintiff alleges that by ignoring On Us Entries and by not properly flagging concerning ACH transactions, Govoni and his associates were able to funnel over $100,000,000 in SNT funds to entities and accounts controlled by Govoni and his associates. As previously stated, Plaintiff has not sufficiently alleged that the On Us Entries were ACH transactions that were required to be considered when assessing risk. However, Plaintiff has alleged that by not properly flagging concerning ACH transactions (and identifying the AMEX transactions and the donations as concerning ACH transactions), Govoni was able to funnel the SNT funds to his other non-Center entities. While the Bank argues that consideration of the AMEX and donation ACH transactions would not have revealed Govoni's scheme, such is a disputed factual issue. As such, this is sufficient at the pleading stage.

Finally, the Court notes that after Plaintiff filed the NACHA Rules, the Bank responded by pointing out that Plaintiff filed the 2026 NACHA Rules, and the ACH agreements state that "Customer agrees to comply with and be subject to the Rules of NACHA **in existence at the date of this Agreement, and any amendments to these Rules made from time to time**."[23] Thus, the Bank argues that Plaintiff should have filed the 2013 NACHA Rules—those in effect at the time of the 2013 ACH agreement—because it is uncertain whether the 2026 NACHA Rules relied on by Plaintiff were in effect at the relevant times. While the Court agrees that only the NACHA Rules in existence at the times of the alleged breaches will control, Plaintiff alleges

---

[23] Doc. 50-9, p. 29 (emphasis added).

in the amended complaint what NACHA Rules 1.2.4 and 2.2.3 allegedly stated at the relevant time. If the relevant NACHA Rules in existence at the times of the alleged breaches say something different, then the Bank can move for summary judgment on the issue. And, at trial, Plaintiff will have to prove the existence and content of the relevant rules (which became terms of the ACH agreements) in order to prove any breaches of those rules.

## IV. Conclusion

Accordingly, it is ORDERED AND ADJUDGED that:

(1) Defendant's Motion to Dismiss Amended Complaint (Doc. 56) is **GRANTED IN PART AND DENIED IN PART:** The motion is granted only to the extent that the Court concludes that Plaintiff has not sufficiently alleged: (1) the IRS is a proper triggering creditor in Count III, and (2) that On Us Entries were ACH transactions that were required to be considered when assessing risk under the NACHA Rules incorporated in the ACH Agreements in Count VI. Otherwise, the motion is denied.

(2) Defendant is directed to file an answer to the amended complaint within 21 days after the entry of this order.

Service via CM/ECF